# EXHIBIT A

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 1

```
 1                                         VOLUME:   I
                                           PAGES:    1-157
 2                                         EXHIBITS:  See Index

 3               AMERICAN ARBITRATION ASSOCIATION

 4

 5    ******************************

 6    TASHIA ANDERSON,

 7            Claimant,

 8            v.                          CASE NO.
                                          01-14-00092 35
 9    WBY, INC., d/b/a THE FOLLIES,

10            Respondent.

11    ******************************

12

13               DEPOSITION of TASHIA ANDERSON

14                  Tuesday, June 23, 2015

15                12:55 p.m. to 4:10 p.m.

16         Constangy, Brooks, Smith & Prophete, LLP

17               230 Peachtree Street, NW

18                    Atlanta, Georgia

19         Reporter:  Sandra Kwiecien, RPR, CLR
                    CCR-6012-7323-6088-4224
20

21

22

23

24

25
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 2

```
 1   APPEARANCES:

 2   NICHOLS KASTER

 3        By:  Paul J. Lukas, Esq.

 4        4600 IDS Center

 5        80 S. 8th Street

 6        Minneapolis, Minnesota 55402

 7        877.448.0492

 8        lukas@nka.com

 9        On behalf of the Claimant

10

11   JACKSON LEWIS, P.C.

12        By:  Allan S. Rubin, Esq.

13             Erin J. Krinsky, Esq.

14        2000 Town Center, Suite 1650

15        Southfield, Michigan 48075

16        248.936.1900

17        rubina@jacksonlewis.com

18        On behalf of the Respondent

19

20

21

22

23

24

25
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 3

```
 1    APPEARANCES (CONT'D):

 2    CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

 3        By:  Tamika R. Nordstrom, Esq.

 4            Erica Mason, Esq.

 5        230 Peachtree Street, NW, Suite 2400

 6        Atlanta, Georgia 30303

 7        404.525.8622

 8        tnordstrom@constangy.com

 9        On behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Also present:

25    Steve Youngelson
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page

```
 1                     I N D E X

 2   DEPONENT:                                       PAGE

 3   TASHIA ANDERSON

 4        Examination by Mr. Rubin                      5

 5

 6

 7                   E X H I B I T S

 8   NO.            DESCRIPTION                       PAGE

 9   Exhibit 15   Sign-In Packet                        57

10   Exhibit 16   2011 Taxes                            76

11   Exhibit 17   2012 Taxes                            76

12   Exhibit 18   Interrogatories                      123

13   Exhibit 19   Demand for Arbitration              135

14   Exhibit 20   Photo Packet of Arbitration

15                Policy                               138

16

17

18

19

20

21

22

23

24

25   (Original exhibits attached to original transcript.)
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                        Page 5

```
 1                    P R O C E E D I N G S

 2    TASHIA ANDERSON, having been duly sworn, was examined

 3    and testified as follows:

 4         EXAMINATION BY MR. RUBIN:

 5    Q.  Good afternoon, Ms. Anderson.  My name is Allan

 6         Rubin.  I'm going to be taking your deposition

 7         today.

 8    A.  Uh-huh.

 9    Q.  Nice to meet you.

10    A.  Nice to meet you, too.

11    Q.  So I'm going to be -- I don't know if you've ever

12         been deposed before.

13    A.  No, not that I can recall.

14    Q.  Okay.  So there is just a couple of ground rules I

15         want to go over with you.  And if you don't

16         understand any of them, please let me know.  Okay?

17    A.  Okay.

18    Q.  First of all, as you can see, there is a court

19         reporter sitting next to you.  She is taking down

20         everything that's being said in this room.  She's

21         taking it down and she's going to make what's called

22         a transcript when this is done.  A transcript, I'm

23         sure you know, but for the record, it's kind of like

24         a book that we're all going to be able to read

25         afterwards.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 6

```
 1   A.   Okay.

 2   Q.   So a couple of things related to that.  Number one,

 3        it's really hard for her to make a good and clear

 4        and clean transcript of what happens in the room if

 5        we're both talking at the same time.  And I will do

 6        my best and I'm not the greatest at it.  And I don't

 7        expect you to be the greatest at it, but I'm going

 8        to try to do my best to ask my question and let you

 9        give answers to those questions.  So I'll ask, you

10        answer; I'll ask, you answer.  Okay?

11   A.   Okay.

12   Q.   So while we very much -- oh, excuse me.  While we

13        very much want to keep this conversational if we

14        can, it is still a formal process, and that formal

15        process is going to end up on the record.  Okay?

16   A.   Okay.

17   Q.   Secondly, what you are doing here, the court

18        reporter swore you under oath.  Do you recall that?

19   A.   Yes.

20   Q.   That's the same oath that you'd give as if you were

21        testifying in a courtroom today.

22   A.   Okay.

23   Q.   It has the same meaning as if you were testifying in

24        the -- in a courtroom today.

25   A.   Okay.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**      Page

1   Q.   Everything you are saying is under oath, and you can

2      imagine yourself sitting in a federal courthouse,

3      giving the testimony.  It's got the same meaning and

4      the same oath.  Do you understand that?

5   A.   I understand.

6   Q.   Also, I'm not here to trick you.  I'm not here to

7      argue with you.  I'm trying to learn some

8      information from you.  Okay?

9   A.   Okay.

10   Q.   It may not make the greatest sense to you.  I'm

11      going to meander down my own kind of path here.  But

12      it's very important that you answer the questions

13      that I ask you.  And if there's any questions that

14      you -- if there is something you want to say, your

15      lawyer will have an opportunity to ask you anything

16      that he thinks is important after this -- after I'm

17      done.  Okay?

18   A.   Okay.

19   Q.   So this isn't who gets to say what when.  I have

20      some questions I'm going to ask you that I need some

21      information regarding this, and so this is my

22      opportunity to ask you those question.  Okay?

23   A.   Okay.

24   Q.   If at any time you do not understand one of my

25      questions, if you think it's -- you can't hear it,

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 8

```
 1        it's being unclear, you're confused by it, just say,

 2        I'm sorry, Allan, I don't get it, I don't understand

 3        it, I didn't hear it, whatever.  Okay?

 4   A.   Okay.

 5   Q.   Because my job here is not to trick you or try and,

 6        you know -- try to get you to say something you

 7        don't want to say.

 8   A.   Okay.

 9   Q.   My job is simply to ask you questions.  And it's

10        important that you understand and hear -- just like

11        right now, there is a fire truck going by us,

12        right -- that you hear and understand the questions

13        so that when you give us your answer, when we go

14        back and read it, we have a clean and clear copy or

15        a clean and clear understanding of what I asked you

16        and what you said.  But more importantly, it's -- or

17        most importantly is that you give answers to the

18        questions that I ask you, that you intend to give.

19        Okay?

20   A.   Okay.

21   Q.   So if you don't understand something, just stop me

22        and let me know.  Okay?

23   A.   Okay.

24   Q.   This is also, last thing, not a marathon, right.  We

25        don't have -- we have as long as we need to do this
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page

```
 1        process.  So if you need to take a break, you need

 2        to use the restroom, you've got to make a phone

 3        call, whatever it is, just let us know.  As long as

 4        there's not a question pending, we'll be happy to

 5        take a break.

 6    A.  Okay.

 7    Q.  Okay.  Any questions before we begin, about the

 8        process?

 9    A.  Nope.  You made it clear.

10    Q.  Okay.  One last thing I should say:  You can't say

11        uh-huh or uh-uh or nod your head or shake because

12        that, the court reporter can't take down.  So if I

13        ever say to you, Is that a yes, Is that a no or

14        rephrase and say, Do you agree with that --

15    A.  Uh-huh.

16    Q.  -- it's because there is something unclear about it

17        or you nodded your head or you made a shake.  I'm

18        just trying to make sure the court reporter gets a

19        clear and clean answer.

20    A.  Okay, okay.

21    Q.  Okay?  So it's not intended to be rude or

22        disrespectful in any way.

23    A.  All right.

24    Q.  All right.  So how old are you?

25    A.  Thirty-six.
```

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 10

```
 1    Q.  What's your date of birth?

 2    A.  10/2/78.

 3    Q.  Do you read, write, and understand the English

 4        language?

 5    A.  Yes.

 6    Q.  High school graduate?

 7    A.  GED.

 8    Q.  Where did you get your GED?

 9    A.  I think that's 2000 -- don't quote me on this

10        because I don't really remember, but I think it was

11        2006.

12    Q.  Okay.  Where did you get your GED from?

13    A.  Georgia Perimeter College here.

14    Q.  Have you had any education beyond your GED?

15    A.  Yes.

16    Q.  What kind of education have you had?

17    A.  I went to real estate school.  And I also graduated

18        from ISSN skin -- school of skin, hair and nails.

19    Q.  Any other education that you've had beyond the high

20        school level?

21    A.  No.

22    Q.  Okay.  So you hold a -- are you currently -- do you

23        currently hold a real estate license?

24    A.  I'm inactive.

25    Q.  When was the last time you held an active real
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 11

```
 1      estate license?

 2  A.  2008.

 3  Q.  Okay.  Did you ever work in the cosmetic field, I

 4      guess?

 5  A.  I do my own thing.

 6  Q.  Okay.  Do you have your own business?

 7  A.  No, not currently.

 8  Q.  Did you at one point?

 9  A.  No.  I just -- I'm -- what do you call that, like

10      say if you call me and you want your facial or

11      whatever, I come to you.  I'm mobile.

12  Q.  Okay.  So you don't have a physical business

13      location?

14  A.  No.

15  Q.  But you perform -- I'm sorry.  That was a no, you

16      don't have a physical business location?

17  A.  No.

18  Q.  But you perform -- you are a makeup artist,

19      essentially?  I don't know what a different way to

20      describe it would be.

21  A.  A wax specialist.

22  Q.  A wax specialist, okay.  A wax specialist.  And so

23      do you have business cards or regular customers

24      or --

25  A.  No.  I'm not currently working in that field right
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 12

```
 1        now.

 2    Q.  When you did --

 3    A.  Yes.

 4    Q.  -- did you have your own business cards?

 5    A.  Yes.

 6    Q.  Did you have your own -- did you advertise?

 7    A.  No.

 8    Q.  Would you promote yourself in some way as --

 9    A.  Just word of mouth.

10    Q.  Okay.  And people would call you up and say, I have

11        a wedding or, I want to be waxed somewhere?

12    A.  It was just friends and family starting out, yeah.

13    Q.  Did you charge money?

14    A.  Did I charge them?

15    Q.  Yeah.

16    A.  Not always.

17    Q.  Okay.  At some point did you do it as a business?

18    A.  Not completely yet.

19    Q.  I'm not asking completely.  At some point did you

20        charge people money to perform those services?

21    A.  No.

22    Q.  Never?

23    A.  Not yet.

24    Q.  Okay.  Is that a business that you plan on going

25        into in the future?
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 13

```
 1   A.  Eventually, yes.

 2   Q.  Have you incorporated or taken any steps to form a

 3       business?

 4   A.  No.

 5   Q.  And do you hold any state-issued licenses to do

 6       that?

 7   A.  No.

 8   Q.  Do you need any state-issued licenses to do that?

 9   A.  Yes.  That's why I haven't charged anyone yet.

10   Q.  What kind of state-issued licenses do you need?

11   A.  I need to be a licensed esthetician.

12   Q.  Have you taken all the requirements to be a licensed

13       esthe- -- I don't --

14   A.  Esthetician.

15   Q.  Esthetician.

16   A.  I have to go back and take the state board.

17   Q.  Do you plan on doing that?

18   A.  Yes.

19   Q.  When do you plan on doing that?

20   A.  I just had a baby, so --

21   Q.  Congratulations.

22   A.  Thank you.  That's my main focus right now.  So

23       sometime in the near future.

24   Q.  Okay.  Fair enough.  Have you had any other training

25       in any other fields?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                      Page 1

```
 1   A.  No.

 2   Q.  So you went to high school.  And what year did you

 3       graduate?  Or what year would you have graduated?

 4   A.  I would have graduated in 1997.

 5   Q.  1997, from where?

 6   A.  Cincinnati, Ohio.  Woodrow High School in

 7       Cincinnati.

 8   Q.  Did you grow up in Cincinnati?

 9   A.  Yes.

10   Q.  And I take it you didn't graduate from high school

11       in Cincinnati.

12   A.  No, I didn't.

13   Q.  Okay.  What did you -- did something -- how old were

14       you when you dropped out of high school?

15   A.  I had a baby in '97, so 11th grade is when I

16       stopped.

17   Q.  Did you complete 11th grade?

18   A.  Yes.

19   Q.  You dropped out sometime before the start of your

20       senior year?

21   A.  Yes.

22   Q.  Beginning in 1997 and continuing until today, can

23       you just give me just a quick sketch of what you've

24       done for -- you know, for a living?

25   A.  What did I do for a living?  I worked for Sprint.  I
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                          Page 15

```
 1        worked for MCI.  I'm not sure if they are still
 2        around, but I worked for MCI.  I worked at This Is
 3        It!, a restaurant.  I worked for Dollar Tree.  And
 4        then I -- my mom and dad helped me out a couple of
 5        years.  I had a boyfriend at the time who helped me
 6        out while I was working.  And then I started dancing
 7        as an entertainer somewhere around 2005.
 8   Q.   Okay.  Why don't we stop there for just a moment.
 9        What did you do for Sprint and MCI?
10   A.   Call center.
11   Q.   So you were sitting in a call center, responding to
12        calls?
13   A.   Yes, customer service calls.
14   Q.   Okay.  Were you paid -- were you paid in any
15        particular way?
16   A.   The wages that they were offering at the time, yeah.
17   Q.   So you understood, for example, that they were
18        offering -- let's just hypothetically say it was
19        5.25 an hour at the time.
20   A.   Uh-huh.
21   Q.   Was that what -- is that the job that you took?  Was
22        it a minimum wage job?
23   A.   Yes.  I don't know what minimum wage was at the
24        time, but back then I was making $8.00 an hour.
25   Q.   Okay.  So whatever it was, you were making eight
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 16

```
 1        bucks an hour?

 2   A.   Yes, whatever they offered.

 3   Q.   When was that -- where was that employment located?

 4   A.   Alpharetta -- MCI was in Alpharetta.  And Sprint, I

 5        believe that was in -- I want to say Smyrna.

 6   Q.   When did you move to Georgia?

 7   A.   I moved to Georgia in 2000, right around 2000.  My

 8        daughter was two.

 9   Q.   Okay.  Before you moved to Georgia, did you have any

10        employment anywhere?

11   A.   No.  I was still living at home.

12   Q.   So your first job was working for Sprint or MCI or

13        some combination thereof?

14   A.   Yes.

15   Q.   How long did you work there for?

16   A.   Sprint, I worked there a year.  MCI, I worked there

17        a little bit over a year, like 18 months.

18   Q.   Okay.  And then you went on and you began working

19        for This Is It!?

20   A.   This Is It!.

21   Q.   What is it?

22   A.   It's a restaurant, like a little soul food

23        restaurant.

24   Q.   I was teasing.

25   A.   Oh, okay.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 1

```
 1   Q.  So where was that located?

 2   A.  Memorial Drive in Decatur, Georgia.

 3   Q.  What did you do there?

 4   A.  Line server, cook.

 5   Q.  Were you paid an hourly wage?

 6   A.  Yes.

 7   Q.  What was your hourly wage?

 8   A.  I don't remember what they paid me.

 9   Q.  Was it something close to what you were making at

10       Sprint?

11   A.  It might have been minimum wage.  No, because it was

12       a restaurant -- not really home based, but they --

13       you know, family-owned restaurant, so it was minimum

14       wage, I'm sure.

15   Q.  Okay.  So whatever minimum was at the time?

16   A.  At the time.  Uh-huh, yes.

17   Q.  So we just did something that she's going to hate us

18       for.  We both said the exact same thing at the exact

19       same time.  So you've got to let -- we've got to

20       pause or -- and I have to pause and let each of us

21       finish.  Okay?

22   A.  Okay.

23   Q.  So after you worked at -- how long did you work at

24       This Is It! for?

25   A.  Eight months.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                          Page 18

```
 1   Q.  Okay.  And then you went on and you -- then you
 2       worked at the Dollar Tree?
 3   A.  Dollar Tree.
 4   Q.  Which Dollar Tree?
 5   A.  Memorial Drive in Decatur.
 6   Q.  How long did you --
 7   A.  I'm sorry.
 8   Q.  You go ahead and finish.
 9   A.  Stone Mountain, actually.
10   Q.  How long did you work for the Dollar Tree?
11   A.  About a year.
12   Q.  What did you do there?
13   A.  Cashier.
14   Q.  Was that also a minimum wage-ish type job?
15   A.  Yes.
16   Q.  Did you have any other employment at that point?
17   A.  No.
18   Q.  Then at some point you stopped working for the
19       Dollar Tree?
20   A.  Yes.
21   Q.  When did you stop -- why did you stop working?
22   A.  My daughter has ADHD, and so it was just difficult
23       for me to be working and not being able to go to the
24       school when I needed to be going to the school.  So
25       it was my scheduling that they had off, and I just
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 1

```
 1        chose to stop doing that and be a full-time mom.

 2   Q.   Okay.  So you were in your early 20s at that point?

 3   A.   Yes.

 4   Q.   And you decided you were going to be a stay-at-home

 5        mom for a couple of years?

 6   A.   Yes.

 7   Q.   Okay.  Fair enough.  And you lived with your mom and

 8        dad.  Did you move back to Cincinnati?

 9   A.   No.  I stayed here with my sister and her mom.

10   Q.   Okay.  And you did that for a few years, and then

11        you had a boyfriend that you said you lived with?

12   A.   No, I didn't live with him.  He just helped support

13        me.

14   Q.   Okay.  And then at some point you began dancing in

15        2005?

16   A.   Yes.

17   Q.   Do I have your employment history correct so far?

18   A.   Yes.

19   Q.   Okay.  I understand you've stopped dancing at this

20        point.

21   A.   No.

22   Q.   You still dance?

23   A.   Yes.

24   Q.   Okay.  Since 2005, has all of your work been in the

25        field of adult entertainment?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 20

```
 1   A.  No.

 2   Q.  Have you had other jobs as well?

 3   A.  Side jobs, yes.

 4   Q.  Okay.  Has all of your primary source of income been

 5       from being an exotic dancer?

 6   A.  Yes.

 7   Q.  You started dancing, you said, in 2005?

 8   A.  Yes.

 9   Q.  Approximately how many clubs have you danced at

10       since 2005?

11   A.  Three.

12   Q.  You've only danced at three clubs?

13   A.  Yes.

14   Q.  What was the first club you started dancing at?

15   A.  Strokers.

16   Q.  I'm sorry?  I didn't hear you.

17   A.  Strokers.

18   Q.  Strokers, where is that?

19   A.  That's in -- it's on Brockett Road.  I'm not sure if

20       that's -- I'm not sure if that's Decatur or if

21       that's -- I know it's not Clarkston.  Stone Mountain

22       maybe.  It's on Brockett Road.

23   Q.  How long did you work at Stockers [sic] for?

24   A.  Strokers.

25   Q.  Strokers.  I'm sorry.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                Page 21

```
 1   A.  S-T-R-O-K-E-R-S.

 2   Q.  My writing is just terrible.  I apologize.

 3   A.  I worked at Strokers for maybe a year and a half.

 4   Q.  What was the next place that you worked at?

 5   A.  Onyx.

 6   Q.  Onyx.  How long did you work for Onyx for?

 7   A.  About two or three years.

 8   Q.  Okay.  And after Onyx, where did you work?

 9   A.  Follies.

10   Q.  And then where did you work, or is that it?

11   A.  That's it.

12   Q.  When was the last time you worked at Follies?

13   A.  Sunday night.

14   Q.  This past Sunday night?

15   A.  Yes.

16   Q.  When was the first time you worked at Follies?

17   A.  I want to say September 2010.

18   Q.  So you began working, you said, at the Follies in

19       September 2010, and you stopped working -- or the

20       last time you worked there was on Sunday?

21   A.  The 21st.

22   Q.  June 21st?

23   A.  21st.

24   Q.  Sorry.  I'm just making sure I have my dates right.

25       So that would be, yeah, Sunday, June 21?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 22

1    A.   Uh-huh, yes.

2    Q.   When did you work prior to Sunday?

3    A.   Prior to Sunday?  Friday the 20th.

4    Q.   Okay.  When did you -- you said you just had a

5         baby --

6    A.   No.  That's the 19th.  I'm sorry.

7    Q.   You said you just had a baby?

8    A.   Yes.

9    Q.   When did you return to dancing?

10   A.   I returned to dancing -- he was born in August --

11        October, November -- November 2014.

12   Q.   Okay.  And you've been working at the Follies since

13        November of 2014?

14   A.   Yes.

15   Q.   And you were off for how long before that?

16   A.   Two months.

17   Q.   Okay.

18   A.   I had him in August.  I didn't return back until

19        November.  I stopped when I was about almost seven

20        months, so that would have put me in July -- June of

21        last year.

22   Q.   Okay.  So you worked through June or July of last

23        year, and then you stopped until October?

24   A.   Yes.

25   Q.   Okay.  And you came back in roughly November, and

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 23

```
 1      you've been working consistently since?

 2  A.  Yes.

 3  Q.  Do you have a regular schedule that you keep?

 4  A.  Yes.  I work four days a week.

 5  Q.  Which four?

 6  A.  I just choose the days.  It varies because of my

 7      babysitting situation.

 8  Q.  Okay.  So you don't have --

 9  A.  But normally it's Thursdays -- I like to be there

10      Thursdays, Fridays, Saturdays, and Sundays.  It

11      could be I don't go on a Friday but go on a Monday.

12      I choose to go that Monday.  But four days a week,

13      definitely.

14  Q.  Do you have a typical start time that you show up?

15  A.  I get there before eight.

16  Q.  8:00 p.m.?

17  A.  8:00 p.m.

18  Q.  Do you know what -- how much before 8:00 p.m.?

19  A.  Before eight o'clock.  What do you mean?

20  Q.  Well, how much before?  Is it like 7:55?  Is it I'm

21      there at four in the afternoon?

22  A.  No, no.  I just did a double.  I did a double, my

23      first double since I've been back.  I did that last

24      Thursday, which would have been the 18th.

25  Q.  Okay.  I guess that wasn't my question.  So let me
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    **Page 2**

```
 1        just -- maybe I wasn't very clear.

 2                 So you said typically you try and arrive

 3        before 8:00 p.m.?

 4   A.   Yes.

 5   Q.   Is it that you are trying to arrive, you know,

 6        within ten minutes of 8:00 p.m. on a typical basis

 7        and then work 8:00 p.m. until close?  Or are you

 8        like coming in at like 3:00 in the afternoon when

 9        you're referring to "my typical is before 8:00

10        p.m."?

11   A.   Okay.  I say before 8:00 p.m. if I'm working night

12        shift only because the price that I have to pay

13        before 8:00 p.m. -- I try to stay within that range.

14   Q.   Okay.  So you try and get there sometime --

15   A.   It could be 7:55 -- I'm sorry.  It can be 7:55,

16        7:30.  It can be, you know, 7:59.

17   Q.   In and around eight o'clock, you try and get there?

18   A.   Yes.

19   Q.   That's all I'm trying to figure out.

20   A.   Yes.

21   Q.   Okay.  Sometimes you may even get there earlier if

22        you want to work earlier?

23   A.   Yes.

24   Q.   Sometimes you -- well, strike that.

25                 Does anybody tell you when you need to be
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 25

```
 1       there?

 2   A.  Does anybody tell me when I need to be there?  No.

 3   Q.  Okay.

 4   A.  Not now, no.

 5   Q.  Nobody tells you when you need to leave?

 6   A.  They don't tell me when I need to leave.  They tell

 7       me that I have to leave before a certain time if I

 8       want to leave early.

 9   Q.  Do you know why that is?

10   A.  I don't know why that is.

11   Q.  How big is the parking lot at Follies?

12   A.  I'm not sure.

13   Q.  Do you know how many cars it holds?

14   A.  No.

15   Q.  Is it pretty crowded at night, the parking lot?

16   A.  Not when I get there.

17   Q.  When you leave?

18   A.  No, because we can't leave until after they do

19       whatever they do, so I don't know how crowded it be

20       out there.

21   Q.  Do you drive?

22   A.  Yes.

23   Q.  Do you know whether -- do you know how difficult it

24       is to retrieve vehicles from the parking lot during

25       the busy periods?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 26

```
 1   A.   I don't.

 2   Q.   Do you know if you get there earlier, that your car

 3        is usually further in the back?

 4   A.   No.  I don't know where the valet parks it.

 5   Q.   Do you valet park?

 6   A.   We have to.

 7   Q.   Well, you can park in a parking spot if it's

 8        available, can't you?

 9   A.   No.

10   Q.   No, you can't?  You're prohibited from?

11   A.   Yes.  We have to valet.

12   Q.   Who told you that?

13   A.   It's just always been like that.

14   Q.   Somebody told you that or is that just something

15        that you presumed?

16   A.   No.  They told us that when I first started working

17        there.  I asked them, Can I park it myself?  And at

18        that time, the guy that was over at the valet said

19        that all girls have to valet.

20   Q.   Was that back in 2010?

21   A.   Yes.

22   Q.   Have you asked anybody since then if you had to

23        valet?

24   A.   Yes, because I don't -- I try to avoid paying valet.

25   Q.   And one of the ways you can avoid paying valet is to
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 2

```
 1       park either off site, right, and walk up to the club

 2       or park in an available parking spot, right?

 3   A.  No.

 4   Q.  So how else would you avoid paying valet?

 5   A.  We can't.  All girls have to valet because they have

 6       to keep our keys.

 7   Q.  Can you have somebody drive you or take a cab?

 8   A.  I guess you could.  But, I mean, I don't because I

 9       drive.

10   Q.  Okay.  You know, one of the -- as I think I heard

11       you say, one the things that you understand that

12       you're going to have to do if you want to work at

13       Follies is you are going to have to pay for valet?

14   A.  Uh-huh.

15   Q.  Is that a yes?

16   A.  Yes.

17   Q.  Is that something that you pay outside before you

18       get into the club?

19   A.  Yes.  But if I don't have it on me, they take my

20       name down and say I have to pay it when I come out.

21   Q.  Okay.  And that's kind of typical with most valet

22       places, right?

23   A.  I'm not sure.

24   Q.  Have you ever valeted your car anywhere else?

25   A.  Not me.  I'm kind of anal.  I prefer to park my own
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                        Page 28

```
 1      car and keep my keys.  That way I don't have to

 2      wait.

 3  Q.  Okay.  Typically you pay all that money to the valet

 4      guy, though?

 5  A.  Yes.

 6  Q.  Do you ever tip the valet guy?

 7  A.  I just pay him what's required, $5.

 8  Q.  Is that how much is required for customers, too?

 9  A.  I'm not sure.

10  Q.  Do you know whether or not the valet company is a

11      separate or the same company as the person who owns

12      -- as the company that runs the Follies?

13  A.  I'm not sure.

14  Q.  Do you pay a fee to perform at the club?

15  A.  To work there.

16  Q.  To perform there?

17  A.  Yes.

18  Q.  That's what you do, right, perform?

19  A.  Yes.

20  Q.  Do you pay a fee for the privilege of doing that?

21  A.  Yes.

22  Q.  Have you always understood, since you started in

23      2010, that there would be a fee associated with --

24      if you wanted to perform there?

25  A.  Yes.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 2

```
 1   Q.  Has that fee been the same or has it changed?

 2   A.  It's been the same.

 3   Q.  Okay.  So from the -- probably the first day that

 4       you started performing there, did you understand

 5       that there was a fee to perform there?

 6   A.  Yes.

 7   Q.  Did you know exactly what that fee was going to be?

 8   A.  Yes.

 9   Q.  Did -- were they clear and did they tell you that?

10       Did they tell you the fee structure?

11   A.  Yes.

12   Q.  And you could have chosen to work there or not work

13       there, right?

14   A.  Yes.

15   Q.  And you chose to work there?

16   A.  Yes.

17   Q.  And every day you show up, you choose to pay the

18       fee, right?

19   A.  Yes.

20   Q.  Because it makes financial sense to do so for you?

21   A.  Yes, it makes financial sense to do so.  And if

22       that's what is required of me to be able to work

23       there, then I just pay the fee.

24   Q.  That's because you make far more from performing

25       there than the cost of working there, right?
```

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 30

 1   A.   What do you mean?  Can you explain that?

 2   Q.   So -- so, for example, right, if I were to give you

 3        -- if you were going to pay me a dollar for the

 4        privilege of coming into this office, but you were

 5        going to get -- earn a million dollars from doing

 6        it, you might take that, right?

 7   A.   Yes.

 8   Q.   Okay.  Same kind of thing, right?  You're paying

 9        some fees to the club to go perform there because

10        you expect that most occasions, for sure to make

11        more money than you are paying in the fees, right?

12   A.   Yes.

13   Q.   And significantly more, right?

14   A.   Sometimes, but not all the time.

15   Q.   Okay.  But that's kind of the risk that you are

16        taking, right?

17   A.   Yes.

18   Q.   The risk you are taking is you are going to pay for

19        the fees and you are not going to make as much,

20        correct?

21   A.   Sometimes, yes.

22   Q.   Most of the times, though, I assume, because you

23        continue to go there four days a week, you're coming

24        out on top.

25   A.   Not all the time.

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 31

```
 1   Q.  That's why I said not all the time.

 2   A.  Not all the time in the season.

 3   Q.  Most of the time?

 4   A.  I would hope so.

 5   Q.  And over the course of a period of time, you would

 6       come out on top, right?

 7   A.  Yes.

 8   Q.  Because otherwise you wouldn't do this?

 9   A.  Exactly.

10   Q.  Okay.  In 2010, you needed a license to perform

11       there, did you not?

12   A.  Yes.

13   Q.  And you got that from DeKalb County?

14   A.  Yes.

15   Q.  Did you go through a licensing process?

16   A.  Yes.

17   Q.  And in 20- -- well, let me back you up.

18           In 2005, when you worked at -- let me make sure

19       -- Strokers, did you have to have a license?

20   A.  Yes.

21   Q.  Was that from DeKalb County?

22   A.  DeKalb County.

23   Q.  Was that the same process that you did in 2013?

24   A.  Yes.

25   Q.  Did it cost a fee?
```

TASHIA ANDERSON v. WBY, INC.

**Tashia Anderson on 06/23/2015**                                        **Page 32**

```
 1   A.  I paid a fee.

 2   Q.  You paid a fee.  You got a background check, right?

 3   A.  Yes.

 4   Q.  You got fingerprinted?

 5   A.  Yes.

 6   Q.  And they gave you a license?

 7   A.  Yes.

 8   Q.  What did that license let you do?

 9   A.  That license -- in DeKalb County I was able to work

10       at any club with that one license.

11   Q.  Okay.  Any club within DeKalb County?

12   A.  In DeKalb County, yes.

13   Q.  Do you know how many clubs are in DeKalb County?

14   A.  I have no idea.

15   Q.  When you worked at Onyx, where was that located?

16   A.  Cheshire Bridge.  That's Fulton County.

17   Q.  Did you have to get a license to work there?

18   A.  Yes.

19   Q.  Did you get that from Fulton County?

20   A.  Yes.

21   Q.  And did you have to pay for that license?

22   A.  Yes.

23   Q.  And how much did you pay for that license, do you

24       recall?

25   A.  I get it mixed up, DeKalb and Fulton.
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 33

1    Q.  What do you recall the fees generally being?

2    A.  At least 300 or 350.

3    Q.  Okay.  So you pay that every year?

4    A.  Yes.

5    Q.  Because you had to get that renewed every year?

6    A.  Yes.

7    Q.  The same thing that you needed in DeKalb County?

8    A.  Sorry?

9    Q.  Same thing that you needed in DeKalb County --

10   A.  Yes.

11   Q.  -- when you worked at the Follies?

12   A.  Yes.

13   Q.  Whatever the license fee was, it is, right?

14   A.  Yes.

15   Q.  You don't need a license today, do you?

16   A.  No.

17   Q.  And that's because the club's no longer in DeKalb

18       County?

19   A.  Correct.

20   Q.  So when you went to The Follies, did you already

21       have a license for DeKalb County the very first time

22       you showed up?

23   A.  No.

24   Q.  Okay.  They didn't let you work without one, right?

25   A.  Correct.

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                                    Page 3

 1   Q.   Did you ask them if you could work there or if you
 2        could perform there?
 3   A.   Yes.
 4   Q.   And did they explain to you how it worked there?
 5   A.   Yes.
 6   Q.   What did they tell you -- what do you recall them
 7        telling you between -- when you first showed up
 8        there that day?
 9   A.   Well, the house mom explained it to me as far as the
10        rules and regulations go.
11   Q.   What did she explain to you?
12   A.   What time I can come to the club, between what hours
13        I could work.  The night shift is -- how much I will
14        have to pay depending on what time I got there,
15        dancing on the stage, you know, the tip outs to
16        whoever you had to tip out, what time you could
17        leave and what time you needed to be gone by, the
18        fee that you had to pay in order to leave early.
19        And that was about it.
20   Q.   Okay.  Now, knowing all of that, you said you
21        thought this was a good idea and you were going to
22        go get your license?
23   A.   Yes.
24   Q.   Now, you went and you made an investment of a
25        license in 2010.  Do you recall what month?

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 35

```
 1   A.  No.

 2   Q.  Do you recall what month you started working in

 3       2010?

 4   A.  I don't -- not -- I couldn't give you the exact

 5       month or day.  I will have to go back and look at my

 6       permit.

 7   Q.  Okay.  Fair enough.  Do you still have that permit?

 8   A.  I don't.

 9   Q.  Going into 2011, right, you needed to renew that

10       permit?

11   A.  Yes.

12   Q.  And you weren't working anywhere but The Follies at

13       this point, correct?

14   A.  Correct.

15   Q.  And you thought it was a great idea to renew your

16       permit because of the -- because you were making

17       money doing this?

18   A.  I just thought it was a great idea to renew my

19       permit because that was my source of income.

20   Q.  Okay.  And so you -- you invested in a permit for

21       the purposes of being allowed to dance at The

22       Follies?

23   A.  Yes.

24   Q.  Okay.  Because you thought that it made financial

25       sense to do so?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 36

```
 1   A.  Yes.  That was my source of income.

 2   Q.  And in 2012, you made the same choice?

 3   A.  Correct.

 4   Q.  2013, you made the same choice?

 5   A.  Correct.

 6   Q.  In 2014, you didn't have to make that choice, right,

 7       or did you?

 8   A.  What's that?

 9   Q.  To renew a permit.

10   A.  Correct.  When we were annexed, I didn't have to

11       make the choice of going and getting a new permit.

12   Q.  Well, that's because they don't -- that's because

13       you no longer are required to have a permit,

14       correct?

15   A.  Correct.

16   Q.  Okay.  So do you recall what the fees were in 2010?

17   A.  What fees?

18   Q.  The fees that the house mom told you that you would

19       have to pay?

20   A.  They are pretty much the same.  The only difference

21       is we get something called a drink ticket.  Back in

22       2010, we were not required to pay the drink ticket

23       up front.  And basically a drink ticket is they give

24       us a fake $20 bill and we have to sell that to a

25       customer.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 3

```
 1   Q.  Do you pay for that?

 2   A.  Yes.  We get $10 off of it, and then the other 10

 3       goes to the club.

 4   Q.  So when did you pay for that drink ticket?

 5   A.  The drink ticket, now we pay it up front.

 6   Q.  Is it included as part of your rent?

 7   A.  It's part of -- it's included in what we pay to

 8       perform at the club each day.

 9   Q.  Okay.  And so when did that change?

10   A.  That changed in 2014.

11   Q.  What changed?

12   A.  Instead of us having to pay for that drink ticket at

13       the end of the night, we pay for it before we work.

14   Q.  Well, you don't pay for it, it sounds like, at all

15       today, if I understand it correctly.  You pay a fee

16       to come there and work, correct?  What's the fee?

17   A.  The fee, if I got there before -- 2014, if I got

18       there before eight o'clock, it was $15 to work.

19   Q.  Okay.

20   A.  Now, if I get there before eight, it's $35 to work.

21       That way we pay for the drink ticket up front.  They

22       don't have to hound us for it.

23   Q.  They tell you now -- or they give you a drink

24       ticket, no drink ticket or ten drink tickets, the

25       fee is $35 to work?
```

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 38

```
 1   A.   Yes.

 2   Q.   And included in that sometimes -- or most days is a

 3        drink ticket, right?

 4   A.   Every day is included a drink ticket.

 5   Q.   Sometimes there's more than one included, correct?

 6   A.   What do you mean?

 7   Q.   Sometimes they give you more than one?

 8   A.   More than one drink ticket?

 9   Q.   Yes, ma'am.

10   A.   Yes.  At night, every day we get two drink tickets.

11   Q.   Okay.

12   A.   We get two drink tickets.

13   Q.   And so you know every day that you are going to show

14        up, since 2014, the fee if you showed up before

15        eight, it was 35 bucks?

16   A.   Before 2014?

17   Q.   Or after 2014?

18   A.   After 2014, it's $35 up front, yes.

19   Q.   And for that, you get two drinks, right?

20   A.   For that, yes, we get two drink tickets.

21   Q.   And you can use those yourself?

22   A.   We can use -- the drink tickets, we can use $5 out

23        of it.

24   Q.   Well, you don't -- you -- you can use the drink

25        tickets yourself and get a drink, right?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 3

 1   A.  $5 of it.  So like if my drink is $8 --

 2   Q.  Mm-hmm.

 3   A.  -- $5 comes from the ticket and then you put the

 4       remaining with it.

 5   Q.  You can sell it to a customer?

 6   A.  Yes.

 7   Q.  How much do you sell it to a customer for?

 8   A.  We sell it to the customer for -- if I give them the

 9       drink ticket, they give us -- they give me $10.

10   Q.  Who does?

11   A.  The customer.

12   Q.  Okay.  So if you sell the drink ticket to a

13       customer, he gives you $10?

14   A.  Yes.

15   Q.  And gets a drink?

16   A.  He gets a drink for $5 from that drink ticket.  He

17       can take that and give it to a waitress and he'll

18       get $5 off his drink.

19   Q.  So he gets -- so he gets $5 -- so he gets $5 off of

20       his drink.  You get $5 off your drink.  Can you

21       redeem it for cash?

22   A.  No.

23   Q.  Okay.  So you can either sell it and put $10 in your

24       pocket, right?

25   A.  Yes.

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                     Page  0

```
 1   Q.  You can buy a drink with it?

 2   A.  $5, yes.

 3   Q.  Or are there drinks that cost less than $5?

 4   A.  Bottled waters and Red Bull.

 5   Q.  Okay.  So you get a Red Bull and bottled water if

 6       you want with it?

 7   A.  Yes.

 8   Q.  You can get an alcoholic drink if you want with it

 9       and pay the difference?

10   A.  And pay the difference, yes.

11   Q.  And your customer can do the same thing?

12   A.  Yes.

13   Q.  Do you ever use the drink ticket to market, like

14       I'll give you two dances and a drink ticket?

15   A.  No.

16   Q.  Do you just give it to customers who treat you well?

17   A.  No.  I use it myself because I pay for it.  So

18       sometimes I may not be able to sell it to a

19       customer, you know, so I just use it myself.

20   Q.  So you either sell it or use it yourself?

21   A.  Yes.

22   Q.  But you never give it away?

23   A.  No.

24   Q.  It sounds to me that prior to 2014, the system

25       worked pretty much the same as $35, you get a drink
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page  1

```
 1        ticket, you pay 15 up front, and then you could pay

 2        it if you sold the drink ticket or could you return

 3        the drink ticket?

 4   A.   No.  You can't return the drink ticket.  And it

 5        wasn't like that prior to 2014.

 6   Q.   How did it work prior to 2014?

 7   A.   Prior to 2014, if I got there before eight o'clock,

 8        I paid $15 the end of the night.  If they gave me

 9        out two -- if they gave -- when they gave out two

10        drink tickets, the house mom was looking for me to

11        tip her the $25, which would be $20 for both the

12        drink tickets and $5 for her fee.  So if they give

13        me a $20 drink ticket, the club is expecting $10

14        from each ticket.  Whether I sold them or not, I

15        still had to give them $10.  So I may not had made

16        any money off the drink ticket and -- if I didn't

17        sell it, which means I still had to pay them the

18        $10.

19   Q.   Okay.  I'm so sorry.  I've got to slow down here a

20        bit because I'm not sure I understand what you are

21        saying, and I don't -- maybe you are explaining it

22        really well, but I don't get it.  But I just want to

23        see if I can follow along.  Okay?

24   A.   Okay.

25   Q.   So when you showed up to the club prior to 2014,
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page  2

```
 1        before eight o'clock, the fee to perform was $15?

 2   A.   $15.

 3   Q.   Okay.  And, again, you knew what that was every day

 4        that you showed up there?

 5   A.   Yes.

 6   Q.   Okay.  You would then go into the locker room?

 7   A.   Yes, the dressing room.

 8   Q.   And you would change?

 9   A.   Yes.

10   Q.   While you were changing, would you see the house

11        mom?

12   A.   Yes.

13   Q.   And the house mom would say, Here are two drink

14        tickets?

15   A.   No.

16   Q.   What would happen?

17   A.   We would get a drink ticket at twelve o'clock

18        midnight.  The DJ will call all the girls on the

19        stage for the review, which is the drink ticket

20        review.

21   Q.   Okay.

22   A.   Then we will be let down off the stage and would be

23        -- we would have to, at that time, try and go sell

24        the drink ticket.  We have three songs to sell the

25        drink ticket.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 3

```
 1   Q.  Okay.  And would you sell the drink ticket?

 2   A.  Yeah, if you were lucky to sell the drink ticket.

 3   Q.  Did you ever sell it?

 4   A.  No.

 5   Q.  You never sold a drink ticket?

 6   A.  I never sold a drink ticket.

 7   Q.  Why not?

 8   A.  I guess I wasn't their type at the time.

 9   Q.  So you -- so in all the years that you were there,

10       you never once sold a drink ticket?

11   A.  I never once sold a drink ticket.

12   Q.  Okay.  So if you didn't sell the drink tickets --

13       well, strike that.

14           Did you ever -- you tried to sell the drink

15       ticket?

16   A.  Yes.

17   Q.  Okay.  What could you use the drink ticket for prior

18       to 2014?

19   A.  What I could use it for now, to get my own drink or

20       to get a bottle of water.  I would go to the bar.

21       Now I don't even attempt to sell a drink ticket.  I

22       just go straight to the bar with that.

23   Q.  I'm not asking about now.  This is all about prior

24       to 2014.

25   A.  Okay.  Even before 2014, after a couple of times of
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page

```
 1      trying to sell the drink ticket and I was

 2      unsuccessful, I never sold a drink ticket.  I will

 3      go to the bar and I will buy myself a bottle of

 4      water or a Red Bull.

 5   Q. Okay.  So one of the things that you would do is try

 6      to sell the drink ticket to a customer -- supposed

 7      to be, right?  But if you -- and you said you

 8      couldn't, and after a few times you stopped trying?

 9   A. Yes.

10   Q. Okay.  On the few times that you tried to sell a

11      drink ticket, what were you attempting to do?

12   A. I would -- say that again.

13   Q. Were you attempting to sell a drink in conjunction

14      with a dance?  Were you just trying to sell a drink?

15      What were you trying to do?

16   A. No.  I would say here is a two-for-one.

17   Q. A two-for-one dance?

18   A. That's what I was told.  You know, with that drink

19      ticket I would say, Hey, would you like a dance, you

20      know, it's two-for-one.

21         They would say, What's two-for-one?

22         I say, I'm going to give you this $20 ticket.

23      You get a dance and then you can get $5 off your

24      drink.

25   Q. So you would go out and try to sell a $20 dance and
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                      Page  5

```
 1      use it as an incentive, the drink ticket; is that
 2      correct?
 3   A. Not a $20 dance.  He will get two dances for just
 4      $20.  Yeah, you're right, a $20 dance.  He would get
 5      two dances for the $20, plus $5 off of his drink.
 6   Q. At the time, each dance was $10?
 7   A. $10, yes.
 8   Q. So he got two dances and $5 off of a drink?
 9   A. Yes.
10   Q. And if you had one dance ticket that evening, you
11      would go back to the locker room if you didn't sell
12      it.  And how much money were you required to give
13      the house mom, you said?
14   A. $10.
15   Q. Okay.  If you did sell it, how much money were you
16      required to give the house mom?
17   A. $10.
18   Q. Is that -- any other fees that you were required to
19      give the house mom prior to 2014?
20   A. Fees, just tip her out.
21   Q. Was there a set amount?
22   A. $6.
23   Q. Anything else?
24   A. No.
25   Q. Is that the same today, $6?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                            Page  6

```
 1   A.  Yes.

 2   Q.  Okay.  Has it always been $6?

 3   A.  Yes.  From my understanding, yes.

 4   Q.  Have you ever tipped her more?

 5   A.  Yes.

 6   Q.  Why would you choose to tip her more?

 7   A.  If I had a good night, hospitality, you know.

 8   Q.  You are in the hospitality business?

 9   A.  No.  Just, you know, she was a nice person, so --

10   Q.  Well --

11   A.  She's in the tipping industry as myself, so I know

12       that's how she makes her living.

13   Q.  From tips?

14   A.  Yes.

15   Q.  So if you have a good night and you feel generous,

16       you might want to tip her more?

17   A.  Yes.

18   Q.  She also provides some services to you, doesn't she?

19   A.  She provides products.

20   Q.  That you don't have to pay for?

21   A.  No.

22   Q.  She provides like feminine napkins and other kinds

23       of female goods and services so to speak?

24   A.  She provides that.  That's why she gets her $6 a

25       night.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                        Page

```
 1   Q.  So you are paying $6 a night for the services that

 2       she's providing to you, such as the products that

 3       are in there, the things that you can just take?

 4   A.  No.  I'm paying $6 a night because they told me

 5       that's what I have to tip out.  That's what I have

 6       to pay her.

 7   Q.  Do you get services from her in exchange for that

 8       $6?

 9   A.  No.

10   Q.  Do you get products in exchange for that $6?

11   A.  No.

12   Q.  If you wanted to, are there certain products that

13       you could get from her without paying a fee?

14   A.  What do you mean?

15   Q.  Okay.  So once you pay your $6, right, are there

16       things in the dressing room that she provides you as

17       an entertainer?  You or other entertainers.

18   A.  Yes.  There are things in the dressing room that

19       you're -- she said that you can use.

20   Q.  What are those things?

21   A.  Combs, deodorant, hairspray.

22   Q.  Anything else?

23   A.  Wipes.

24   Q.  Anything else?

25   A.  That's it.  Everything else, you have to pay for.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page  8

```
 1   Q.  Are there feminine napkins?  She provides things

 2       like that?

 3   A.  Wipes.

 4   Q.  So we're talking the same thing?

 5   A.  Yes.

 6   Q.  Any other items that she provides?

 7   A.  No.

 8   Q.  She provide mints or perfume or anything like that?

 9   A.  No.

10   Q.  Nothing?  Are there things that you can buy from

11       her?

12   A.  Yes.

13   Q.  What can you buy from her?

14   A.  Snacks.

15   Q.  So she provides some free stuff and she sells you

16       some stuff?

17   A.  Yes.

18   Q.  Did you ever buy snacks from her?

19   A.  Yes.

20   Q.  What kind of snacks?

21   A.  Potato chips.

22   Q.  Is there food sold at the club as well?

23   A.  Yes.

24   Q.  Could you buy food from the club?

25   A.  Yes.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page

```
 1   Q.  So you don't have to buy snacks from her if you
 2       don't want to?
 3   A.  No.
 4   Q.  You can bring your own in too?
 5   A.  Yes.
 6   Q.  Okay.  Any other fees that she's ever collected from
 7       you?
 8   A.  No.
 9   Q.  So it was either this $10 for this dance [sic]
10       ticket or -- and $6 you tip her out or more?
11   A.  Yes.
12   Q.  Have you ever tipped her less than $6?
13   A.  No.  And let me be clear.  It's $20 -- she gets $20
14       for the dance tickets because we get two dance
15       tickets a night.
16              MR. LUCAS:  You mean drink tickets?
17              THE WITNESS:  Yes, drink tickets.
18   Q.  I said for each one of the -- that may be the word,
19       or maybe I wasn't clear.  But for each one of the
20       dance [sic] tickets.  Now, she gets nothing for
21       them, right?
22   A.  No.  We just don't give it to her.  We give it to
23       the front.
24   Q.  Right.  That's what I said.  You don't give it to
25       her and she gets nothing for it, right, today?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 50

```
 1   A.  Right, correct.

 2   Q.  You pay -- you don't pay separately for your dance

 3       tickets -- or your drink tickets, do you?

 4   A.  Not anymore.

 5   Q.  That hasn't been since at least January of 2014?

 6   A.  Correct.

 7   Q.  You just paid a fee -- a dance fee to perform there?

 8   A.  Correct.

 9   Q.  Okay.  Do you ever remember the dance fee being $25?

10   A.  No.

11   Q.  Do you ever -- strike that.

12           Are there different fees for the day shift from

13       the night shift?

14   A.  Yes.

15   Q.  Do you ever work the day shift?

16   A.  Yes.

17   Q.  What are the fees for the day shift?

18   A.  Fees for the day shift?  I'm trying to remember when

19       I was working a day shift consistently.  Abby --

20   Q.  If you don't know, that's fine.

21   A.  I don't recall because I haven't worked the day

22       shift since I had my son.

23   Q.  How about before you had your son?  Do you recall

24       that?

25   A.  That's what I'm trying to recall.  I do know that I
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                          Page 51

```
 1      have to pay a fee.  Then I have to tip out the house

 2      mom, and I have to tip out the bar, and I have to

 3      tip out the DJ, and I have to tip out security for

 4      the day shift.  But it's lesser than what we pay at

 5      night shift.

 6   Q. So at some point you had to -- you had to pay a

 7      house fee and tip out various people when you worked

 8      the day shift.  And as I understand your testimony,

 9      you don't recall what that was?

10   A. Correct.

11   Q. Today you have to do similar things, correct?

12   A. Correct.

13   Q. And it's generally $35 before eight, and it goes up

14      after eight?

15   A. Correct.

16   Q. And it goes in increments by hour -- by the hour?

17   A. Correct.

18   Q. So if you get in there before nine, it's a higher

19      fee and before ten it's a higher fee?

20   A. Correct.

21   Q. Do those go down the later you stay as well?

22   A. No.  If you get there -- you said it backwards.  If

23      you get there before nine, it's a lesser fee.  If

24      you get there after nine, it's a higher fee.

25   Q. If you stay later -- you said if you wanted to leave
```

TASHIA ANDERSON v. WBY, INC.
**Tashia Anderson on 06/23/2015**                                      Page 52

```
 1      earlier, you can do so if you pay a fee?

 2   A. Correct.

 3   Q. And do you know if that's because the rent is

 4      calculated -- the fees that you are paying are

 5      calculated based upon time?

 6   A. I don't believe so.  It's just one standard fee.

 7   Q. I'm going to show you what I've had marked as

 8      Exhibit 2, and just ask you if you've ever seen a

 9      document like this.

10   A. Where is the night shift?  I have seen this.

11   Q. Does that seem to be a matrix of fees for the

12      various times that entertainers work?

13   A. (Inaudible.)

14           MR. LUCAS:  When you think out loud, she

15      has to type it down.  She gets confused as to

16      whether you're actually talking or mumbling.

17           THE WITNESS:  Oh, okay.

18   A. I've seen this.  But when I seen it, it confused me

19      in the same way it's doing now, so --

20   Q. Okay.  So you've seen this matrix that's Exhibit 2

21      of the fees and the hours and the prices, but you

22      don't understand it, is what you are saying?

23   A. I don't understand it.

24   Q. Is this something that was in use, you've seen at

25      the club?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                        Page 53

```
 1   A.  I've seen it.  The house mom showed it to me before.

 2   Q.  Okay.  And -- but you just -- you didn't understand

 3       it then, you don't understand it now?

 4   A.  No, I didn't understand it then.  I don't understand

 5       it now.

 6   Q.  Do you recall when the first time you saw that chart

 7       was?

 8   A.  I don't.

 9   Q.  Was it before you came back or was it after you came

10       back?

11   A.  It was before I -- before I even left for -- to have

12       my son.

13   Q.  Okay.  Fair enough.  Something that you understood

14       was used by the club, but you didn't understand how?

15   A.  Correct.

16   Q.  Okay.  When you performed at the club, did you use a

17       stage name?

18   A.  Yes.

19   Q.  What was your stage name?

20   A.  Malachi, M-A-L-A-C-H-I.

21   Q.  Has that been your stage name the whole time?

22   A.  Yes.

23   Q.  Does that name have some special meaning?

24   A.  My favorite chapter of the Old Testament.

25   Q.  When you performed at the club, did you ever -- were
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 5

```
 1        your times noted or recorded by anybody that you

 2        worked?

 3   A.   Was it noted by anyone that I was physically there?

 4   Q.   The times that you were working, was it recorded

 5        anywhere?

 6   A.   Yes, the front door, when you -- when you sign in.

 7   Q.   Did you also have to sign in on the DJ sheets --

 8        sign a DJ sheet with the -- initialing the times

 9        that you were there?

10   A.   Yes.  The -- I had to initial that I tipped out.

11   Q.   Did it also have times that you arrived and times

12        that you departed?

13   A.   Not that I know of, not that I departed, but times

14        that I arrived.

15   Q.   I'm going to show you what's been marked as Exhibit

16        9.  Just take a look at this document.  This -- for

17        the first page, this is a document dated 12/4 on the

18        bottom, I think.  Maybe that's just the totals.

19   A.   Okay.

20   Q.   But it's got your name, Malachi, here.

21   A.   Okay.

22   Q.   Do you see that?

23   A.   Yes.

24   Q.   It's got 9:45 p.m.  Do you see that?

25   A.   Yes.
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 55

```
 1   Q.  It's got a 15 here?

 2   A.  Okay.

 3   Q.  And it's got some initials that looks like -- I

 4       think that they're your initials.

 5   A.  That's not my initials.

 6   Q.  Okay.  That's not your initials?

 7   A.  No.

 8   Q.  It's got a 4:15 time for departure?

 9   A.  Yes.  I never seen him put the time down, but okay.

10   Q.  Okay.  Is this -- does that kind of look like the

11       form that you've seen before?

12   A.  Yes.

13   Q.  I know it won't have this big black on here.

14   A.  Yes.  Is this from the DJ?

15   Q.  Yes.

16   A.  Because I never go and check in.  So I don't even

17       know how he would write down 9:45 p.m.  I only check

18       in at the front door.  Oh, it's the sheet from the

19       door?

20   Q.  Do you see that there is some initials up here?

21   A.  Yes.

22   Q.  If you take a look through this document -- I just

23       want you to take a look and tell me if you recognize

24       any of your writing on there.

25   A.  Yeah, those are never my initials.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 56

1  Q.  What's that?

2  A.  I don't sign my -- I don't sign just an M, yeah.

3  Q.  So you didn't initial any of these?

4  A.  No.

5  Q.  Okay.  But you said that you record your time in --

6      strike that.

7           Besides for the initials, is any of the writing

8      on the document yours?

9  A.  No.

10  Q.  Okay.  You say you never initial -- strike that.

11      That's a bad question.

12           You said you do sign something in when you come

13      in the door?

14  A.  I don't sign it.  She just writes my name down.

15  Q.  And then somebody apparently writes your name down

16      when you depart?

17  A.  Yes.

18  Q.  Do those -- just kind of looking through there,

19      because you just looked through it kind of quickly,

20      those seem to be kind of like your arrival and

21      departure times.  I'm not asking you to tell me on

22      any specific days if it's accurate.  I just want to

23      know generally if those fit within when you arrive

24      and depart.

25  A.  Some of them don't have the time on here, just that

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 5

```
 1        first one.

 2   Q.   Right.  I think if it doesn't have a time, that

 3        means that you left at the end of the shift.

 4   A.   What was the question you asked me?

 5   Q.   Do those seem to be consistent with when you arrived

 6        and departed?

 7   A.   No.

 8   Q.   No?  What's wrong -- what seems wrong?

 9   A.   I don't recall getting there at 9:45 hardly ever

10        because the fee is high at that time.  So if I was

11        going to get to work -- get to work at 9:45, I

12        wouldn't have -- I wouldn't have went to work.

13   Q.   Did you ever show up at like 10:00, 10:30?

14   A.   I did one time, and it was here recent.

15               MR. RUBIN:  Can I borrow an exhibit

16        sticker?

17               (Exhibit 15 marked for identification.)

18   Q.   I'm going to hand you a packet of documents that I'm

19        going to have marked as Exhibit 15.

20               MR. RUBIN:  Paul.

21               MR. LUCAS:  Thanks.  What was 14?  What

22        did I miss?

23               MR. RUBIN:  I think 14 was --

24               MR. LUCAS:  Oh, those interrogatories.

25   Q.   Take a look at Exhibit 15.  It's a packet of a few
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 58

```
 1        more of those documents.  Some of them may be the
 2        same as what were partially marked on Exhibit 9.
 3        But I'm going to ask you the same questions.  Kind
 4        of go through these and tell me, A, if you recognize
 5        any of your handwriting on these documents, and B,
 6        if the departure and arrival times seem --
 7   A.   I can tell now that none of mine handwriting -- this
 8        is none of my handwriting, because when we come to
 9        work, the door girl, she writes our name down to,
10        you know, document and say that we're there and that
11        we paid our door fee.  And then at the end of the
12        night, all we do is -- all I do is, I give my money
13        to the DJ, and he marked me -- that's his
14        handwriting to mark me off to say --
15   Q.   Let me short circuit all of this.
16   A.   Okay.
17   Q.   Generally, when you show up, do you see the door
18        girl write your name down?
19   A.   Yes.
20   Q.   Does it seem to be at the time that you are showing
21        up?  Because you are watching her, right?  You are
22        walking through the door, you are seeing her write
23        your name down, right?
24   A.   Yes.
25   Q.   And when you are leaving, you're seeing the DJ write
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 5

```
 1        the time out?

 2   A.   I don't see him write the time out.  I just -- I

 3        never see him write the time out.  He just -- when I

 4        give him my tip out, he just put how much I gave him

 5        and he writes down, you know, that he initialed it.

 6   Q.   So whatever that writing on there is, at least some

 7        of it occurs contemporaneously with when you are

 8        coming and going?  And by contemporaneously, I mean

 9        at the same time.

10   A.   Yes.  But on here, the time that I checked in, it's

11        not on the majority of these papers.

12   Q.   I'm not asking you that.  But what I'm asking is,

13        whatever is on there, you generally see somebody

14        write it on the document --

15   A.   Yes.

16   Q.   -- as you are walking in?  You see somebody writing

17        on the document as you are walking up?

18   A.   Correct.

19   Q.   What they are writing, you may not know?

20   A.   Correct.

21   Q.   But you see them at least doing it at the time that

22        you are doing these things --

23   A.   Correct.

24   Q.   -- whatever they're writing?

25   A.   Correct.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 60

```
 1   Q.  And it's on a form that looks kind of like that,

 2       right?

 3   A.  Correct.

 4   Q.  Okay.  Why don't you set those aside.

 5           Were you -- did you join the Onyx lawsuit?

 6   A.  No.

 7   Q.  No?  Did you opt in?

 8   A.  Did I opt in?

 9   Q.  Yes, ma'am.

10   A.  No.

11   Q.  Did you ever receive any recovery from a lawsuit

12       involving Onyx?

13   A.  No.

14   Q.  Did you ever send a lawyer a note and then choose

15       not to participate?

16   A.  Yes.

17   Q.  What did you send the lawyers?

18   A.  The lawyers, they contacted me.  And you said for

19       Onyx, right?

20   Q.  Yes.

21   A.  They contacted me and -- whatever it was that they

22       said I could sign to participate in it, and then I

23       eventually told them that I didn't want to

24       participate in it.

25   Q.  Let me ask you this -- and I don't want to know any
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                      Page 61

```
 1      conversations you had with your lawyers -- with a

 2      lawyer.  But you received -- but you received a form

 3      in the mail saying are you interested in

 4      participating; is that correct?

 5  A.  Yes.

 6  Q.  You initially signed it and returned it?

 7  A.  Yes.

 8  Q.  And then later chose not to do it?

 9  A.  Yes.

10  Q.  Was there any particular reason why you chose not to

11      do it?

12  A.  I just didn't want to be a -- just didn't want to be

13      a part of it.  And, you know, they were -- just

14      didn't want to be a part of it.

15  Q.  Okay.  So let me ask you, when did you work at Onyx?

16  A.  I don't know the definite dates.

17  Q.  What was your best recollection?

18  A.  Whatever year that lawsuit was, you know, started.

19  Q.  Okay.  How long did you work there?  I think you

20      told me earlier about six or eight months.

21  A.  At Onyx?

22  Q.  Yes.

23  A.  No, I wasn't at Onyx six to eight months.  That was

24      at the restaurant that I was six to eight months.

25  Q.  Oh, I'm sorry.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 62

```
 1   A.  I was there about 18 months, 2 years.

 2   Q.  Eighteen months.  I'm sorry.  When you worked at

 3       Onyx -- when you performed at Onyx, did you perform

 4       under a similar relationship to what you have at The

 5       Follies?

 6   A.  Yes.

 7   Q.  That is, you pay the fee to work there?

 8   A.  Yes.

 9   Q.  And for that, you received the dance money that you

10       received?

11   A.  Yes.

12   Q.  Is that -- the same hold true with the other club

13       that you worked at?

14   A.  I'm sorry.  What was that?

15   Q.  Was the same relationship hold true with the other

16       club that you worked at?

17   A.  That I paid a fee?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Do the relationships generally work the same,

21       whether it was at Strokers, Onyx or The Follies?

22       There may be some difference in how the money

23       worked, but was it generally the same?  You paid a

24       fee?

25   A.  Paid a fee, yes.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                   Page 63

```
 1   Q.  For that, you got the right to perform?

 2   A.  Yes.

 3   Q.  Okay.  Now, was this different than -- strike that.

 4           This was a different relationship than you had

 5       when you were an employee at some of the various

 6       places you worked, correct?

 7   A.  Come again with that.

 8   Q.  Sure.  Well, like -- so when you worked at -- when

 9       you worked at, let's just say, This Is It!, which

10       was a restaurant, if I remember correctly.

11   A.  Yes.

12   Q.  They paid you a fee, and you performed work for

13       them, right?

14   A.  Yes.  You're talking about This Is It!  They paid me

15       a salary.

16   Q.  What did they pay you?

17   A.  Whatever minimum wage was.

18   Q.  What did you do for that minimum wage?

19   A.  Serve, make plates.

20   Q.  Okay.  Did they -- they set your hours, they told

21       you when to work, and all those other things?

22   A.  Yes.

23   Q.  And when you did that, they paid you a -- they paid

24       you seven and a quarter an hour, or whatever it may

25       have been at the time, in exchange for the services
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 6

```
 1        you were performing, correct?

 2   A.   Yes.

 3   Q.   Now, did they sell a product?

 4   A.   Food.

 5   Q.   Now, who got the money from the product that they

 6        sold?

 7   A.   The restaurant.

 8   Q.   Okay.  Now, when you went to work at any of these

 9        adult clubs, right, did you get the money for the

10        dances that you performed?

11   A.   Yes.

12   Q.   Okay.  How much did you -- strike that.

13          Were there various types of dances that you

14        could perform at -- let's just talk about The

15        Follies.  Are there various types of dances you

16        could perform?

17   A.   As in what?  Various types?

18   Q.   Let me see if I can rephrase it for you.  Dance on

19        the floor?

20   A.   Yes.

21   Q.   That's got a fee for it, right?

22   A.   Yes.

23   Q.   Who sets that fee?

24   A.   The club.

25   Q.   Is there a minimum fee that they set, or do they set
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 65

```
 1      a maximum fee as well?

 2   A.  A minimum, $10 a dance.

 3   Q.  You can charge whatever above that you want?

 4   A.  No.

 5   Q.  Okay.  So there is a set fee, fixed fee?

 6   A.  Yes.

 7   Q.  Okay.  Can you get tips on top of that?

 8   A.  Yes.

 9   Q.  Okay.  So there is a minimum fee, but the customer

10       -- that the customer has to pay per dance, but the

11       customer can, in reality, pay as much as they want,

12       right?

13   A.  Correct.

14   Q.  Okay.  You can dance on stage?

15   A.  Yes.

16   Q.  And you get tips for dancing on stage?

17   A.  Yes.

18   Q.  Okay.  There is a VIP room?

19   A.  Yes.

20   Q.  Customer pays a fee to use that, correct?

21   A.  I believe so, yes.

22   Q.  They pay like 52 bucks a half-hour?

23   A.  Forty-two.

24   Q.  Fifty-two.

25   A.  I think it's 42.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                              Page 66

```
 1   Q.  Okay.  So whatever it is -- 42, 52, 62, 102,

 2       whatever it is, they pay that -- the customer gives

 3       that money to the club, right?

 4   A.  Yes.

 5   Q.  You don't touch that money, right?

 6   A.  No, no.

 7   Q.  Then you get -- the customer gets to use the private

 8       room, right?

 9   A.  Yes.

10   Q.  He can bring you in there with him?

11   A.  Yes.

12   Q.  And do you charge a fee for that?

13   A.  No.

14   Q.  You don't charge any money to go into a private room

15       with a customer?

16   A.  No.  They pay you per dance.

17   Q.  Okay.  So do you have a price that you charge per

18       dance in the VIP room?

19   A.  I'll prefer not to speak on that because I can't

20       speak for everyone else.  I don't --

21   Q.  I'm not asking you to speak for anyone else.

22   A.  I don't go into VIP.

23   Q.  Have you ever been in VIP?

24   A.  Once.

25   Q.  How much did you charge to go into VIP?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                        Page 6

```
 1   A.   I was telling the customer it was $20 per dance.

 2        And they wanted other services outside of me dancing

 3        once I got in there, so I didn't make any money out

 4        of that VIP situation.

 5   Q.   Okay.  But that's one of the ways that you can make

 6        money, is by performing private dances in the VIP

 7        area?

 8   A.   Yes.

 9   Q.   And you understand that you can charge whatever fees

10        you want in there, right?

11   A.   Yes.

12   Q.   Okay.  You set those fees, correct?

13   A.   I told them $20 a dance.  That's what I was told by

14        the bouncers.

15   Q.   You can set those fees at whatever you wanted,

16        right?

17   A.   You're telling me this now, so I guess you can.  I

18        was never told that.

19   Q.   You were never told what to charge, other than you

20        asked the bouncer, you said, what you should charge?

21   A.   Yes.  I said, How do VIP work, how much are the

22        dances?

23            And he says, 10 or 20, whatever you want.

24   Q.   Okay.  So -- and is there a time period that the VIP

25        is supposed to last for?
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                               Page 68

```
 1   A.   I think 30 minutes.

 2   Q.   So in 30 minutes -- every song that's played at the

 3        club is roughly three minutes?

 4   A.   Correct.

 5   Q.   So you can perform about ten dances --

 6   A.   Roughly --

 7   Q.   -- in half an hour?

 8   A.   Yeah, yeah.

 9   Q.   So about 200 bucks a half-hour, could you charge?

10   A.   Yes.

11   Q.   Maybe more, maybe less?

12   A.   Depending on how short he makes this -- the DJ makes

13        the songs or how long he drags the song out.

14   Q.   That's kind of in your discretion, right?

15   A.   Yes.

16   Q.   And you choose not to perform in there?

17   A.   Correct.

18   Q.   Nobody makes you perform in there, correct?

19   A.   Correct.

20   Q.   Nobody tells you you have to perform in there?

21   A.   Correct.

22   Q.   Nobody says that you can't perform in there?

23   A.   Correct.

24   Q.   Any rules that you're aware of at the club for --

25        generally for performing dances in the VIP?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                    Page 6

```
 1   A.  No.

 2   Q.  Okay.  Well, one of the general rules of the club is

 3       that you're not supposed to break the law, right?

 4   A.  Correct.

 5   Q.  Any other rules that you're aware of that the club

 6       enforces?

 7               MR. LUCAS:  Object to the form of the

 8       question.  Go ahead and answer.

 9   A.  What was that?

10   Q.  Any other rules --

11               MR. LUCAS:  You can answer.  I'm just

12       making an objection for the record.

13   Q.  -- other than you don't break the law, that you're

14       aware of that the club enforces?

15   A.  So are there any other rules that the --

16   Q.  Other than don't break the law.

17   A.  Other than don't break the law.  No, not besides you

18       have to pay your fees.

19   Q.  Okay.  You've got to --

20   A.  I would consider those rules.

21   Q.  Okay.  You've got to pay your fees, and don't break

22       the law?

23   A.  Yes.

24   Q.  Any other rules that you can think of?

25   A.  You have to ask to leave early.  I will consider
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page  0

```
 1      that a rule.

 2  Q.  Anything else?

 3  A.  No fighting.

 4  Q.  That goes along with don't break the law?

 5  A.  Don't break the law, yeah.  No, that's probably

 6      about it.

 7  Q.  No drugs, don't break the law, right?

 8  A.  Right, right.

 9  Q.  Have those rules been consistent since the time that

10      you've been there?

11  A.  Yes.

12  Q.  Now, on a typical night -- well, strike that.

13          When you worked at Follies, did Follies have

14      rules?

15  A.  I still work at Follies.  Yes.

16  Q.  I'm sorry.  At Onyx.  When you worked at Onyx, did

17      Onyx have rules?

18  A.  Yes.

19  Q.  Did they have rules in writing?

20  A.  Did they have rules in writing?

21  Q.  Yes, ma'am.

22  A.  Not all the rules are in writing.

23  Q.  But some of them were?

24  A.  Yes.

25  Q.  Some of them were pretty specific about how to dress
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page  1

```
 1        and what to wear and when to wear it?

 2   A.   Not that I can recall.

 3   Q.   Okay.  Well, what rules do you recall they had at

 4        Onyx?

 5   A.   The fees, what time you had to be there by.  Just

 6        general rules.  Don't break the law, what you can --

 7        no fighting, stuff like that.  No drugs, no lap

 8        dancing, that type of stuff.

 9   Q.   Did Onyx restrict you from working in other clubs?

10              MR. LUCAS:  Onyx?

11              MR. RUBIN:  Yes, ma'am -- yes, sir.

12        Sorry.

13   A.   Not that I recall.  I mean, at the time I worked at

14        Onyx, I didn't work at another club anyway, so it

15        didn't pertain to me.

16   Q.   When you went to work at Onyx, did they have -- did

17        they give you a packet that included something like

18        called "Onyx club rules and" -- "club rules and

19        conduct for contractors and employees"?

20   A.   I don't recall what they gave me and what it said

21        because it was so long ago, so --

22   Q.   I'm just asking if you recall.

23   A.   I remember signing some paperwork or them telling --

24        giving me something to look over that basically was

25        the structure, how they ran their business, so --
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                   Page  2

```
 1   Q.   Okay.  I'm just asking if you recall getting a

 2        packet that included club rules and conduct for

 3        contractors and employees.

 4   A.   I don't recall that.

 5   Q.   Do you recall getting a packet that contained

 6        conduct rules for VIP rules?  This all relates to

 7        club Onyx.

 8   A.   I don't recall that.

 9   Q.   Do you recall completing a dancer information sheet?

10   A.   Dancer information, yes.

11   Q.   Okay.  Did you complete a random drug test consent

12        form?

13   A.   No, I never did a drug test.

14   Q.   I'm saying did you have to complete one of those

15        forms?

16   A.   I don't remember that being in there.

17   Q.   Do you recall signing some sort of agreement with

18        Onyx?  A contractor agreement?

19   A.   I don't remember signing anything.

20   Q.   Did you get a --

21   A.   When I worked for Onyx, they weren't as detailed as

22        they were until after they lost their lawsuit, so --

23   Q.   Okay.

24   A.   All I ever remember filling out an Onyx is basically

25        my information with my social, my real name, my
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page  3

```
 1        address, my dance name, and that was about it.

 2   Q.   And you didn't get any of these forms?

 3   A.   No.

 4   Q.   Do you know if those forms -- strike that -- ceased

 5        after the -- when did you -- I'm sorry.

 6             When did you work for Onyx?  You didn't recall

 7        the years?

 8   A.   I don't recall the years, no.

 9   Q.   Okay.  Was it before or after they got sued?

10   A.   Before.

11   Q.   Okay.  Do you know why -- well, if I were to tell

12        you that those were the forms that were alleged to

13        be in place with entertainers prior to being sued,

14        does that sound right to you?

15   A.   I'm sorry.  What --

16             MR. LUCAS:  Object to the form of the

17        question.  Go ahead and answer if you can.

18   Q.   Let me see if I can rephrase it.  If I were to tell

19        you or suggest to you that those forms were alleged

20        to be the forms that entertainers were required to

21        sign at the time of the lawsuit, does that seem

22        right to you or does that seem wrong?

23   A.   Were required to sign at the time of the lawsuit?

24   Q.   Yeah, prior to the lawsuit starting.

25   A.   Prior to the lawsuit?  I don't recall signing any of
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                    Page

```
 1      those.

 2   Q.  You're not saying it didn't happen; you just don't

 3      recall?

 4   A.  Oh.  Okay, yes.

 5   Q.  Is that right?

 6   A.  Yes.

 7   Q.  Okay.  You didn't sign any of those kind of forms at

 8      Follies, though, right?

 9   A.  No.

10   Q.  Where there were club rules and all those things,

11      correct?

12   A.  No.  I don't believe so, no.

13   Q.  Did you ever advertise your services as an

14      entertainer?

15   A.  No.

16   Q.  Did you know other girls who did?

17   A.  Yes.

18   Q.  Some of them advertise pretty extensively?

19   A.  Yes.

20   Q.  Some of them had extensive web presences, correct?

21            MR. LUCAS:  Object to the form of the

22      question.  Go ahead.

23   Q.  Correct?

24   A.  Yes.

25   Q.  Something that you're aware of from having worked
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page  5

```
 1        there with these girls, but something you chose not

 2        to do?

 3   A.   Yes.  That's just something I choose not to do.

 4   Q.   But you could have done it had you chose to, right,

 5        because --

 6   A.   Yeah.

 7   Q.   Did you have regular customers?

 8   A.   No.

 9   Q.   Did other entertainers have some regular customers

10        that you observed?

11   A.   I'm not -- I don't pay attention to other dancers.

12   Q.   So you don't know whether or not -- so you never

13        would send out text messages or Instagram messages

14        telling people that you were going to be there?

15   A.   No.

16   Q.   Never advertised in any way?

17   A.   No.

18   Q.   Have you ever seen the club advertised?

19   A.   No.

20   Q.   Club Onyx, did they advertise a lot?

21   A.   I'm not sure.  I'm not big with social media.

22   Q.   Well, just maybe on radio, TV?  Anything?

23   A.   I'm not -- no.  I haven't paid any attention.  I

24        know they had the billboards outside of the -- not a

25        billboard, but you know like a board outside of the
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page  6

1     club, and they might have best dancers in Atlanta or

2     finest girls to come in.

3   Q.   But nothing else that you recall?

4   A.   Nothing.

5   Q.   Okay.  Now, before today's deposition, you were kind

6     enough to provide us with your 2011, 2012 tax

7     returns.

8   A.   Yes.

9          MR. RUBIN:  Okay.  I'm going have these

10    marked as Exhibits 16 and 17, respectively.

11          (Exhibit 16 marked for identification.)

12          (Exhibit 17 marked for identification.)

13  Q.   For the record, 16 is your '11 tax return and 17 is

14    your '12 tax return.

15          MR. LUCAS:  Thank you.  Can we take a

16    break?

17          MR. RUBIN:  Sure.

18          (Recess.)

19    BY MR. RUBIN:

20  Q.   Take a look at Exhibit 16, if you would.  It

21    purports to be your 2011 tax return.

22  A.   Correct.

23  Q.   You had professional assistance in completing this

24    return?

25  A.   Yes.

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                        Page

 1   Q.   And that was from Landguard Income Tax Services?

 2   A.   Correct.

 3   Q.   Okay.  How long has Landguard completed your tax

 4        returns?

 5   A.   Since -- I'm not really sure.  Probably 2010.

 6   Q.   Do they still complete your taxes today?

 7   A.   No.  They are out of business now.  The young lady

 8        who completes -- does my taxes now, she started her

 9        own.  It's no longer called Landguard.

10   Q.   What's her name?

11   A.   Tamika.  Tamika Harris.

12   Q.   Okay.  So Tamika Harris, who prepared your '11 and

13        '12, prepared your '13 and '14, but from her own

14        business?

15   A.   Yes.

16   Q.   As I understand it, you agreed to provide us with

17        your '13 and '14 tax returns, but you were unable to

18        locate them because they're with your accountant,

19        who has not given them back to you, and she's on

20        maternity leave?

21   A.   Maternity leave, correct.

22   Q.   But you've agreed to provide them to us as soon as

23        you can?

24   A.   I will.  I will.

25   Q.   Okay.  So I want to start with some basic questions,

1       if I can.  There's some information on this form.

2       Okay?  And so if I turn to what I think is the --

3       one, two, three, four -- the fifth page of this

4       packet in, which I think you had open --

5   A.  Uh-huh.

6   Q.  -- it's the cover page of the IRS Form 1040.  Do you

7       see that?

8   A.  Correct.















25   Q.   Okay.   You signed this tax return under penalties of

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 86

```
 1      perjury?

 2   A.  What do you mean?

 3   Q.  Do you see where you -- on the bottom on page 2, you

 4       affixed your signature, or there was a place for you

 5       to affix your electronic signature, I guess that

 6       would have been, in 2011?

 7   A.  On page 2?

 8   Q.  Let me go back.  Let me get you the right page here.

 9          Did you file these tax returns or have them

10       filed for you?

11   A.  Yes.

12   Q.  Okay.  Do you see on -- where it says "sign here" on

13       page 2?

14   A.  Yes.

15   Q.  Do you see where it says, "Under penalties of

16       perjury, I declare I have examined this schedule and

17       its statements"?

18   A.  Yes.

19   Q.  Do you recall signing the copy that was filed with

20       the IRS, whether it was on this form or the

21       electronic transmittal form that may have been sent

22       instead?

23   A.  I don't recall signing.

24   Q.  Okay.

25   A.  No.
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                              Page 8

 1   Q.   Okay.  Let's take a look at Exhibit 17.  If I turn

 2        to the second page, this is your '12 tax return.  Do

 3        you see that there is something called an ERO?

 4   A.   Yes.  ERO use only.

 5   Q.   This is for the Georgia Department of Revenue to

 6        file electronically?

 7   A.   Yes.

 8   Q.   Do you see it's got that same "I declare under

 9        penalties of perjury" under Part 2, right above the

10        line for your signature?

11   A.   Yes.

12   Q.   Do you recall signing this?

13   A.   No.

14   Q.   If I turn to probably the fourth or fifth page in,

15        there's an IRS E-File signature authorization for

16        2012?

17   A.   Okay.

18   Q.   Okay.  And there would be a signature for you to

19        sign under "taxpayer PIN check box.  I authorize

20        Source Accounting Solutions," et cetera?

21   A.   Yes.

22   Q.   Would you have signed that to authorize her to file

23        this return for you?

24   A.   I didn't sign it.

25   Q.   Okay.  You didn't sign this one or you didn't sign

TASHIA ANDERSON v. WBY, INC.

**Tashia Anderson on 06/23/2015**                                      Page 88

```
1        the one that was filed with the IRS?

2    A.  I didn't sign this one.

3    Q.  Are you suggesting that your tax preparer prepared

4        taxes without your authorization, filed them with

5        the IRS without your permission or authority?

6    A.  No.  I gave her permission to file them.

7    Q.  Do you recall doing that in writing?

8    A.  I didn't do it in writing.  We did it over the

9        phone.  She does my taxes every year, so I just call

10       her and --

11   Q.  So you --

12   A.  -- we speak.

13   Q.  So it's your testimony that you -- did you go over

14       this form with her?

15   A.  Yes.

16   Q.  Did you understand its contents prior to authorizing

17       her to file it?

18   A.  What it -- what the information was stating?

19   Q.  Yes, ma'am.

20   A.  No.

21   Q.  Okay.  You relied on her to provide you with basic

22       accounting advice?

23   A.  Yes.

24   Q.  And you're not suggesting she filed it without your

25       authority, are you?
```

1   A.   No.

2   Q.   Whatever was filed, she filed lawfully?

3   A.   Yes.

4   Q.   Okay.  So I'm not sure if this is put together

5        right, but it was put together, I think, in the

6        order that we received it from you.

7   A.   Yes.

8   Q.   So I apologize if it's out of order, but let's see

9        if we can follow this document for just a moment.

10  A.   Okay.

11  Q.   Okay.  If I go through and I go to the same Schedule

12       C, profit and loss for business, it's going to say

13       Schedule C.

14  A.   Uh-huh.

15  Q.   Do you see that?

16  A.   Uh-huh, yes.

17  Q.   In this year, it reports gross receipts from sales

18       in your business as a service entertainer of

19       ▮▮▮▮▮▮.  Do you see that?

20  A.   Yes.

21  Q.   So do you know how you determined how much income

22       you made in 2012?  And I mean income you took in.

23  A.   How much income I took in?

24  Q.   Yes, ma'am.  The line that is reported at line 1 of

25       Schedule C, Exhibit 17.

```
 1   A.   No.  I know the previous year -- so when I filed for
 2        2012, I filed in 2013, but it was for 2012, right?
 3        Okay.
 4   Q.   In 2012, you would have filed for '11.  That's why
 5        Exhibit 16 is dated 2012.
 6   A.   Okay.  This particular year, I didn't work as much,
 7        I believe.
 8   Q.   Okay.  So it appears that in 2012, your income went
 9        down.
10   A.   Yes.
11   Q.   Your gross income?
12   A.   Yes.
```

















13          MR. RUBIN:  So, Paul, I'm just going to

14    reserve these questions on those two tax years.

15          MR. LUCAS:  On those two tax years, sure.

16          MR. RUBIN:  Can we take a few minutes?

17          MR. LUCAS:  Sure thing.

18          (Recess.)

19          (Attorney Mason enters conference room.)

20    BY MR. RUBIN:

21    Q.  So we talked a little bit earlier about all of the

22        ways in which one could earn income at the club, and

23        one of the ways was from the $10 dances, right?

24    A.  Yes.

25    Q.  One of the ways was dancing on stage?

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                         Page

```
 1   A.  Yes.

 2   Q.  And we talked about VIP?

 3   A.  Yes.

 4   Q.  Okay.  And you said that you didn't like doing VIPs?

 5   A.  Correct.

 6   Q.  Was there any requirement that the -- that -- by the

 7       club that you had to do VIPs?

 8              MR. LUCAS:  Objection.  Asked and

 9       answered.

10   Q.  Is there any requirement by the club that you have

11       to do VIPs?

12   A.  No.

13   Q.  Okay.  So the choice whether to do them or not was

14       your own?

15              MR. LUCAS:  Objection.  Asked and

16       answered.  Go ahead and answer it again.

17   A.  Yes.

18   Q.  Okay.  And if I recall correctly, you said you did

19       it just on one occasion.

20   A.  Yes.

21   Q.  Okay.  Do you recall what tax year that was in?

22   A.  What tax year?  No.

23   Q.  Okay.  So except for that income, all of your other

24       income would have come from performing dances either

25       on the stage, like getting tips?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                Page 100

```
 1   A.   Yes.

 2   Q.   From performing table dances for the fee that the

 3        club mandated you charge?

 4   A.   Yes.

 5   Q.   Or tips above that?

 6   A.   Yes.

 7   Q.   Okay.  Those would be the only three ways, excluding

 8        that one time in the VIP, that you could receive

 9        income, correct?

10   A.   Correct.

11   Q.   Okay.  Now, can you tell me, for example, whether or

12        not there was a minimum amount of table dances that

13        you were required to perform at any particular

14        shift?

15   A.   No.

16   Q.   Could you perform as many or as little as you

17        wanted?

18   A.   Yes.

19   Q.   Okay.  As many or as little as you could sell?

20   A.   Yes.

21   Q.   Did you typically perform table dances, you know, in

22        sets?

23   A.   Like with another person?

24   Q.   Sure -- no.  Okay.  So maybe I'm just asking it

25        poorly.  Each song that the club plays is about
```

 1      three minutes, we talked about, right?  Do you

 2      recall that?

 3   A.  Correct.

 4   Q.  Okay.  Typically, when you perform one lap dance,

 5      did you just -- when you performed a dance for a

 6      table dancing, it's for a customer?

 7   A.  Yes.

 8   Q.  Did you perform, just generally, one dance or did

 9      you perform a series of dances for that customer?

10   A.  However many dances they wanted me to perform.

11   Q.  Typically, it was more than one, right?

12   A.  Not always.

13   Q.  Okay.  I understand it's not always, but most of the

14      time it was, right?

15   A.  No.

16   Q.  Most of the time it was just one?

17   A.  Yes.  Most of the time they just want one dance.  Or

18      if they like the way I dance, then they will say,

19      Okay, give me another one.

20   Q.  Okay.  Well, typically, in an hour, how many dances

21      would you do?

22   A.  I don't even know how to guesstimate that, because

23      sometimes I will go an hour without getting a dance,

24      period.

25   Q.  Sure.  That's why I'm not asking you specifically in

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 102

```
 1        this hour how many hours did you get.  There is --

 2        you worked eight or ten hours, you said, a day,

 3        right?

 4   A.   Yes.

 5   Q.   Over the course of that eight-to-ten-hour period of

 6        time, how many dances do you, on average, perform?

 7   A.   About 50.

 8   Q.   About 50?

 9   A.   Yeah.

10   Q.   So you perform about 50 dances a day?

11   A.   Yes.

12   Q.   Each time you're there?

13   A.   That's my quota.

14   Q.   Internal quota?

15   A.   Yes.

16   Q.   Nobody put that quota on you?

17   A.   No.

18   Q.   And once you hit 50, you're done?

19   A.   No.  I just don't -- I don't like to -- when I come

20        to work, I say, Okay, I need at least 50 dances

21        today.  That's my minimum that I will like.

22   Q.   Sometimes you exceed that?

23   A.   Yes.

24   Q.   What was the most dances that you've ever performed?

25   A.   What was the most dances that I've ever performed?
```

```
1        I really -- I haven't counted.
2   Q.   Well, if 50 is your quota, have you ever doubled
3        your quota?
4   A.   But it don't have to be in dances.  It could've been
5        in tips, you know.
6   Q.   Okay.  I'm just asking the number of dances.
7   A.   I'm not -- I'm not sure.  I don't -- because
8        sometimes -- my quota is ███ a day, you know.  If
9        -- whether I get that in dances, the combined of
10       dance and tips, you know.
11  Q.   Has that always been your quota?
12  A.   Yes.
13  Q.   So since you started there?
14  A.   Yes.
15  Q.   Typically, on average of -- you work, you said, on
16       average about four days a week?
17  A.   Yes.
18  Q.   What's your -- how many days a week do you typically
19       hit your quota?
20  A.   At least two days a week, two to three days a week.
21  Q.   So two to three days a week, you're hitting your
22       quota?
23  A.   Yes.
24  Q.   In one day, typically how close do you come when you
25       don't hit it?
```

███████████████

2   Q.   Okay.  So on most weeks, right, before you pay your

3        tip outs, it sounds to me like you're making between

4        ███████████████████████████.

5   A.   Yes.

6   Q.   Does that sound about right?

7   A.   Sounds -- yeah.

8   Q.   Has that been consistent throughout the time that

9        you have worked there?

10  A.   Like I said, the club has its season, so in the

11       summertime, I may make less than I will make in the

12       wintertime.

13  Q.   I understand that.  That's why I'm saying on

14       average, right?  It's --

15  A.   Yes, up and down.

16  Q.   It's up and down, but on average, you walk out of

17       ██ there with about ████ a week, right?

18  A.   That's what I hope.

19  Q.   That's what's happened since 2011?

20  A.   Yeah.  I mean, I don't want to say yeah because some

████████████████████████████

██████████████████████████████████

████████████████████████

██████████████████████████████████

███████████████████

```
 1   Q.  Okay.  So let's just say I took ████ as an average.
 2       Would that seem right?
 3   A.  Okay.  Yeah, ████
 4   Q.  ████ a week on average?
 5   A.  Yeah.
 6   Q.  That accounts for the ups and downs, right?
 7   A.  Yeah.
 8   Q.  So -- and has that been fairly consistent through --
 9       from 2011, at least, on?
10   A.  Yes.
11   Q.  Okay.  Now, do you make on top of that -- and maybe
12       I'm mixing them, so correct me if I'm mixing them,
13       okay?
14   A.  Okay.
15   Q.  Do you make on top of that tips, or are tips
16       included in that?
17   A.  Tips are included.
18   Q.  Okay.  What percentage of your income is from tips
19       as opposed to the fees?
20   A.  As opposed to the dances, per dance?
21   Q.  Yeah.
22   A.  I don't know how to really split that, because I
23       could dance for this guy two songs and that's $20
24       for that song, but he could have threw a hundred
25       ones on the floor.  So I don't know how to really
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    **Page 106**

```
 1       split it percentage-wise because every customer

 2       isn't like that.

 3   Q.  Sure.  There's going to be those outliers that throw

 4       a hundred bucks and make it rain, right?

 5   A.  Exactly.

 6   Q.  But for the most part, is there an average of how

 7       much income you make from the dances as compared to

 8       tips?  Is it two for one?  Is it -- you know, is it

 9       three for one; you know, for every $30 I make in

10       dances, I make 10 bucks in tips?  Anything like

11       that?

12   A.  No.

13   Q.  Now, from the money that you collect from the

14       customers for the table dances -- well, let me back

15       you up.

16           Now, you've talked about all these fees that

17       you have to pay?

18   A.  Yes.

19   Q.  Okay.  Is there any requirement as to where you get

20       the money from?

21   A.  No.

22   Q.  You can bring it with you from home?

23   A.  Yes.

24   Q.  You could go work at 7-Eleven and make the money to

25       pay those fees?
```

```
 1   A.   Yes.

 2   Q.   You can get it from your mom?

 3   A.   To pay what fees?

 4   Q.   The fee to go in the door, the tip out to the DJ,

 5        the --

 6   A.   Yeah.  They don't care where you get it from.  You

 7        just got to pay it.

 8   Q.   Okay.  It's a fee, right?  It doesn't matter where

 9        you get the money from.

10   A.   No.

11   Q.   So nobody is like saying, okay, give me your $300

12        that you earned in tips and I'm taking off 10 bucks,

13        right?

14   A.   Right.

15   Q.   You can pay that 10 bucks from any source of income

16        you got?

17   A.   Yes.

18   Q.   It can be a gift from -- I'm just using this as an

19        example.  It can be a gift from your mom?

20   A.   Yes.

21   Q.   $10 you found blowing down the street?

22   A.   Yes.

23   Q.   Right?  It can be from anything?

24   A.   Yes.

25   Q.   Once you pay whatever these fees are, all the money
```

```
1        is yours to keep, right?

2   A.   Yes.

3   Q.   It's yours to keep whether you earn a lot or a

4        little?

5   A.   Yes.

6   Q.   So the fees are fixed, right, generally?

7   A.   Yes.

8   Q.   And the income is variable?

9   A.   Yes.

10  Q.   So you can make, like you said, $2,000 one day and

11       $800 the next?

12  A.   Yes.

13  Q.   And is that before or after you pay these fees?

14  A.   What do you mean?

15  Q.   Well, when we're talking about you make ▮▮▮, on

16       average, a week or a night, whatever it was that we

17       said --

18  A.   That's before I pay the fees.

19  Q.   Before?

20  A.   Yeah.  So if -- yeah.  If my quota is ▮▮▮ a day, I

21       would have to subtract what I have to pay before I

22       leave the club.  So, really, I'm not making the ▮▮▮

23       I'm making -- subtract my fees, and then that's what

24       I'm going home with.

25  Q.   So you're going to go home with ▮▮▮▮▮▮
```

1   A.   Yeah, yeah.  About ▇▇▇.

2   Q.   Okay.  So net in your pocket, right, is ▇▇ bucks?

3   A.   Yes.

4   Q.   Okay.  And so that would be -- if you dance four

5        nights a week, that would be roughly ▇▇▇, but we've

6        been using a little lower average than that, right?

7   A.   Yes.

8   Q.   Okay.  And that's after your fees, right?

9   A.   Yes.



19   Q.   Okay.  We're on the same page?

20   A.   Okay.

21   Q.   And I'll see that in all the years, right?

22   A.   Yes.

23   Q.   Now, if you were an employee, do you know whether or

24        not you would be entitled to claim business expenses

25        on your tax returns on Schedule C?

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    **Page 112**

```
 1                MR. LUCAS:  Object to the form of the
 2        question.  Go ahead and answer it if you can.
 3    A.  I don't -- I'm not an employee, so I don't know how
 4        that would work.
 5    Q.  Okay.  Have you spoken to a tax professional about
 6        that?
 7    A.  About what?
 8    Q.  About whether it would be, from a tax standpoint,
 9        beneficial to you to be an employee or a contractor?
10    A.  No, I haven't spoken to anyone.
11    Q.  Now, going back throughout your entire period of
12        working at The Follies, has anybody ever offered you
13        a position as an employee?
14    A.  No.
15    Q.  So nobody's ever offered to pay you a wage for the
16        services that you provide?
17    A.  No.
18    Q.  Has anybody suggested to you under what
19        circumstances the club would be willing to employ
20        you -- to employ you as a employee -- strike that.
21        That's a really bad question.
22             Has anybody ever explained to you the
23        circumstances under which the club would be
24        interested in retaining your services as an
25        employee?
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 113

```
 1   A.  No.

 2              MR. LUCAS:  That one was really good.

 3              MR. RUBIN:  Thank you.  I got to ask that

 4       one much better.

 5   Q.  Has anybody suggested to you from the club that they

 6       would be willing to employ you as an employee?

 7   A.  Willing to employ me as an employee?

 8   Q.  Yes, ma'am.

 9   A.  I don't think so.  I mean, no, I don't think so.

10   Q.  Okay.  Now, I just want to talk about some just very

11       general things, and I think some of these we talked

12       about, some of these we may not.  But I'm just going

13       to be very quick.  Okay?

14   A.  Very quick?

15   Q.  Very quick with my questions.

16   A.  I can't hear.  I can't hear your questions.

17   Q.  You can't hear me?

18   A.  I can now.

19   Q.  Okay.  I can talk much louder if you'd like.  So I'm

20       not yelling, I promise.  Tell me if I'm too loud.

21   A.  Okay.

22   Q.  Okay.  Has anybody ever at the club required you to

23       work a specific schedule?

24   A.  To work a specific schedule?  No, back -- no, not

25       that I can recall.
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 11

```
 1   Q.  Has anybody ever required you to come in on any

 2       particular shift?

 3   A.  Any particular shift, yes.

 4   Q.  When?

 5   A.  Night shift only.

 6   Q.  Were you limited to only working the night shift at

 7       one point?

 8   A.  Yes.

 9   Q.  It wasn't that you couldn't come in at another

10       shift; it was that you could work the night shift,

11       right?  That's what the club agreed with you to do?

12   A.  No.  When I first got hired, I could only work the

13       night shift.

14   Q.  Any particular days of the night shift that you

15       could work?

16   A.  No.

17   Q.  You could work the night shift on any day that you

18       wanted?

19   A.  Yes.

20   Q.  Okay.  What year was that?

21   A.  2010 and '11.

22   Q.  Okay.  At some point in 2011, did that end?

23   A.  They tried to switch it up, you know.

24   Q.  When?

25   A.  I want to say it was the summer of 2011, because the
```

```
1        girls wasn't -- there wasn't as many girls coming.

2        So I guess they needed to have a certain number of

3        girls there per night, and they were stating that we

4        had to work a slow day, which would be -- which at

5        that time was like a Monday, Tuesday or a Wednesday.

6    Q.  Who told you that?

7    A.  The house mom at the time.

8    Q.  How long did you have to work a slow day for?

9    A.  It didn't last.  It didn't last.

10   Q.  Did you ever work a slow day?

11   A.  Yes.

12   Q.  How many times?

13   A.  For the first three weeks.

14   Q.  And then it ended?

15   A.  After we said -- yeah.

16   Q.  So in all the time that you've been there, the

17       requirement that you work on any particular shift

18       lasted for three weeks?

19   A.  Yes.

20   Q.  And the only requirement was that you work a slow

21       day?

22   A.  We had to work a slow day in order to work a busy

23       day.

24   Q.  Okay.  So you could work all the slow days you

25       wanted, right?
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 116

```
 1   A.   Yes.

 2   Q.   Work all of the -- I guess all of the non-busy days

 3        that you wanted, the days or nights?

 4   A.   Yes.  I can't -- I couldn't work days, just night

 5        shift.  If I was hired night shift, I had to work

 6        night shift.

 7   Q.   Okay.  Could you ask to -- could you ask to be

 8        allowed to work on the day shift?

 9   A.   I did, but you had to ask the day shift management.

10        And the times that I did come in and say, "Hey, I

11        work night shift.  Can I work?" they said no.

12   Q.   Okay.  So as you understood it, each of the shifts'

13        managers had discretion to decide whether to

14        contract or allow certain entertainers to work or

15        not?

16   A.   Yes, I believe so.

17   Q.   Okay.  At some point, though, you were eventually

18        permitted to work the day shift?

19   A.   Yes.

20   Q.   That's because the day shift manager said, I'm

21        willing to enter into a business relationship with

22        you?

23            MR. LUCAS:  Object to the form of the

24        question.  Go ahead.

25   A.   No, no.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 11

```
 1   Q.  He said okay?

 2   A.  I didn't have to ask management.  I came in one day

 3       and I asked the door girl could I work, you know.

 4       She asked me was I going to work day shift.  I said

 5       yes.  And since she accepted my money, I just didn't

 6       go ask anybody else.

 7   Q.  That was -- but that's been since whenever?

 8   A.  Excuse me?

 9   Q.  So as you understood it, one -- on one day, you

10       decided that you wanted to work on the day shift,

11       and the door girl said okay and took your money?

12   A.  Yes.

13   Q.  When was that?

14   A.  I don't remember.  That was a while ago.

15   Q.  2011?  2012?  Before then?

16   A.  About 2012.

17   Q.  Now you can work whenever you want?

18   A.  Yes.

19   Q.  No -- you can come in in the day if you want, at

20       night if you want?

21   A.  Yes, as long as you pay your fee.

22   Q.  Okay.  Have you ever been asked to attend a meeting?

23   A.  Yes.

24   Q.  When?

25   A.  Several times.
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 118

```
 1   Q.  What kind of meeting?

 2   A.  Typically we'll have the meeting -- the manager at

 3       night will call a meeting right after the club

 4       closes.  And -- you know, if there's been problems

 5       out of the girls or if there's been too many fights

 6       or if girls haven't been paying their tip out or

 7       when new -- new rules went into play, you know, he

 8       would just call a meeting at the end of the night.

 9   Q.  So as I understand, when you're saying about calling

10       a meeting, right, you're not saying that you have to

11       come in on Saturday morning at nine to show up for a

12       meeting.  It's before -- it's after the end of the

13       shift, the manager may come talk to you guys?

14   A.  Yes.

15   Q.  Anything -- any other meetings that you can recall?

16   A.  Not that I can recall.

17   Q.  Okay.  Have you ever seen an entertainer schedule

18       anywhere in all the years that you worked at the

19       club?

20   A.  No.

21   Q.  Was there a minimum day shift -- number of day

22       requirements that you had to work at the club?

23   A.  No.

24   Q.  Okay.  I mean, realistically -- you've been there a

25       long time, right?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 11

```
 1   A.  Yes.

 2   Q.  Okay.  There are some girls who come in once a

 3       month, right?

 4   A.  I'm not sure.  I don't socialize with them, so --

 5   Q.  I understand that, but you've been --

 6   A.  Yeah.  I mean, I don't know.  I -- the ones that I

 7       see, I see all the time.

 8   Q.  There are others that you see just on rare

 9       occasions, aren't there?

10   A.  When I don't see somebody, either they quit or they

11       got fired.

12   Q.  So it's your -- so you're not aware of any

13       entertainers who come to Onyx for like a week at a

14       time and --

15   A.  To The Follies?

16   Q.  Follies.  I'm sorry.  I'm looking at some notes

17       here.

18   A.  I'm not aware of that, no.  I just don't pay

19       attention.

20   Q.  Okay.  You're not saying it doesn't happen.  You

21       just don't pay attention?

22   A.  Yeah, I'm not saying -- yeah, I just don't pay

23       attention who is there and when they're there.

24   Q.  Is the club always pretty full with entertainers?

25   A.  Yes.
```

**TASHIA ANDERSON v. WBY, INC.**

```
 1   Q.  Have you ever had a call to come to the club other

 2       than because a customer of yours was looking for

 3       you?

 4   A.  No.

 5   Q.  Have you ever paid a fine?

 6   A.  Yes.

 7   Q.  For what?

 8   A.  Not getting on stage.

 9   Q.  When have you paid a fine?

10   A.  When I first started there in 2010.

11   Q.  Okay.  When was the last time you paid a fine?

12   A.  I don't recall.  I haven't paid a fine in a long

13       time.

14   Q.  Probably 2010?

15   A.  2011.

16   Q.  Okay.  Do you recall what that fine was?

17   A.  Not getting on stage.

18   Q.  How much was it?

19   A.  $40.

20   Q.  Is that the last time you can recall ever having to

21       pay a fine?

22   A.  Yes.

23   Q.  Are there any other fines that you've ever heard of

24       at the club?

25   A.  Fines, no.
```

TASHIA ANDERSON v. WBY, INC.

**Tashia Anderson on 06/23/2015**                                    Page 121

```
 1   Q.  Did those -- did the practice of fining for not

 2       getting on stage stop in 2011 or so?

 3   A.  Did it stop?  With me.

 4   Q.  Okay.

 5   A.  Yeah.

 6   Q.  You can't speak about anybody else?

 7   A.  Yeah.  I hear other people that say they pay fines,

 8       but I can't speak for them.

 9   Q.  Who is the house mom who told you you could not work

10       the day shift?

11   A.  I don't -- I don't know her name.  It's not Abby.

12       It's the other one.  I think she's a waitress too.

13   Q.  Did you ever speak to anybody in management about

14       that?

15   A.  Yes.

16   Q.  Who?

17   A.  I don't know that day shift management's name.  I

18       don't know the guy's name.  Steve, I guess.

19   Q.  Would that have happened in 2011?

20   A.  Yes.

21   Q.  On the day shift, who do you check in with?

22   A.  The house mom.

23   Q.  And the night shift, it's the day --

24   A.  Door girl.

25   Q.  Has that been the same for as long as you can
```

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 122

```
 1      remember?

 2  A.  Yes.

 3  Q.  Other than the name Malachi, have you used any other

 4      stage names?

 5  A.  Malachi?

 6  Q.  Malachi.  I'm sorry.  I'm -- my pronunciation is

 7      terrible.

 8  A.  Yes, I have.  Not at Follies.

 9  Q.  Okay.  Where else have you used other stage names?

10  A.  Strokers, when I first started dancing.  It was

11      Trinity.

12  Q.  Trinity?

13  A.  Yes.

14  Q.  Any other stage names that you've used?

15  A.  No.

16  Q.  You provided certain answers to some discovery in

17      this case.  Do you recall that?

18  A.  Yes.

19  Q.  Have you reviewed that discovery recently?

20  A.  Not recently-recently.

21  Q.  You only would have responded within the last

22      probably two weeks or so, right?

23  A.  Yes.

24  Q.  Now, there are some calculations for fees and costs

25      and those things.  Did you make those calculations
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                          Page 123

```
 1      yourself or did somebody provide those to you?

 2   A.  Calculations for --

 3   Q.  So like here, I'm just looking at your answers to

 4      interrogatories, which I'll mark just for

 5      identification purposes as Exhibit 18.

 6             (Exhibit 18 marked for identification.)

 7   Q.  And if you take a look right -- for example, we

 8      asked you to tell us your house fees here.

 9   A.  Uh-huh.

10   Q.  Right.  And there is a whole answer here?

11             MR. LUCAS:  Go ahead.  Take your time and

12      read it.

13   Q.  You can take your time and read it, but let me just

14      go over the question so -- since I'm on the other

15      side of the table, it's hard to read to you.  And

16      all I want to know is, did you come up with these

17      calculations yourself or did somebody provide them

18      to you?

19   A.  Yes.

20   Q.  Which one is it?

21             MR. LUCAS:  Go ahead and read it.  Take

22      your time and read it, then answer his question.

23   Q.  My only question to you is --

24   A.  I came up with that.

25   Q.  Okay.  You came up with that yourself?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 12

```
 1   A.  Yes.

 2   Q.  You came up with it the same way you came up with

 3       your taxes?

 4   A.  Something like that, yes.

 5   Q.  Well, what was different?

 6   A.  What was different was -- is I came up with that

 7       with -- my taxes with the lady that prepared them,

 8       by her asking me the questions and stuff, so --

 9   Q.  But did you follow the same format that you followed

10       for coming up with that for your taxes?

11   A.  Yes, based off of how much money I -- it cost to pay

12       the fee to work and how much the DJ is required and

13       how much my tip out.  Yes, that's how I came up with

14       it.

15   Q.  These were estimates?

16   A.  Yes.

17   Q.  Maybe high, maybe low?

18   A.  Maybe a little bit higher.  I think I --

19   Q.  Same thing for -- I think it's the exact same

20       answer, but same thing for Interrogatory No. 17?  I

21       think it's the same answer, but --

22   A.  It's the exact same thing, right?

23   Q.  Yeah, I said it's the same thing.  Same way?

24   A.  Yes.

25   Q.  Can I ask you a question?  Can you hand me that
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                    Page 125

```
 1      back, please?

 2           Do you know what time period you completed this

 3      -- you completed your calculations for?  Was it the

 4      entire time that you worked?  Some period of time

 5      that you worked?

 6  A.  Over the course of the time that I've been at

 7      Follies.

 8  Q.  So since you started until now?

 9  A.  Yeah.

10  Q.  Now, did you -- were you able to complete these

11      calculations in your head or did you use scratch

12      paper to complete them?

13  A.  Yeah, I used scratch paper, calculator.

14  Q.  Did you keep that scratch paper that you used?

15  A.  No.  I didn't know I should have.

16  Q.  Okay.  I'm just asking if you did.  I'm not asking

17      if you should have.

18  A.  No.

19  Q.  I'm just asking if you did.

20  A.  No.

21  Q.  Can you tell me the numbers that you used to come up

22      with the final number, so how many days you

23      attributed to each year or how many --

24  A.  Yeah.

25  Q.  Okay.
```

```
 1   A.   Like four or five nights a week for like five

 2        months.  Three nights -- two nights, I worked

 3        doubles -- two days, I worked doubles for five

 4        months straight.

 5   Q.   Can you tell me what particular year?

 6   A.   2012 and '13.

 7   Q.   So some crossover period?

 8   A.   Yeah.

 9   Q.   Go ahead and finish.

10   A.   And I just added how much I would have to have paid

11        out for the day shift and the night shift when I did

12        work the doubles, and I used that -- those numbers

13        to calculate around about.

14   Q.   Did you make any subtractions for time that you

15        didn't work?

16   A.   Yes.

17   Q.   Okay.  What time did you take off for not working?

18   A.   When I was pregnant.

19   Q.   Any others?

20   A.   The days that -- the nights that I didn't work.

21   Q.   How do you know the nights that you did work versus

22        the nights you didn't work?

23   A.   Because I kept myself on a schedule.

24   Q.   That was the schedule that we talked about earlier?

25   A.   Yes.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 12

```
 1   Q.  Did you ever go on vacation?

 2   A.  Not really.

 3   Q.  Since 2011, you haven't gone on vacation?

 4   A.  I will just -- my vacation was the days that I

 5       didn't work.  If I did go on a vacation, it would be

 6       like that Monday, Tuesday, Wednesday, I would be

 7       gone.

 8   Q.  Did you ever go like travel to Vegas or anywhere

 9       with your friends or family?

10   A.  I have, but it was on my days off.  It wasn't like a

11       vacation.

12   Q.  Did you ever perform in Vegas?

13   A.  No.

14   Q.  So there would be no time where you didn't work 52

15       weeks in a year?

16   A.  Where I didn't work 52 weeks in a year?

17   Q.  Yes, ma'am.

18   A.  Yeah.  When I was pregnant.

19   Q.  I'm sorry.  Excluding when you were pregnant.

20   A.  It's a possibility that there were some weeks that I

21       didn't work, yeah.

22   Q.  Did you take holidays off ever?

23   A.  Yeah.  I didn't work on Christmas.  I didn't work on

24       Thanksgiving.

25   Q.  Did you take those weeks off?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                              Page 128

```
 1   A.   Yes.

 2   Q.   Okay.  So would -- did you adjust for those in your

 3        calculations?

 4   A.   I did.

 5   Q.   How did you adjust for those?

 6   A.   I basically -- like I said, I had myself on a strict

 7        schedule.  I knew the quota that I wanted to meet,

 8        what I needed, and I just made my adjustments

 9        accordingly.  I wouldn't say I worked the whole 52

10        weeks for three years straight, you know.

11   Q.   So just give me an example.  Other than being

12        pregnant, how many weeks off did you take a year,

13        generally?

14   A.   If I add up all the days, I never took --

15   Q.   No, I'm not asking you to add up the days.  Weeks

16        you did not work.

17   A.   There isn't one week that I didn't work.

18   Q.   Okay.  So every -- so every week you worked --

19   A.   I may not have worked those four or five days, but I

20        made -- I know for sure I worked two or three days a

21        week for 52 weeks.

22   Q.   When you did your calculations, did you come up with

23        averages for how many days a week you were working?

24   A.   Yes.  I scribbled.

25   Q.   What was the average that you used?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 12

```
 1   A.  For what?

 2   Q.  The days of the weeks that you were working.

 3   A.  Four days a week.

 4   Q.  Do you still use your Twitter handle Private Life?

 5   A.  Yeah.

 6   Q.  Do you use any other Twitter handles?

 7   A.  No.

 8   Q.  Do you have any other social media that you've used

 9       in the last four years?

10   A.  Facebook, Instagram.

11   Q.  Okay.  What's your Facebook handle?

12   A.  My first name, Godislove Anderson.

13   Q.  Have you used any others?

14   A.  Instagram, Private Life.

15   Q.  Okay.  Is there a difference between what you use on

16       Facebook and the Private Life handle with what you

17       -- the types of stuff you post?

18   A.  No.

19   Q.  Is one more geared towards friends and family and

20       one more geared towards the public?

21   A.  Facebook is geared towards friends, family, and

22       public, because there's a lot of people I have on

23       there that I don't know them, you know.

24   Q.  But for the most part, it's geared toward -- now,

25       your Twitter and all the other one and your
```

TASHIA ANDERSON v. WBY, INC.

Tashia Anderson on 06/23/2015                                    Page 130

```
 1        Instagram, is that more geared for your business

 2        use?

 3   A.   No.

 4   Q.   How do you use Twitter?

 5   A.   I don't anymore.

 6   Q.   When was the last time you used Twitter?

 7   A.   Probably February, March of this year.

 8   Q.   Okay.  You've had other periods of time where you've

 9        gone a couple of months without using it, haven't

10        you?

11   A.   Yes.

12   Q.   You haven't deleted your account, did you?

13   A.   No.

14   Q.   Now, Instagram, same way?

15   A.   No.  I'm on Instagram more often.

16   Q.   Did you ever use Instagram for business-related

17        purposes?

18   A.   No.  When it pertains to working at Follies?

19   Q.   Yes, ma'am.

20   A.   No.

21   Q.   Do you have a calendar?

22   A.   A calendar?

23   Q.   Yes, ma'am.  Do you keep a calendar?

24   A.   Uh-huh.

25   Q.   What kind of calendar do you keep?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 131

```
 1   A.   Ones that have kittens on it.

 2   Q.   Okay.  So on your pretty kitten calendar you've got

 3        hanging in your --

 4   A.   In my kitchen on a wall.

 5   Q.   We have a pretty dog one, so --

 6   A.   Okay.

 7   Q.   -- I relate.

 8             Do you record -- what kind of information do

 9        you record on your calendar?

10   A.   My daughter's extracurricular activity schedules.

11   Q.   Do you ever record when you're working?

12   A.   Not at all.

13   Q.   Do you record -- so how do you know when you're

14        planning on working during the workweek, or is it

15        just in your head?

16   A.   It's in my head.

17   Q.   Are there any records that you have anywhere of any

18        days that you worked?

19   A.   No.

20   Q.   Of any shifts that you've worked?

21   A.   No.

22   Q.   Of any fees that you pay?

23   A.   No.

24   Q.   Any tip outs that you've made?

25   A.   Nope.
```

```
1   Q.   Have you done anything since the institution of this
2        litigation or this arbitration to preserve that
3        information on your end?
4   A.   To preserve the recent information?
5   Q.   Yes, ma'am.
6   A.   No, I haven't.  Maybe I should have.
7   Q.   Have you taken any steps to secure any records that
8        you may have, even if it's just scraps of paper?
9   A.   No.
10  Q.   In the last four years, have you had any employment
11       with anybody other than The Follies --
12  A.   No.
13  Q.   -- of any type?
14  A.   No.
15  Q.   Have you received any source of income from any
16       source other than The Follies?
17  A.   No.
```





12          MR. RUBIN:  What number are we on?

13          THE REPORTER:  Nineteen.

14          (Exhibit 19 marked for identification.)

15  Q.  I'm going to show you what I've had marked as

16      Exhibit 19.  I'm going to ask you just to take a

17      look at this document.  It's a demand for

18      arbitration filed in connection with this matter

19      that we're here for.  Have you seen this document

20      before?

21  A.  Yes.

22  Q.  Okay.  I'm not going to ask you to look at any of

23      the first few pages of this, okay, but can you turn

24      all the way to the back?  There is an Exhibit A.

25  A.  Okay.

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 136

```
 1   Q.  Okay.  Is that your signature?

 2   A.  Yes.

 3   Q.  Okay.  The first letter there to me looks like an L,

 4       not a T.  Am I just reading that wrong?

 5   A.  Yes.  It's a T.

 6   Q.  So that's -- okay.  Do you see where on the

 7       signature it looks like you signed it with an L?

 8   A.  Uh-huh.

 9   Q.  That's not Lakasha?  It's --

10   A.  No.

11   Q.  So Tasha is your full legal name?

12   A.  Tashia.

13   Q.  Tashia.  I'm sorry.

14           Turning to Exhibit B, there are some other

15       signatures on what's an entertainer contract.  Do

16       you see that?

17   A.  Yes.

18   Q.  Appears that it's dated 2012 but signed by you in

19       2014.

20   A.  Yes.

21   Q.  Is this your signature?

22   A.  Yes.

23   Q.  Okay.  Do you recall whether or not you signed a

24       prior version of this document?

25   A.  What day is that, March 2, 2014?
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 13

```
 1   Q.  Or March 22nd.  I can't read that, whatever the date

 2       is.  Do you recall signing one of these prior to

 3       2014?

 4   A.  No.

 5   Q.  This would be the first one?

 6   A.  Yes.

 7   Q.  Okay.  If you turn to the next document, it's an

 8       arbitration policy.

 9   A.  Uh-huh.

10   Q.  Looks like that's dated March 2nd of 2014.

11   A.  Yes.

12   Q.  Is that the first time you ever signed one of these?

13   A.  Yes.

14   Q.  You never signed an arbitration policy before that?

15   A.  No.

16   Q.  If I turn to what is the front of Exhibit B here --

17       strike that.

18           Yep, front of Exhibit B, there is a memo dated

19       June 21st of 2012 that appears to be attached to the

20       documents that you're attaching.  Have you ever seen

21       that letter before?

22   A.  Not prior to when I signed it.

23   Q.  Okay.  So you don't recall seeing anything in 2012,

24       2013 or 2014?

25   A.  No.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                        Page 138

```
 1   Q.  You don't recall any revisions to documents being

 2       made?

 3   A.  No.

 4   Q.  Okay.

 5              (Exhibit 20 marked for identification.)

 6   Q.  I'll show you what I've had marked as Exhibit 20.

 7       I'll ask you to take a look at this document and

 8       just tell me if you've ever seen this document

 9       before.

10   A.  Yes, I have.

11   Q.  What is this document?

12   A.  This is the one that they had me sign when I came

13       back after having my son.

14   Q.  So is this the second one or the first one?

15   A.  I believe this is the -- let me see, because it was

16       revised.  I have to read it.  This may be the second

17       one.  I can't read it.  And then it's not dated.

18       This is the second one.

19   Q.  So this is the second one that you've signed?

20   A.  Yes, I believe so.

21   Q.  Is that your finger in the --

22   A.  Yes.

23   Q.  Okay.  So this is actually you holding it?

24   A.  Yes.

25   Q.  And you took a photograph of it?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 13

```
 1   A.  Yes.

 2   Q.  Where were you when you took a photograph of it?

 3   A.  In the dressing room.

 4   Q.  Before or after you signed it?

 5   A.  After I signed it.

 6   Q.  What did you do with this document once you signed

 7       it?

 8   A.  Gave it to the girl at the front door.

 9   Q.  What did you do with the photographs that you took

10       of these pages?

11   A.  In my phone.

12   Q.  So you could read them at your leisure?

13   A.  Yes.

14           MR. RUBIN:  We'll take a quick break.

15           (Recess.)

16   BY MR. RUBIN:

17   Q.  Other than your tax returns, do you have any other

18       documents that are in any way related to this case

19       anymore?

20   A.  No.

21   Q.  What have you done to look for documents, anything?

22   A.  Nothing, because I know I don't have any.

23   Q.  Have you looked in filing cabinets or drawers or on

24       your computer or checked your e-mail?

25           MR. LUCAS:  Objection.  Asked and
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                   Page 1  0

```
 1       answered.
 2                  MR. RUBIN:  Not in this depo.
 3                  MR. LUCAS:  She just said there's nothing
 4       to look for, so she didn't look.
 5  Q.  So you didn't look in any of those places?
 6  A.  No.
 7  Q.  I'll show you what we've marked as Exhibit 7
 8       yesterday.  And just tell me if you've ever seen
 9       this document before.
10  A.  Yes.
11  Q.  Where did you see this document?
12  A.  In the dressing room, posted on the mirrors and the
13       wall.
14  Q.  What day?
15  A.  I don't know the exact day.
16  Q.  How long was it on the wall for?
17  A.  About a month.
18  Q.  Are you sure it was about a month?
19  A.  It was some weeks, yeah, before they took it down.
20  Q.  Okay.  So when was the first day that you saw it?
21                  MR. LUCAS:  Objection.  Asked and
22       answered.
23  Q.  When was the first day that you saw it?  Any
24       particular day that you can tell me?
25  A.  I don't recall the day.
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                    **Page 1  1**

```
 1   Q.  Do you recall -- do you recall the date as opposed

 2       to the day, or whether it was a Friday or Saturday?

 3   A.  Two days before March the 10th.  Is that the date

 4       that's on here?

 5   Q.  So it would have been March 8th?

 6   A.  Yes.

 7   Q.  When did you take a copy of this document?

 8   A.  The 9th.

 9   Q.  Okay.  And when was the last date after you took a

10       copy of this document that you saw one at the club?

11   A.  When was the last day?

12   Q.  Yes.  So March 8th was the day that you --

13   A.  Saw it.

14   Q.  -- saw it.  March 9th was the day you took a copy of

15       it.  And when was the last day that you personally

16       saw it?

17   A.  I don't know the exact day.

18   Q.  Do you know whether or not any of these things ever

19       happened?

20   A.  Yes.

21           MR. LUCAS:  Objection to form of the

22       question.  She already answered it.

23   Q.  Okay.  What happened on this -- on this form after,

24       I guess, March 10th?

25           MR. LUCAS:  Object to the form of the
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                          Page 1  2

```
 1      question.

 2   Q.  Well, did something happen after March 10th?

 3       Something change?

 4   A.  Yeah.

 5   Q.  What changed?

 6   A.  Everything that this form says is what changed.

 7   Q.  Okay.  So everything changed.  So you -- the valet

 8       needed to be paid before coming in?

 9   A.  Yes.

10   Q.  How long did that last for?

11   A.  It still goes on.

12   Q.  Okay.  House fees need to be paid up front?

13   A.  Yes.

14   Q.  Wasn't that the rule before?

15   A.  Yes.

16   Q.  Nothing different about that rule?

17   A.  No.

18   Q.  Were the house fees listed correct?

19   A.  Yes.

20   Q.  Okay.

21   A.  The only thing that changed is the house fees.  The

22       house fees changed.

23   Q.  There were increases?

24   A.  Prior to this day --

25   Q.  Uh-huh.
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 1  3

```
 1   A.   -- we only had to pay $15 before eight.

 2   Q.   Okay.  But the rest of them stayed the same?

 3   A.   Take $20 off of before -- I mean after eight, so

 4        that would be, what, 35?

 5   Q.   Okay.

 6   A.   Take $20 after nine, so that would be 45.

 7   Q.   Okay.

 8   A.   Take $20 off of after ten, that would be 65.

 9   Q.   Do you know how that interrelates to Exhibit 2,

10        which is a document that you had seen at various

11        times from the club from 2011?

12   A.   What do you mean?

13   Q.   Do you know if there is any relationship between the

14        two?

15             MR. LUCAS:  Object to the form of the

16        question.

17   Q.   I'm just asking if you know.

18   A.   I don't know.  I -- I don't know.  Like I said, I

19        don't understand that right there.  All I understand

20        is what was told to me and what I had to pay.

21   Q.   All my question was, do you know the relationship,

22        if any, between the two?

23   A.   No, I don't.

24   Q.   Okay.  Okay.  It says you will still get your see ya

25        pass from the house mom?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 1

```
 1   A.  Yes.

 2   Q.  Is that the way it was before?

 3   A.  Yes.

 4   Q.  Is that the way it was after?

 5   A.  Yes.

 6   Q.  Anything change about that?

 7   A.  No.

 8   Q.  Tip out; anything about the tip out change?

 9   A.  No.

10   Q.  The same before, same after?

11   A.  Yes.

12   Q.  See ya passes, does anything about that change?

13   A.  No.

14   Q.  Leaving early, do you see anything there?

15   A.  Yeah.  Because of the club's jurisdiction, we no

16       longer close at 4:00 a.m.  So it's not 4:00 a.m.;

17       it's 3:00 a.m.

18   Q.  It wasn't 3:00 a.m. on this date either, was it -- I

19       mean, it wasn't 4:00 a.m. on this date, was it,

20       either?

21   A.  No.

22   Q.  Do you know if any other -- if there's any other

23       mistakes on this document?

24   A.  No.

25   Q.  Any other documents that you've seen like this ever?
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                    Page 1 5

```
 1   A.  No.

 2   Q.  This one, you saw for some period of about a month

 3       or less?

 4   A.  Yes.

 5   Q.  And you didn't see it before March 8th, and you

 6       haven't seen it anytime after --

 7   A.  No.

 8   Q.  -- say, March 20th or so?

 9   A.  No.

10   Q.  Okay.  Had you -- when was the first time you were

11       in contact with any lawyer about suing Follies?

12   A.  They have that information.

13   Q.  I'm asking you.

14   A.  I don't remember.  I don't remember the exact day.

15   Q.  Was it before or after March 8th?

16   A.  It was before March 8th.

17   Q.  When did you ever ask Follies to treat you as an

18       employee?

19   A.  I never physically asked them to treat me as an

20       employee.  I asked them to stop treating me as an

21       employee if I was an independent contractor.

22   Q.  In which ways -- well, in which ways, other than

23       what we've talked about today, have they treated

24       you, you believe, as a contractor -- as an employee?

25       Is there anything that we haven't talked about?
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 1 6

```
 1   A.   Nothing that we haven't talked about.
 2   Q.   Okay.  Now, was there any terms and conditions that
 3        you offered the club under which you'd be willing to
 4        work as an employee?
 5   A.   No.
 6   Q.   Okay.  Well, for example have you ever heard of the
 7        term "tip minimum wage employee"?
 8   A.   No, I never heard of that.
 9   Q.   Do you ever -- do you know what -- like, for
10        example, a waitress, they get paid reduced wages
11        plus they get to keep tips.  That's tip minimum wage
12        employees.
13   A.   Yeah.  That's what waitresses do, yeah.
14   Q.   Have you ever asked to be treated as a tip minimum
15        wage employee?
16   A.   No.
17   Q.   Have you ever asked to be treated as a minimum wage
18        employee?
19   A.   No.
20   Q.   Well, I know we talked about this earlier, I think,
21        but I'm not sure if I talked to you about it or
22        Ms. Payne, so I'm going to ask you.  I'm going to
23        ask you this, and if I asked you, I apologize, but
24        had you ever agreed or would you ever be willing to
25        work at the club as a tip minimum wage employee?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                     Page 1

1              MR. LUCAS:  Objection.  Calls for

2        speculation.

3    Q.  If the club said today, We're going to convert you

4        to a tip minimum wage employee, pay you 2.13 an hour

5        plus tips -- and tips, I don't money dance fees, but

6        I mean money above the dance fee --

7              MR. LUCAS:  Same objection.

8    Q.  -- would you take that job?

9              MR. LUCAS:  Same objection.

10             THE WITNESS:  Do I answer?

11             MR. LUCAS:  Yeah.  Go ahead.

12   A.  No, I wouldn't take the job.  Why would I want to be

13       paid less than what I can make as an independent

14       contractor?  I would prefer to stay an independent

15       contractor and be treated as an independent

16       contractor.

17   Q.  Which rules would you like them to get rid of?

18   A.  Me having a mandatory tip out.  If I don't make the

19       money to tip out, I shouldn't be required to pay it

20       the next day.

21   Q.  Okay.  So the only -- so is it fair to say that the

22       only thing that you're seeking from this lawsuit is

23       to get rid of the -- this arbitration on your behalf

24       is to get the fees back for which you paid on days

25       that you didn't make them?

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                        Page 1 8

```
 1                    MR. LUCAS:  Object to form of the
 2        question.  Go ahead and answer.
 3    A.  Ask the question again.
 4                    MR. RUBIN:  Can you read that back,
 5        please?
 6                    (Record read back as requested.)
 7    Q.  Let me just redo it.  I don't even understand it.  I
 8        understand Paul's objection.
 9            Other than receiving the fees back on days in
10        which you did not make an -- appropriate money to
11        pay your tip out, are you seeking anything else?
12                    MR. LUCAS:  I object to the question.
13        Exhibit 19 has her demand.  You have it in front of
14        you.
15    Q.  I'm asking you, are you seeking anything else?
16    A.  I still don't understand the question.
17    Q.  You just told me you didn't want to be treated as an
18        employee, right?
19    A.  Right.
20    Q.  You want to stay as an independent contractor?
21    A.  Right.
22                    MR. LUCAS:  You took her down the road of
23        speculation and then asked her to make a conclusion
24        on it.  It's a totally improper question.  My
25        objection stands.  Go ahead and answer it if you
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                           Page 1

```
 1      can.
 2                  MR. RUBIN:  Okay.  There is no question
 3      pending.
 4                  MR. LUCAS:  It's an imaginary world.
 5   Q. You've already told me --
 6                  MR. RUBIN:  I'm going to repeat my
 7      question.  You can have a standing objection.
 8                  MR. LUCAS:  He can stop talking out loud.
 9   Q. You've already told me that you don't want to be
10      converted to an employee, you want to stay an
11      independent contractor, so I'm trying to
12      understand --
13                  MR. LUCAS:  It mischaracterizes her
14      testimony.  Ask her a question.
15                  MR. RUBIN:  I'm trying to ask her a
16      question.
17                  MR. LUCAS:  Don't tell her what she's
18      saying.
19                  MR. RUBIN:  Hold on.  You know what, this
20      is cross-examination.  I get to ask the questions
21      however I'd like.
22   Q. Now, you've already told me that you don't want to
23      be an independent contractor -- you don't want to be
24      treated as an employee, want to stay as an
25      independent contractor, and I'm just trying to
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    **Page 150**

```
 1      understand generally, because you said what you
 2      don't want is to have to pay, if I have it right,
 3      tip out on days that you don't make enough money.
 4      Did I understand that right?
 5  A.  No.  I don't want to pay tip out, period.  If I'm an
 6      independent contractor, then that means I tip at my
 7      discretion.
 8  Q.  Okay.  Now, you understand that, for example, if you
 9      wanted to run a business like a law firm, right, and
10      you're qualified, you might have to rent space to do
11      it?
12              MR. LUCAS:  I'm going to object to the
13      form of the question.
14  Q.  Do you understand that?
15  A.  No.
16  Q.  Okay.  You also -- you see all these buildings in
17      town?
18  A.  Uh-huh.
19  Q.  You understand that they have offices?
20  A.  Uh-huh.
21  Q.  Right?  There's landlords who rent space to people
22      who want to use that space?
23  A.  Yes, uh-huh.
24  Q.  So when you say all these tip outs, are you
25      referring to the tip outs to the individuals or are
```

**TASHIA ANDERSON v. WBY, INC.**
**Tashia Anderson on 06/23/2015**                                    Page 151

```
 1      you referring to the fee that you pay to the house?

 2   A.  Both.

 3   Q.  Okay.  Now, what -- why would the house want to let

 4      you work there for free?

 5   A.  I don't know why they --

 6              MR. LUCAS:  Objection.  Calls for

 7      speculation.  It's an imaginary world you're

 8      building these questions upon.

 9              MR. RUBIN:  Okay.  You know, you can have

10      a standing objection, but please try to stop trying

11      to instruct the witness.  It's really improper,

12      Paul.

13              MR. LUCAS:  Well, this is just ridiculous.

14              MR. RUBIN:  Okay.  Thank you.

15   Q.  Now, my question to you is this, is, under what

16      circumstance do you believe that the club would let

17      you retain the fees for the services that you

18      perform for customers?

19   A.  I can't speak for the club, but if that was the

20      case, they should have made that clear when they

21      hired me.

22   Q.  Well, they did make that clear, right?  They said

23      that you get to retain all the dances that you do,

24      and these are the fees that you have to pay for that

25      privilege, didn't they?
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                    Page 152

```
 1   A.   Yeah.  But in the paperwork that I signed, it

 2        clearly states that it's at my discretion.

 3   Q.   What's at your discretion?

 4   A.   The tip out and everything like that.  Now, as far

 5        as renting space, that should have been noted in the

 6        agreement which I signed.

 7   Q.   Well, you knew every day that you came there that

 8        that was the agreement that you were making, didn't

 9        you?

10   A.   But I also knew that when I first started there, I

11        paid $15.  And after everything came about, they --

12        they took the $20 dance -- the $20 dance ticket and

13        they included that into the fine -- the fee, which

14        took it up to 35.

15   Q.   Okay.  But if you didn't like that, you didn't have

16        to show up there.  You could go do business with

17        another club, couldn't you?

18   A.   I mean, I wanted to keep my job there, but at some

19        point, if I got my -- my permit back, then I

20        wouldn't be able to work there.

21   Q.   But you've been doing this and you came back even

22        after a maternity leave.  You could go somewhere

23        else, right?

24   A.   I could have went somewhere else.

25   Q.   You chose to come here because you make a lot of
```

**TASHIA ANDERSON v. WBY, INC.**

Tashia Anderson on 06/23/2015                                    Page 153

```
 1        money here, right?

 2   A.   No, because that's where I -- that's where I've been

 3        working at for the past couple years, and so I

 4        didn't want to have to go somewhere and start over.

 5   Q.   Since 2011, the -- the second day you were there for

 6        sure, you knew what the deal was, right?

 7   A.   I knew what the fees were?

 8   Q.   Yeah.

 9   A.   Yeah.

10   Q.   And the club was very clear with you as to what --

11        the fees you would have to pay, right?

12   A.   Yeah.  $15.

13   Q.   Well, $15, plus $20 ticket, plus whatever else you

14        had to pay all these people, right?

15   A.   Yeah.  They were clear about that.

16   Q.   Okay.  And at some point, they decided that they

17        were going to raise that fee, right?

18   A.   Yeah.

19   Q.   And your choice was whether or not you wanted to

20        continue to do business with them, right?

21   A.   What do you mean?

22   Q.   Well, you could have -- your choice was whether or

23        not you wanted to continue to do it under the

24        changed arrangement, right?

25   A.   Right.
```

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 15

```
 1   Q.  Okay.  You may -- and you kept saying yes, right?

 2   A.  Yeah.

 3   Q.  Okay.

 4   A.  I paid the fees.

 5              MR. RUBIN:  I've got nothing else.  Thank

 6       you.

 7              MR. LUCAS:  All right.  Thanks.

 8              (End at 4:10 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**TASHIA ANDERSON v. WBY, INC.**
Tashia Anderson on 06/23/2015                                  Page 155

```
 1    ATTACH TO THE DEPOSITION OF TASHIA ANDERSON
      In Re:  ANDERSON v. WBY, INC., d/b/a THE FOLLIES
 2

 3
                            ERRATA SHEET
 4
      INSTRUCTIONS:  After reading the transcript of your
 5    deposition, note any change or correction to your
      testimony and the reason therefor on this sheet.  DO
 6    NOT make any marks or notations on the transcript
      volume itself.  Sign and date this errata sheet
 7    (before a Notary Public, if required).

 8    PAGE    LINE
      _____   _____       CHANGE:_____
 9    _____   _____       REASON:_____
                          CHANGE:_____
10    _____   _____       REASON:_____
                          CHANGE:_____
11    _____   _____       REASON:_____
                          CHANGE:_____
12    _____   _____       REASON:_____
                          CHANGE:_____
13    _____   _____       REASON:_____
                          CHANGE:_____
14    _____   _____       REASON:_____
                          CHANGE:_____
15    _____   _____       REASON:_____
                          CHANGE:_____
16    _____   _____       REASON:_____
                          CHANGE:_____
17    _____   _____       REASON:_____
                          CHANGE:_____
18                        REASON:_____

19            I have read the foregoing transcript of my
      deposition and except for any corrections or changes
20    noted above, I hereby subscribe to the transcript as
      an accurate record of the statements made by me.
21

22            _____
              Tashia Anderson   Date
23

24

25
```

1

2

3

4

5    C E R T I F I C A T E

6

7

8    GEORGIA:

9

10        I hereby certify that the foregoing deposition

11   was reported, as stated in the caption, and the

12   questions and answers thereto were reduced to the

13   written page under my direction; that the foregoing

14   pages 1 through 157 represent a true and correct

15   transcript of the evidence given.  I further certify

16   that I am not in any way financially interested in

17   the result of said case.

18        Pursuant to the Rules and Regulations of the

19   Board of Court Reporting of the Judicial Council of

20   Georgia, I make the following disclosure:

21        I am a Georgia Certified Court Reporter.  I am

22   here as an independent contractor for Huseby,

23   Incorporated.

24        I was contacted by the offices of Huseby,

25   Incorporated to provide court reporting services for

TASHIA ANDERSON v. WBY, INC.
Tashia Anderson on 06/23/2015                                    Page 15

1    this deposition.  I will not be taking this

2    deposition under any contract that is prohibited by

3    O.C.G.A. 15-14-37 (a) or (b).

4         I have no written contract to provide reporting

5    services with any party to the case, any counsel in

6    the case, or any reporter or reporting agency from

7    whom a referral might have been made to cover this

8    deposition.  I will charge my usual and customary

9    rates to all parties in the case.

10                        This 6th day of July, 2015.

11

12

13

14

15                        _____

16                        Sandra Kwiecien

17                        Certified Court Reporter

18                        CRR-6012-7323-6088-4224

19                        License Valid Until

20                        April 1, 2016

21

22

23

24

25