# EXHIBIT B

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                          Page 1

```
 1                                        VOLUME:   I
                                          PAGES:    1-177
 2                                        EXHIBITS:  See Index

 3                AMERICAN ARBITRATION ASSOCIATION

 4

 5    ******************************

 6    TIARA PAYNE,

 7          Claimant,

 8          v.                          CASE NO.
                                        01-14-0000-5109
 9    WBY, INC., d/b/a THE FOLLIES,

10          Respondent.

11    ******************************

12

13                DEPOSITION of TIARA PAYNE

14                Tuesday, June 23, 2015

15                8:51 a.m. to 12:03 p.m.

16         Constangy, Brooks, Smith & Prophete, LLP

17              230 Peachtree Street, NW

18                   Atlanta, Georgia

19         Reporter:  Sandra Kwiecien, RPR, CLR
                     CCR-6012-7323-6088-4224
20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    NICHOLS KASTER

 3        By:  Paul J. Lukas, Esq.

 4        4600 IDS Center

 5        80 S. 8th Street

 6        Minneapolis, Minnesota 55402

 7        877.448.0492

 8        lukas@nka.com

 9        On behalf of the Claimant

10

11    JACKSON LEWIS, P.C.

12        By:  Allan S. Rubin, Esq.

13             Erin J. Krinsky, Esq.

14        2000 Town Center, Suite 1650

15        Southfield, Michigan 48075

16        248.936.1900

17        rubina@jacksonlewis.com

18        On behalf of the Respondent

19

20

21

22

23

24

25
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 3

```
 1     APPEARANCES (CONT'D):

 2     CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

 3          By:  Tamika R. Nordstrom, Esq.

 4          230 Peachtree Street, NW, Suite 2400

 5          Atlanta, Georgia 30303

 6          404.525.8622

 7          tnordstrom@constangy.com

 8          On behalf of the Respondent

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Also present:

25     Steve Youngelson
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                    Page

```
 1                    I N D E X

 2  DEPONENT:                              PAGE

 3  TIARA PAYNE

 4      Examination by Mr. Rubin               5

 5

 6

 7                 E X H I B I T S

 8  NO.          DESCRIPTION               PAGE

 9  Exhibit 11   Memo dated 6/21/12         100

10  Exhibit 12   Photo Packet of

11               Entertainment Contract     111

12  Exhibit 13   Sign-In Packet             113

13  Exhibit 14   Interrogatories            172

14

15

16

17

18

19

20

21

22

23

24

25  (Original exhibits attached to original transcript.)
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                      Page 5

```
 1               P R O C E E D I N G S

 2          TIARA PAYNE, having been duly sworn, was

 3   examined as follows:

 4          EXAMINATION BY MR. RUBIN:

 5   Q.  Good morning, Ms. Payne.  My name is Allan Rubin.

 6       How are you?

 7   A.  I'm fine.  How are you?

 8   Q.  Good.  I introduced myself to you briefly before the

 9       deposition.  Today I'm going to be taking your

10       deposition in an arbitration matter that you

11       commenced before AAA in a matter captioned Payne

12       versus WBY, d/b/a The Follies.

13          Are you a party to that claim?

14   A.  Yes, I am.

15   Q.  You are the Tiara Payne who initiated that

16       arbitration matter?

17   A.  Yes.

18   Q.  Okay.  Have you ever been deposed before?

19   A.  As --

20   Q.  Have you ever gone through this process before?

21   A.  No.

22   Q.  Okay.  Have you ever been in a room where somebody

23       swore you to tell the truth and answer questions?

24   A.  No.

25   Q.  Okay.  You understand that, although we're sitting
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                        Page 6

```
 1          in a law office conference room, that you've been

 2          sworn to tell the truth by somebody authorized to

 3          administer oaths in the State of Georgia?

 4   A.     Yes.

 5   Q.     And you are under the same penalties of perjury as

 6          if you were testifying in a courtroom?

 7   A.     Yes.

 8   Q.     Okay.  During today's deposition I'm going to be

 9          asking you a series of questions.  Okay?  And this

10          process can generally seem to be kind of not formal

11          because we're not in a courtroom.  But

12          unfortunately, it's every bit as formal.  Okay?  And

13          by that -- what I mean by that is that I'm going to

14          be asking you questions, and I'm going to expect you

15          to answer those questions.  Okay?  Do you understand

16          that?

17   A.     Yes.

18   Q.     Okay.  If I ask you a question that you don't

19          understand, I need you to let me know.  Okay?

20   A.     Okay.

21   Q.     And it's very important that you let me know before

22          you answer a question because if you answer a

23          question, you are going to -- the court reporter is

24          going to take down what you say.

25   A.     Okay.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page

```
 1   Q.   Okay.  And later we're all going to get a transcript

 2        of your testimony.

 3   A.   Okay.

 4   Q.   Okay?  And that's going to have all the questions

 5        that I ask you and all the answers that you give.

 6        Okay?

 7   A.   Okay.

 8   Q.   It's important that you answer -- it's important

 9        that you tell us you don't understand, you don't

10        hear or can't comprehend what I'm asking or

11        anything, if my question is unclear.  Because once

12        you give me an answer, everybody who reads this

13        transcript is going to make two assumptions:  The

14        first is that you heard the question that was asked

15        of you, you heard and understood it.  Do you

16        understand that?

17   A.   Yes.

18   Q.   Secondly, that you are intending to give me -- you

19        are intending to give the answer that you are giving

20        to that question.  Okay?

21   A.   Okay.

22   Q.   This is not a marathon.  We have as long as it takes

23        to go through this process.  If you need to take a

24        break any reason, as long as there is not a question

25        pending, I'll be happy to take a break.
```

1   A.   Okay.

2   Q.   Have you ever been a party to a lawsuit before?

3   A.   Yes.

4   Q.   How many times?

5   A.   Once.

6   Q.   What did that lawsuit involve?

7   A.   It was Shooter's Alley class action lawsuit.

8   Q.   Were you a named plaintiff?

9   A.   I need to understand that better.

10  Q.   Sure.  Were you the person who initiated that case?

11  A.   No.

12  Q.   Did you go through a process called "opting in"?

13  A.   I don't know what that is.

14  Q.   Did you get a note or a letter in the mail from

15       somebody saying, Do you want to be part of this

16       lawsuit?

17  A.   Yes.

18  Q.   And you signed your name?

19  A.   Yes.

20  Q.   And you became part of that lawsuit?

21  A.   Yes.

22  Q.   Were you deposed in that case?  Asked questions

23       under oath?

24  A.   No.

25  Q.   Did you respond to any written questions?

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                      Page

```
 1   A.  I don't remember.

 2   Q.  Well, in this case you were asked some questions

 3       that you were asked to respond to in writing; do you

 4       recall that?

 5   A.  I don't remember.

 6   Q.  Okay.  Do you recall being sent a document called

 7       "Respondents's First Set of Interrogatories"?

 8   A.  Is this paperwork that --

 9               THE WITNESS:  Is this the paperwork

10       that --

11               MR. LUCAS:  Yes.

12   A.  See, I'm not sure what it is that I agreed to.  I

13       was forced to sign paperwork or I was --

14               MR. LUCAS:  No, no, no.  He's talking

15       about in connection with this lawsuit, the

16       interrogatories and request for admission answers,

17       the discovery stuff.

18   A.  Discovery, yes, I read through the discovery.

19   Q.  Okay.  Did you prepare those discovery responses?

20   A.  Yes.

21   Q.  Okay.  Did you prepare similar types of documents

22       when you were responding to -- when you were

23       involved in the Shooter's Alley case?

24   A.  I don't remember.

25   Q.  Okay.  Did you have a lawyer in that case?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 10

```
 1   A.  Yes.

 2   Q.  Who was your lawyer?

 3   A.  Kimberly Martin.

 4   Q.  Was she the lawyer for the, quote, "class"?

 5   A.  Yes.

 6   Q.  As a result of that lawsuit, did you receive any

 7       money?

 8   A.  Yes.

 9   Q.  How much?

10   A.  I don't remember.

11   Q.  That wasn't very long ago, was it?

12   A.  I don't remember how much it was.

13           MR. LUCAS:  I have to -- you know what?

14       I'm not sure what her -- I should probably instruct

15       her not to answer because I'm not sure what her

16       confidentiality provision -- to the extent there was

17       one in that case.  I wasn't the counsel.  I'm going

18       to instruct her not to answer about amount anyway.

19       She doesn't remember, but --

20           MR. RUBIN:  Okay.

21   Q.  When did you receive those funds?

22   A.  They were installations over the course of a

23       three-month period, three- to four-month period.

24   Q.  Okay.  Did those come from Mrs. Martin?

25   A.  They came from Shooter's Alley to Mrs. Martin to me.
```

**TIARA PAYNE v. WBY, INC.**

Tiara Payne on 06/23/2015                                              Page 11

```
 1   Q.  Okay.  Now, did you have to provide any information

 2       to Ms. Martin about when you worked at Shooter's

 3       Alley?

 4   A.  I don't know.  I don't remember.

 5   Q.  When did you work at Shooter's Alley?

 6   A.  I don't recall the dates I worked there.

 7   Q.  Do you recall the years?

 8   A.  2012.

 9   Q.  Any other year?

10   A.  No.

11   Q.  Do you recall the months?

12   A.  No.

13   Q.  Do you recall whether it was the first half or the

14       second half?

15   A.  No.

16   Q.  So just sometime in 2012 you worked there?

17   A.  Yes.

18   Q.  For how many days?

19   A.  I don't remember.

20   Q.  How many weeks?

21   A.  I don't remember.

22   Q.  Can you tell me how many months?

23   A.  About six.

24   Q.  About six.  Is that your only job that you held

25       during that period of time?
```

```
 1   A.  No.  I was working at Follies at the same time.

 2   Q.  Okay.  How many days a week did you work in the

 3       six-month period of time at Shooter's?

 4   A.  I don't remember.  I know that I had to -- I ended

 5       up stopping working at Shooter's because I had to

 6       give my permit to Follies.

 7   Q.  How many days a week did you work at Shooter's, if

 8       you can recall, during the six-month period?

 9   A.  I don't.

10   Q.  Okay.  Do you have a journal that you are looking

11       at?

12   A.  Yes.

13   Q.  Is there writing on that journal?

14   A.  No.

15   Q.  Is it a blank journal?

16   A.  Yes.

17   Q.  Can I see it, please?

18   A.  Sure.

19   Q.  Thank you.

20   A.  You're welcome.

21   Q.  Okay.  Thank you.

22   A.  You're welcome.

23   Q.  Have you ever testified under oath in a court

24       before?

25   A.  No.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 13

```
 1   Q.  Okay.  Have you ever been charged with a crime?

 2   A.  No.

 3   Q.  Have you ever been convicted of a crime?

 4   A.  No.

 5   Q.  How old are you?

 6   A.  21.

 7   Q.  What's your date of birth?

 8   A.  8/6/93.

 9   Q.  What's your address?

10   A.  4327 Richmeadow Drive.

11   Q.  What city?

12   A.  Houston, Texas 77048.

13   Q.  How long have you lived in Houston?

14   A.  About 13 months.

15   Q.  Where did you live before that?

16   A.  Here in Atlanta.

17   Q.  Where?

18   A.  Buckhead.

19   Q.  Do you have an address?

20   A.  517 Main Street.

21   Q.  Have you ever lived anywhere else in the Atlanta

22       area?

23   A.  No.

24   Q.  Did you ever live or have an address recorded as

25       being in Dacula?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                                Page 1

```
 1   A.  Yes.

 2   Q.  Did you live at 2613 Misty Rock?

 3   A.  Yes.

 4   Q.  When did you live there?

 5   A.  From the time I was about 11 until 18.

 6   Q.  Okay.  Do you have a driver's license?

 7   A.  Yes.

 8   Q.  What address is listed on your driver's license?

 9   A.  That address.

10   Q.  Okay.  Do you know any other -- what's your middle

11       name?

12   A.  Chantelle.

13   Q.  Were there another Tiara Chantelle Payne residing at

14       Misty Rock?

15   A.  No.

16   Q.  So you'd be the only one?

17   A.  Yes.

18   Q.  Did you ever appear in the Gwinnett County Circuit

19       Court to answer for any charges, any criminal

20       charges?

21   A.  I don't want to answer that.

22   Q.  Were you charged with prostitution?

23   A.  I don't want to answer that either.

24   Q.  Were you convicted of prostitution?

25   A.  I don't want to answer that.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                          Page 15

```
 1   Q.  If the record reflects that you pled guilty to the
 2       criminal charge of prostitution, would that be
 3       inaccurate?
 4   A.  I don't want to answer that.
 5   Q.  You are not going to answer that?
 6   A.  No.
 7   Q.  Okay.  Well, you told me a minute ago that you've
 8       never been charged with a crime.  Okay?  Was that
 9       true?
10   A.  I don't -- I think that these questions -- like it's
11       just a lot of questions right now, and I'm trying to
12       answer them to the best of my ability.  So maybe I
13       just made a mistake, but --
14            MR. RUBIN:  Move to strike as
15       nonresponsive.
16   Q.  My question is, were you telling me the truth when I
17       asked you if you were charged with a crime?
18   A.  I don't remember.
19   Q.  Okay.  Are you telling me the truth now that you
20       don't remember being charged with a crime?
21   A.  I don't remember exactly what it is that I told you,
22       so I don't want to go back.
23   Q.  Were you charged in Gwinnett County with
24       trespassing?
25   A.  No.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 16

```
 1   Q.  Okay.  Were you charged in Gwinnett County with

 2       fighting?

 3   A.  Yes.

 4   Q.  Who did you get in a fight with?

 5   A.  I don't even remember who it was.  It was in high

 6       school.

 7   Q.  Okay.  Did you plead guilty to that?

 8   A.  I don't remember.

 9   Q.  Have you ever been charged with any other crimes?

10   A.  No.

11   Q.  Have you ever had a license that you held revoked?

12   A.  Yes.

13   Q.  What kind of license did you have revoked?

14   A.  My driver's license.

15   Q.  When -- did you ever work in DeKalb County as an

16       entertainer?

17   A.  Yes.

18   Q.  Did you have an entertainment permit?

19   A.  Yes.

20   Q.  Has that been revoked?

21   A.  No.

22   Q.  No?  What do you do for a living today?

23   A.  I'm a dancer.

24   Q.  Where?

25   A.  In Texas.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 1

```
 1   Q.  Where?

 2   A.  At another place.

 3   Q.  What's that -- does that place have a name?

 4   A.  Do I have to tell you?

 5           MR. LUCAS:  Yeah, go ahead.  Go ahead and

 6       answer his questions.

 7   A.  Heartbreakers.

 8   Q.  Heartbreakers.  How long have you danced at

 9       Heartbreakers for?

10   A.  Since December.

11   Q.  I'm so sorry?

12   A.  Since December of 2014.

13   Q.  Have you worked at any other clubs other than

14       Shooter's Alley, The Follies and the Heartbreakers?

15   A.  No.  Well, not that I remember.

16   Q.  Okay.  Well, so, for example, other than The Follies

17       and Shooter's Alley, is there any other club in the

18       greater Atlanta area that you've stepped foot in and

19       performed as an entertainer?

20   A.  The Gold -- Gold -- Gold Room or Gold -- Gold

21       something.

22   Q.  The Gold Club?

23   A.  Yeah, I think.  I think that's the name of it.  I

24       can't remember.  I didn't work there long.

25   Q.  How long did you work there?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 18

```
 1   A.  Probably a couple of weeks, if that.

 2   Q.  In what year?

 3   A.  2014.  No.  2013.

 4   Q.  Okay.

 5   A.  And that's not -- I'm not certain on that.  I'm

 6       pretty much just --

 7   Q.  Any other clubs that you've worked at?

 8   A.  No.

 9   Q.  So you've worked now at Shooter's Alley, The

10       Follies, Gold Club or Goldrush, I think --

11   A.  Heartbreakers.

12   Q.  -- and Heartbreakers, and nowhere else?

13   A.  Not that I remember.

14   Q.  Okay.  Now, do you have any documents either that

15       you created or that you maintained or that were

16       given to you in conjunction with your performance as

17       an entertainer at any of the clubs?

18   A.  No.

19   Q.  Okay.  Do you have a phone?

20   A.  Yes.

21   Q.  Okay.  Does that phone have text messages?

22   A.  Yes.

23   Q.  Does that phone have e-mail?

24   A.  Yes.

25   Q.  Is it the same phone you owned -- or how long have
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1

1       you owned this phone for?

2   A.  Maybe since February.

3   Q.  Okay.  What kind of phone is it?

4   A.  An iPhone.

5   Q.  What kind of phone did you have before?

6   A.  An iPhone.

7   Q.  How long have you had an iPhone for?

8   A.  Since they first started making them.

9   Q.  So since before you started working at Shooter's

10      Alley?

11  A.  Yes.

12  Q.  Okay.  When you got your iPhone, did you get it from

13      a store?

14  A.  I don't really remember.

15  Q.  Okay.  Is it AT&T, Verizon?

16  A.  It's AT&T.

17  Q.  Okay.  Did you go to an AT&T store to buy it?

18  A.  No.  I think I might have -- I don't think I bought

19      it.  It's under my parents.

20  Q.  Well, when you went there with either yourself or

21      your parents to the store to get it, did you bring

22      your old one with you?

23  A.  No.

24  Q.  Okay.  So you lost all of your contact information

25      or had you backed it up somewhere?

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 20

```
 1   A.  I don't still have information from those old, old

 2       phones.

 3   Q.  That's not my question.  My question is, did you

 4       take -- before you went to the store with your

 5       iPhones, did you back it up to a computer or the

 6       cloud?

 7   A.  I don't know.

 8   Q.  What computer would you have used to back it up if

 9       you did?

10   A.  Maybe an old VIZIO.

11   Q.  Okay.  Did you use iTunes?

12   A.  Yes.

13   Q.  And you would connect and sync your phone to iTunes?

14   A.  Yes.

15   Q.  That's how you would download all your music?

16   A.  Yes.

17   Q.  What computer had iTunes on it that you used?

18   A.  That old VIZIO computer -- laptop.

19   Q.  Where is that VIZIO?

20   A.  It's -- I don't even know where it is now.

21   Q.  Where was the last time you recall seeing it?

22   A.  Last year when I was doing a PowerPoint on it.

23   Q.  Where was that at?

24   A.  Here.

25   Q.  Here at your mom's house?
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 21

```
 1   A.   Yeah.

 2   Q.   In Gwinnett County?

 3   A.   Yes.

 4   Q.   In the De- -- I'm sorry.  At the Misty Rock address?

 5   A.   Yes.

 6   Q.   That was the last time you saw it?

 7   A.   Yes.

 8   Q.   Okay.  Well, we asked you a whole bunch of questions

 9        to produce some documents.  Do you recall that, to

10        produce all sorts of documents, we asked you a whole

11        series of questions?

12   A.   (Nonverbal response.)

13   Q.   Can you tell me what you did to look for any

14        documents?

15   A.   I don't understand what you are asking me.

16   Q.   Okay.  Well, we asked you a whole series of

17        questions.  They said request for production of

18        documents.  Do you recall seeing those -- that

19        document before?

20   A.   Yes.

21   Q.   Okay.  And it asked you to produce a whole series of

22        things?

23   A.   Okay.

24   Q.   Right?

25   A.   Right.
```

1    Q.    I just want to know what you did to go look for

2          those kinds of things?

3    A.    Well, I'm -- check all my e-mails, anything that --

4          anything that could have possibly retained[sic] to

5          me working there.  But I mean obviously that long, I

6          don't even have pictures in my phones from back

7          then.

8    Q.    So let's start with your old e-mails.  What e-mails

9          did you use?  What was the e-mail names?

10   A.    ████████████████████.

11   Q.    You've got to go way slower than that.

12   A.    ████████████████████.

13   Q.    Any other?

14   A.    Uh-uh.

15   Q.    Is that a no?

16   A.    Yeah, that's a no.

17   Q.    Okay.  So ████████████████████ is the only e-mail

18         that you've ever used?

19   A.    That's not the only one that I've ever used, but

20         it's the only one that I can think of.

21   Q.    What other e-mails may you have used?

22   A.    I don't remember.

23   Q.    Do you remember the name of that --

24   A.    That's the main one.  That's my e-mail.

25   Q.    I understand.  Do you remember the name of the

```
 1        provider?

 2   A.   Provider?  Can you --

 3   Q.   The company like Yahoo, Gmail?

 4   A.   Yahoo.

 5   Q.   All Yahoo accounts?

 6   A.   Yes.

 7   Q.   Any other names that you recall using on Yahoo is

 8        either a user name, screen name?

 9   A.   No, I didn't do all that.

10   Q.   Did you use Instagram?

11   A.   Yes.

12   Q.   How many different Instagram accounts do you have?

13   A.   I don't have one now.

14   Q.   How many have you had?

15   A.   One.

16   Q.   What was that?

17   A.   ██████ ███████.

18   Q.   ██████

19   A.   ████████████

20   Q.   █████████

21   A.   Uh-huh.

22   Q.   When did you get rid of ████████, your Instagram

23        account or stopped using it, I should say?

24   A.   Probably -- I don't know.  I don't even know.  I

25        can't tell you.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 2

```
 1   Q.  Did you go back and search through that account to

 2       look for any photographs or documents that would

 3       relate to this litigation?

 4   A.  Yeah, and then there is no account to look through

 5       because it is no longer there.

 6   Q.  When did you get rid of that?

 7   A.  I don't remember.

 8   Q.  Before you got rid of it, did you take any steps to

 9       preserve any of the documents that were on it?

10   A.  No.

11   Q.  Okay.  Any other Instagram accounts that you used?

12   A.  No.

13   Q.  How about Facebook?

14   A.  Yeah, I haven't had a Facebook in years.

15   Q.  What was your Facebook name?

16   A.  Tiara Payne.

17   Q.  Any others?

18   A.  No.

19   Q.  Did you look through your Facebook account for any

20       documents or e-mails, messages, photographs?

21   A.  I wouldn't -- I didn't have it.  I haven't had it in

22       so long.

23   Q.  That's not my question.  My question is, did you?

24   A.  No.

25   Q.  Did you look at it?
```

```
 1   A.   No.

 2   Q.   Any other social media that you've used?

 3   A.   I had a Twitter with the same name, the ████.

 4   Q.   Did you ever -- when did you get rid of your Twitter

 5        account?

 6   A.   Possibly like a year and a half ago.

 7   Q.   When you say get rid of it, did you just stop using

 8        it?

 9   A.   I deleted it.

10   Q.   Off your phone?

11   A.   Deleted the actual user name and everything.

12   Q.   Were you involved in the Shooter's lawsuit at that

13        point?

14   A.   At what point?

15   Q.   Around the time when you deleted your accounts?

16   A.   I can't put the two together.

17   Q.   Why did you delete your Twitter and your Instagram

18        account?

19   A.   They're not productive.

20   Q.   What do you mean by "not productive"?

21   A.   I mean it's not productive.  It doesn't do anything.

22   Q.   What did you use them for?

23   A.   Social media at the time, but --

24   Q.   What kind of social media?

25   A.   Talking to relatives, people in distances, but --
```

```
 1   Q.  Any other social media?

 2   A.  No.

 3   Q.  No other social media whatsoever?

 4   A.  Not that I can think of at this moment.

 5   Q.  You know this is the moment to think of it.

 6   A.  Yeah, and it's not coming to me.

 7   Q.  Okay.  If you think about it later, will you let

 8       your lawyer know so he can let us know?

 9   A.  I will.

10   Q.  Any other computers that you've owned other than

11       this VIZIO?

12   A.  I have a Toshiba.

13   Q.  Is that what you have today?

14   A.  Yes.

15   Q.  When you say you looked through your documents on

16       your e-mail, what did you look for?

17   A.  Anything just pertaining to the club name or just

18       anything that would have anything to do with this

19       whole situation.

20   Q.  Okay.  First of all, did you go through your

21       calendars and see what you did every day?

22   A.  Yeah, well, see, I don't even have any type of --

23       any intel on anything back in that time.  I don't

24       have those phones.  I don't have those records.

25       Those are old iPhones that I don't have anymore.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                      Page 2

```
 1   Q.  Where are they?

 2   A.  I don't even remember.

 3   Q.  What did you do with those old iPhones?

 4   A.  I guess I sold them or -- I don't know where -- I

 5       don't know, but -- I mean, that was so long ago.

 6   Q.  Well, you are 21 now.  You danced just a couple of

 7       years ago.  It wasn't so long ago.  It was less than

 8       two years, isn't it?

 9   A.  But I go through phones frequently.  I do.  I break

10       phones and do all types of stuff to them, so it was

11       that long ago for me.

12   Q.  It was less than two years ago that you got rid of

13       them?

14   A.  Yes, it was.

15   Q.  And would you have had information on what you did

16       on a daily basis on those phones?

17   A.  Maybe not so much that, but like photos in the

18       locker room.  Just memories and stuff like that I

19       would have had.

20   Q.  Did you ever keep track of the days that you were

21       going to work at any particular place?

22   A.  No.

23   Q.  Did you ever have a schedule that you had to keep

24       track of?

25   A.  No.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                      Page 28

```
 1   Q.  Did you go to school?

 2   A.  Not at the time I was dancing.

 3   Q.  Okay.  Did you graduate high school?

 4   A.  Yes.

 5   Q.  From where?

 6   A.  Dacula.

 7   Q.  I'm so sorry?

 8   A.  Dacula.

 9   Q.  What year did you graduate?

10   A.  2011.

11   Q.  Did you ever apply to any colleges?

12   A.  Yeah, I went to college.  I just didn't finish.

13   Q.  So you applied to a college and you got accepted?

14   A.  Yeah.

15   Q.  What college?

16   A.  I went to Savannah State, and I went to Stillman

17       College in Tuscaloosa, Alabama.

18   Q.  You went to Savannah State and Stillman?

19   A.  Yeah.  I went to Savannah State first semester and

20       to Stillman second semester.

21   Q.  Okay.  Is that all the college you've completed?

22   A.  Yeah.

23   Q.  Okay.  Did you obtain any degrees?

24   A.  No.

25   Q.  So you stopped going after your freshman year?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 2

```
 1   A.  Yes.

 2   Q.  Did you work anywhere while you were in Savannah?

 3   A.  No.

 4   Q.  Did you work anywhere when you went to Stillman?

 5   A.  No.

 6   Q.  Have you ever held a job other than as an

 7       entertainer?

 8   A.  No.

 9   Q.  So when you were in high school, you didn't hold any

10       jobs?

11   A.  The Follies was my first job.

12   Q.  And then -- and you haven't held any jobs after,

13       other than in the adult entertainment?

14   A.  Actually, when I went to Texas, I did this -- as

15       soon as I got to Texas, I did this like -- I don't

16       know what the job title is for this job, but it's

17       like when car dealerships -- you have people who are

18       doing the little boxes to ask questions, and they

19       send the information to the dealership.  I did a job

20       doing that for a month or so.

21   Q.  Was that the first time you've ever been hired as an

22       employee by anybody?

23   A.  Yes.

24   Q.  Okay.  So when you worked at The Follies, you

25       understood that you weren't being treated as an
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 30

```
 1       employee, correct?

 2   A.  Well, when I worked there, I wasn't sure what I was.

 3   Q.  Okay.  Well, nobody ever told you that they were

 4       hiring you to perform a job, correct?

 5   A.  They don't hire me to perform a job.

 6   Q.  Did anybody ever promise to pay you any money for

 7       what you were doing?

 8   A.  Oh, no.

 9   Q.  Did anybody ask you to fill out an employment

10       application?

11   A.  No.

12   Q.  Did anybody ask you to -- did anybody have you

13       complete any IRS forms?

14   A.  No.

15   Q.  Did anybody tell you a schedule?

16   A.  No.

17   Q.  Did you apply to work on any particular shift or

18       schedule?

19   A.  Well, when I first started working there, I wasn't

20       allowed to work day shift or mid shift.  I had to

21       work night shift.

22   Q.  Did anybody tell you what days of the week to show

23       up on the night shift?

24   A.  No.

25   Q.  You got to choose that all by yourself, right?
```

```
 1   A.   Yes.

 2   Q.   And you already told me nobody promised you that

 3        they were going to pay you any money for that,

 4        right?

 5   A.   Right.

 6   Q.   You understood that the money that you were going to

 7        get was going to come from the customers?

 8   A.   Yes.

 9   Q.   What -- how did you learn about The Follies?

10   A.   This girl who worked there called me up, because I

11        went to school with her, and she asked me what was I

12        doing for money and did I want to come work where

13        she was working.

14   Q.   And did she tell you that that was in the adult

15        entertainment field?

16   A.   Yes.

17   Q.   Did this girl have a name?

18   A.   Catherine.

19   Q.   Does she have a last name?

20   A.   I'm trying to think of her last name, but -- you

21        know, we know girls by other names, and I can't

22        remember her --

23   Q.   What was the stage --

24   A.   -- last name.

25   Q.   -- name that she went by?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 32

```
 1   A.   To be honest, I don't remember her stage name.

 2   Q.   Okay.

 3   A.   But her real name is Catherine.

 4   Q.   So Catherine whose last name you don't recall --

 5   A.   Right.

 6   Q.   -- whose stage name you don't remember, called you

 7        up and said, I'm working at The Follies.  Why don't

 8        come here and work?

 9   A.   No, she didn't tell me where she was working.  She

10        just told me she had a job making really good money

11        and asked me if I was interested.

12   Q.   So she told you she was making really good money?

13   A.   Yes.

14   Q.   Did you ask her what she meant by that?

15   A.   Yeah, and she told me dancing.

16   Q.   And did she tell you how much money she was making?

17   A.   Uh-uh.

18   Q.   Did you ask her?

19   A.   No.

20   Q.   Did you ask her what she thought really good money

21        was?

22   A.   No.

23   Q.   And so how long after you graduated high school did

24        you have this conversation with her?

25   A.   It was literally right after -- well, no.  This was
```

```
 1        after -- after I came back from Stillman in May, and
 2        she called me, and literally the middle of May I
 3        started working at Follies.  It was right after I
 4        had left school.
 5   Q.   Middle of what year?
 6   A.   2012.
 7   Q.   And she told you that she was working as a dancer
 8        making really good money?
 9   A.   (Nonverbal response.)
10   Q.   Is that correct?
11   A.   Yes.
12   Q.   Did she tell you anything else about the job or
13        about the location or about anything?
14   A.   No.
15   Q.   How long was it after you talked with her that you
16        first went to The Follies?
17   A.   Probably like that fourth week of May.  I think I
18        started working there like the last -- one of the
19        last few days in May.
20   Q.   So you'd never been a dancer before, right?
21   A.   No, never.
22   Q.   So a friend of yours from high school called you up
23        and said, I'm making really good money taking off my
24        clothes and entertaining customers, and you said,
25        Great, I'll be there tomorrow?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**        Page 3

```
 1   A.  Yeah.

 2   Q.  Okay.  Now, you showed up and -- did you meet with

 3       somebody?

 4   A.  Yeah, the manager.  Jim was the manager at the time.

 5   Q.  And you had to complete some -- a couple of

 6       documents?

 7   A.  He told me to go get my permit.  As soon as I could

 8       come back with my permit, I could work night shift.

 9   Q.  So you understood that you had to have a permit to

10       perform there?

11   A.  Yes.

12   Q.  Okay.  What did you have to do to get a permit?

13   A.  Go to the DeKalb County, fingerprint.

14   Q.  What kind of permit was it?

15   A.  Dancing license to work in DeKalb County.

16   Q.  So you understood that you just couldn't be -- you

17       couldn't just walk in off the street at that

18       point --

19   A.  And just work there.

20   Q.  Let me finish my question --

21   A.  Okay.

22   Q.  -- so that she -- otherwise, she'll start yelling at

23       us.

24   A.  I'm sorry.

25   Q.  So you understood you had to have a permit to work
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                                Page 35

```
 1        there?

 2   A.   Yes.

 3   Q.   And that was a permit issued by the County of

 4        DeKalb?

 5   A.   Yes.

 6   Q.   And you had to have certain requirements before you

 7        could work there, right, before you could get the

 8        permit?

 9   A.   What do you mean, like requirements?

10   Q.   Well, you had to go show proof of your age?

11   A.   At DeKalb County?

12   Q.   Yes.

13   A.   Yes.

14   Q.   You had to be fingerprinted?

15   A.   Yes.

16   Q.   And you couldn't be convicted of certain offenses?

17   A.   Right.

18   Q.   Okay.  You had to pay some money?

19   A.   Yes.

20   Q.   How much did you have to pay?

21   A.   I don't remember how much the fee was, but it was

22        almost like $400.

23   Q.   $400?

24   A.   Almost.

25   Q.   Okay.
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                              Page 36

```
 1   A.  I think.

 2   Q.  And any other requirements that you could recall?

 3   A.  Uh-uh, no.

 4   Q.  Now, when you got that permit from the county, did

 5       you understand it allowed you to dance anywhere

 6       within DeKalb County?

 7   A.  Yes, but I could only dance --

 8   Q.  Just please answer my questions.  I know you have

 9       lots of things you want to say.  I promise I will

10       ask you questions, but just try to respond to my

11       questions.  Okay?

12   A.  Okay.

13   Q.  It goes a lot smoother.

14   A.  Okay.

15   Q.  Okay?

16   A.  Okay.

17   Q.  Now, you had a permit, right, and that allowed you

18       to dance at any of the clubs in DeKalb County?

19   A.  Yes.

20   Q.  And there were how many that you could dance at?

21   A.  I don't even recall how many clubs there are in

22       DeKalb County, but it's -- it's a bit.

23   Q.  Okay.  And that same permit that you got you needed

24       to go dance at any of them, right?

25   A.  In DeKalb County.
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                    Page 3

```
 1   Q.  And it's the same permit you used when you danced at

 2       Shooter's -- Shooter's Alley?

 3   A.  Yes.

 4   Q.  Did you have to renew that permit?

 5   A.  Yes.

 6   Q.  How many times have you renewed that permit?

 7   A.  I think I renewed my permit two times.

 8   Q.  Twice?

 9   A.  (Nonverbal response.)

10   Q.  Did it cost the same each time?

11   A.  Yes.

12   Q.  So you would have gotten your permit in 2012,

13       renewed it in --

14   A.  '13.

15   Q.  -- 2013 and renewed it in 2014 as well?

16   A.  I don't think I was working there in 2014.

17   Q.  I don't care where you were working.  Did you renew

18       your permit in DeKalb County?

19   A.  I don't remember because if I wasn't working there,

20       then I didn't.

21   Q.  Now, are there other clubs in the greater Atlanta

22       area that you did not need a permit to work at?

23   A.  Not that I know of.

24   Q.  Did you ever have a permit issued by any other

25       governmental agency?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 38

```
 1   A.  The City of Atlanta.

 2   Q.  Uh-huh.

 3   A.  The Gold Club, that was the City of Atlanta.

 4   Q.  Did you have to get a license from the City of

 5       Atlanta?

 6   A.  Yes.

 7   Q.  What was the process to get a license from the City

 8       of Atlanta?

 9   A.  It was ideal[sic] to the process of DeKalb.

10   Q.  Identical you said?

11   A.  Uh-huh.

12   Q.  Is that a yes?

13   A.  Yes.

14   Q.  I may sometimes interrupt you and say, Is that a

15       yes, or Is that a no?

16   A.  Okay.

17   Q.  Or repeat something you just said.  I'm not trying

18       to be rude or disrespectful.  It's just I want to

19       make sure that we have a clean, clear record.  Okay?

20   A.  Okay.

21           MR. LUCAS:  It's just his personality.

22           MR. RUBIN:  My personality is rude and

23       disrespectful.  I'm just teasing.

24   Q.  So you had a permit from the City of Atlanta?

25   A.  Yes.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                          Page 3

```
 1   Q.  Any other permits that you had?

 2   A.  No.

 3   Q.  It cost approximately the same?

 4   A.  Yes.

 5   Q.  And you had to purchase that permit each year you

 6       wanted to dance either in DeKalb County or the City

 7       of Atlanta?

 8   A.  Yes.

 9   Q.  Today do you need one in Harris County?

10   A.  No.

11   Q.  Harris County doesn't require licenses?

12   A.  No.

13   Q.  And that's where you reside and work today is in

14       Harris County, Texas, correct?

15   A.  Correct.

16   Q.  When you worked at The Follies, did you have a stage

17       name?

18   A.  Yes.  It was Climax.

19   Q.  Climax?

20   A.  Uh-huh.

21   Q.  Any other stage names that you used at The Follies?

22   A.  No.

23   Q.  So any time you would have worked at The Follies or

24       performed at The Follies, you would have used the

25       name Climax?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                   Page  0

```
 1    A.   Yes.

 2    Q.   Any time you worked at Shooter's, would you have

 3         used the stage name Climax?

 4    A.   Yes.

 5    Q.   Any time that you performed at Heartbreakers, would

 6         you have used the name Climax?

 7    A.   Autumn.

 8    Q.   Autumn?

 9    A.   Uh-huh.

10    Q.   Are you the only Autumn at Heartbreakers?

11    A.   Yes.

12    Q.   Were you the only Climax that you were aware of at

13         The Follies?

14    A.   Yes.

15    Q.   Were you the only Climax that you were aware of at

16         the Goldrush or Gold Club, whichever it may have

17         been?

18    A.   I think I went by Taylor there.

19    Q.   Taylor?

20    A.   Yes.

21    Q.   Did you choose all these names that you were using?

22    A.   Yes.

23    Q.   So when you went -- by the way, the permit that you

24         got for the City of Atlanta, how many clubs did that

25         allow you to work for?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                            Page  1

```
 1   A.  One.

 2   Q.  Just one?

 3   A.  (Nonverbal response.)

 4   Q.  Are you sure?

 5   A.  Yeah.  It had on there "Gold Club."  You couldn't

 6       work anywhere but that club.

 7   Q.  If you wanted to go to work at another club, you had

 8       to go get another permit?

 9   A.  Another permit.

10   Q.  Pay another almost 400 bucks?

11   A.  Yep.

12   Q.  If you wanted to go work at some other club, you'd

13       have to pay another 400 bucks?

14   A.  For the City of Atlanta.

15   Q.  Okay.  But in DeKalb?

16   A.  One permit is good for all DeKalb County.

17   Q.  Have you ever tried to work in any club as an

18       employee?

19   A.  No.

20   Q.  Has any of the clubs that you've ever performed at

21       offered you a position which they would -- in which

22       they agreed to pay you wages in exchange for the

23       services?

24   A.  Heartbreakers.

25   Q.  So they pay you wages?
```

 1   A.  No.  I'm an independent contractor, but they gave me

 2       the option to be an employee and take all my money

 3       or be an independent contractor.

 4   Q.  So as I understand what you are saying -- and let me

 5       just see if I understand it correctly.  The one time

 6       that you've been offered the opportunity to be an

 7       employee was at Heartbreakers?

 8   A.  Yes.

 9   Q.  And at Heartbreakers they gave you an option to pay

10       you a wage?

11   A.  Yes.

12   Q.  And what was the wage that they promised or they

13       told you that they were willing to pay you?

14   A.  Minimum wage.

15   Q.  Okay.  So what's minimum wage in --

16   A.  7.25.

17   Q.  So they offered to pay you seven and a quarter an

18       hour to perform as an entertainer?

19   A.  That's correct.

20   Q.  Or allow you to perform as an independent contractor

21       in which you wouldn't be their employee doing their

22       bidding but performing -- running your own business

23       essentially and getting to keep the money?

24   A.  Yes.

25   Q.  And in that circumstance you chose to be a

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page  3

```
 1      contractor?

 2  A.  Yes.

 3  Q.  Because you thought that being a contractor was

 4      better money than being paid as a minimum wage

 5      employee?

 6  A.  Yes.

 7  Q.  Okay.  And that's based upon your experience in

 8      working in the adult industry?

 9  A.  Yes.

10  Q.  You knew that in the adult industry, it's always

11      better to be a contractor than a minimum wage

12      employee, right?

13  A.  Yes.

14  Q.  You make far more money in -- as a business person

15      being a contractor than you do being an employee for

16      these clubs, correct?

17              MR. LUCAS:  Object to the form of the

18      question.  Go ahead and answer.

19  A.  Yes.

20  Q.  You make far more than seven and a quarter an hour

21      on average, don't you?

22  A.  It depends.  It's -- it's a gamble in the clubs.

23      Some days you do and some days you don't.

24  Q.  Some days you make thousands of dollars, right?

25  A.  Possibly.
```

1   Q.   And that's a gamble that at least when you were at

2        Heartbreakers you chose to take, correct?

3   A.   Correct.

4   Q.   That's based upon your experience having been a

5        dancer at least three our clubs?

6   A.   That's based upon I can't survive off of 7.25 an

7        hour.

8   Q.   And you make far more by being a contractor?

9   A.   On a good day.

10  Q.   Well, let me ask you some questions.  What's a good

11       day?

12  A.   A day that I come out with more money than I have to

13       pay to the club.

14  Q.   Okay.  So let me ask you a question, if I wanted to

15       know how much money you made -- when was the last

16       time you danced at Heartbreakers?

17  A.   Sunday.

18  Q.   How much did you make at Heartbreakers on Sunday?

19   ████████████████████

    ████████████████████████████████████

21  A.   (Nonverbal response.)

22  Q.   How about Saturday; did you dance Saturday at the

23       club?

24  A.   No.

25  Q.   Friday?

```
 1   A.  Yes.

 2   Q.  How much did you make Friday?

 3   A.  I don't remember.

 4   Q.  Approximately?

 5   ███████████████   ████████

 6   Q.  █████

 7   A.  Yes.

 8   Q.  How much did you dance -- how much did you earn --

 9       did you dance Thursday?

10   A.  No.

11   Q.  Did you dance Wednesday?

12   A.  No.

13   Q.  Tuesday?

14   A.  Yes.

15   Q.  How much did you earn last Tuesday?

16   A.  ██████

17   Q.  Did you dance Monday?

18   A.  No.

19   Q.  So last week -- last week, if my math is right, you

20       made about ███████

21   A.  Yes.

22   Q.  Is that a pretty average week at Heartbreakers?

23   A.  Pretty average.

24   Q.  So working three days a week you made about █████

25       bucks?
```

```
 1   A.   Yes.
 2   Q.   Is that typical for how much you made when you
 3        worked at the Gold Club -- Goldrush?
 4   A.   No, there was no money in there.
 5   Q.   How about at the Follies?
 6   A.   No.  I made at a lot more money at Follies.
 7   Q.   You made more than ████ a week?
 8   A.   Yes.
 9   Q.   How much on average did you make a week at Follies?
10   A.   Anywhere between ██████████████████.
11   Q.   So you worked there all of 2012?
12   █████████████████████████████████████████
     ████████████████████████
     ███████████
     █████████████████████████████████
     █████████████
     ████████████████████████████████████████████
     ██████████████
     ███████████████████████████
     ████████████████████████████████████
     ███████████████████████████
     ████████████████████
23   Q.   Okay.  Well, did you work in -- you worked from May
24        until the end of the year, May until December?
25   A.   Yes, 2012.
```

1    Q.   And if you averaged between ████████████

2    A.   I wasn't averaging that at the time.

3    Q.   What were you making?  What were you averaging then?

4    A.   A lot less than that.

5    Q.   Okay.  Tell me.

6    A.   I can't even tell you because I don't remember, but

7         it was a lot less than that because there were

8         nights where I wasn't making a dollar.

9    Q.   Did you average ████████ a week?

10   A.   Maybe -- maybe so.  A little less, a little more.

11   Q.   So just in the short term that you worked there in

12        2012, you averaged -- you probably made ██████

13        ██████

14   A.   Around that number.

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

18   Q.   In 2013 you worked at The Follies?

19   A.   Yes.

20   Q.   Did you work the same kind of schedule as you work

21        today?

22   A.   No.  At Follies I was working every shift in 2013.

23   Q.   Every shift?

24   A.   Yeah.

25   Q.   So every day of the week, all three shifts?

1    A.   No.  But six days out of the week I was in there all

2         three shifts, yes.

3    Q.   All three shifts?

4    A.   Yes, from the time it opened to the time it closed.

5    Q.   So you were there about 18 hours a day?

6    A.   About 16.

7    Q.   About 16 hours a day, six days a week?

8    A.   I was.

9    Q.   Okay.  I understand that's what you are saying.  You

10        were there 96 hours a week.  Is that what you are

11        saying?

12   A.   Yes.

13   Q.   Okay.  And how much did you earn in those 96 hours a

14        week on average?

18   Q.   So if I were to tell you that was about � an

19        hour, would that surprise you?

20   A.   No.

21

```
  7   Q.   Okay.  So -- but just using your average --

  8   A.   I don't know about my average because this is like a

  9        whole bunch of math that I'm trying to do off the

 10        top of my mind, and that's not accurate, so I can

 11        only do so much.

 12   Q.   You said you averaged about ▮▮▮▮

 13   A.   But when it comes to these specific numbers and all

 14        that --

 15   Q.   You have an iPhone, so ▮▮▮▮, right?

 16   A.   Yes.

 17   Q.   You recognize the calculator?

 18   A.   Yes.

 19   Q.   You said you worked 52 weeks?  How many weeks did

 20        you work?  Did you go on vacation at all?

 21   A.   No.

 22   Q.   Did you work every week?

 23   A.   Pretty much for the whole time I was there.

 24   Q.   So that's 52, right?

 25   A.   Yes.
```

```
 1   Q.  That's -- how much is that?

 2   A.  About ███████

 3   Q.  You see I did the math; you could follow it?

 4   A.  Yes.

 5   Q.  You can see that?

 6   A.  Yes.

 7   Q.  Okay.

 8   A.  Apparently if that's what these hours are and that's

 9       what it says, then that must be it.

10   Q.  Then you claimed that you worked 96 hours a week,

11       right?

12   A.  Six hours a day.

13   Q.  How many?

14   A.  I'm sorry.  Six days a week for 12:00 p.m. until

15       4:00 a.m.

16   Q.  So 16 hours times 6.

17   A.  Let's do 12:00 to 4:00.  How many hours is that?

18   Q.  96.  12 times 6 is 96.

19   A.  Yeah, 16 hours a day.

20   Q.  12 times 6 is 96.  I just did the math.

21   A.  Okay.

22   Q.  Can you see that?

23   A.  Yes, all this is accurate.

24   Q.  Because I -- I don't want to trick you at all.  I

25       divided that by -- I divided ████ by 96, and that's
```

1   ████████████████████████████

2   A.   That sounds about good.

3   Q.   Okay.  Just making sure.  I want to make sure that I

4        had it right and that you could see what I did.

5   A.   Yes.

6   Q.   You stopped working there in 2013 at The Follies,

7        correct?

8   A.   Correct.

9   Q.   You never went back and worked again there, correct?

10  A.   Correct.

11  Q.   Now, when you worked at Shooter's Alley --

12  A.   Yes.

13  Q.   -- what kind of money were you making there?

14  A.   Maybe like ████████ a night.

15  Q.   How many nights a week were you working there?

16  A.   About four.

17  Q.   So you were working -- so you made between ██ and

18       ██████ a week there?

19  ██   Possibly.

20  Q.   Just going -- I'm going to take █████████ because

21       that's in the middle, right, and you said you worked

22       there for about six months?

23  A.   Yes.

24  Q.   So that's 26 weeks times ██████████, so you made

25       about ████████ there as well?

```
 1   A.   (Nonverbal response.)

 2   Q.   So if I had my math -- what did you do in 2014?  Did

 3        you work somewhere?

 4   A.   I think that's when I went to Houston.

 5   Q.   When in 2014 did you go to Houston?

 6   A.   Around April.

 7   Q.   Is that when you started working at Heartbreakers?

 8   A.   I started working at Heartbreakers in December.

 9   Q.   What did you do between April and December?

10   A.   I had that little telemarketing thing for like a

11        month and then I wasn't working.

12   Q.   You were living off your savings?

13   A.   Uh-huh.

14   Q.   Is that a yes?

15   A.   Yes.

16   Q.   So if I have my math right, and I just want to make

17        sure that this comports with what you think, you

18        made in probably two years of dancing about

19        █████████

20   A.   Probably more than that.

21   Q.   More than that?

22   A.   Yeah, I made bank at Follies.

23   Q.   Did you save that money in a bank account?

24   A.   Kind of, yeah.

25   Q.   Do you have a bank account?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 53

```
 1  A.  Yes.

 2  Q.  What bank?

 3  A.  Wells Fargo.

 4  Q.  Which Wells Fargo?

 5  A.  All of them.  I mean, how do I answer that?

 6  Q.  Did you use a particular branch?

 7  A.  No.

 8  Q.  Did you deposit -- was it your practice to deposit

 9      your earnings into your bank accounts?

10  A.  No.  At times.

11  Q.  What would you use your bank account for?

12  A.  I guess -- I don't know.  Whatever I needed.

13  Q.  So like did you have a car, for example?

14  A.  Yes.

15  Q.  Did you have a car payment?

16  A.  Yes.

17  Q.  Did you pay that from your Wells Fargo account?

18  A.  Uh-huh.

19  Q.  Is that a yes?

20  A.  Yes.

21  Q.  What kind of car did you have or do you have?

22  A.  I had a Chrysler at the time.

23  Q.  What kind of Chrysler?

24  A.  A 300.

25  Q.  What year?
```

1   A.   '07.

2   Q.   Did you take a loan on that?

3   A.   Yes.

4   Q.   From Wells Fargo?

5   A.   No.

6   Q.   From whom?

7   A.   From -- it's -- it wasn't my car.  It was somebody

8        else's car, but I was paying for it.

9   Q.   And you were writing checks to Chrysler Financial or

10       whomever?

11   A.   I was paying for it out of my account.

12   Q.   Who were you paying the checks to?

13   A.   Crescent Bank & Trust.

14   Q.   And were you getting the money to pay that from

15       dancing?

16   A.   (Nonverbal response.)

17   Q.   Is that a yes?

18   A.   Yes.

19   Q.   How much were the payments a month?

20   ██████████████████

21   Q.   Okay.  Did you have an apartment?

22   A.   Yes.

23   Q.   When you were here in Atlanta?

24   A.   Yes.

25   Q.   Where did you live?

```
 1   A.  In Buckhead.

 2   Q.  Did you live alone or did you have a roommate?

 3   A.  I had a significant other.

 4   Q.  Okay.  And did you make the rent payments?

 5   A.  Yes.

 6   Q.  From money you earned while dancing?

 7   A.  Yes.

 8   Q.  And how much were the rent payments a month?

 9   ███████████

10   Q.  And you earned that money only from dancing?

11   A.  Yes.

12   Q.  Any other -- did you have student loans?

13   A.  Yes.

14   Q.  Did you make payments on those?

15   A.  Yes.

16   Q.  How much were you paying a month?

17   A.  I didn't do it consistently.  But when I did, it was

18       like ████████ dollars.

19   Q.  That came from dancing --

20   A.  Yes.

21   Q.  -- the money?

22   A.  (Nonverbal response.)

23   Q.  Any other source of regular -- strike that.

24           Any other regular payments that you would make?

25   A.  Car insurance, the light bills, the electricity, any
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                          Page 56

```
 1        bill that needed to be taken care of.

 2   Q.   So when you were living here in Atlanta and dancing

 3        at The Follies, you would dance at The Follies and

 4        you would deposit a portion of your money?

 5   A.   And then keep the rest of it on me.

 6   Q.   In cash?

 7   A.   (Nonverbal response.)

 8   Q.   Did you do anything to track -- strike that.

 9            Would you go to the bank on a regular basis or

10        was it just on occasion?

11   A.   No.  It was on -- it was just being new in society

12        and trying to figure stuff out.

13   Q.   But my question is, did you go every Friday?  Did

14        you go every other Friday?  Once a month?

15   A.   Sporadically.  So where are all these questions

16        about --

17            MR. LUCAS:  Uh, uh, uh, uh.  Just answer

18        the questions he asks.  Okay?

19            THE WITNESS:  Okay.

20            MR. LUCAS:  He only gets to know what he

21        asks.

22            THE WITNESS:  Okay.  It's just like he's

23        asking all of my information.

24            MR. LUCAS:  No, no, no, no, no.  Just

25        answer his questions.  No commentary, no narratives.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 5

1      Okay?

2                THE WITNESS:  All righty.

3      BY MR. RUBIN:

4   Q.  Now, you had a significant other.  Did that person

5       have a name?

6   A.  Yes, but I don't want to tell his name.

7   Q.  What was his name?

8   A.  I don't feel like that's necessary.  Like this is

9       ridiculous.

10               MR. LUCAS:  You know what?  Let's take a

11      break.  Let's take a break.  I need to go to the

12      restroom anyway.

13               MR. RUBIN:  Fair enough.

14               (Recess.)

15      BY MR. RUBIN:

16   Q.  Who did you live with in 2013?

17   A.  My boyfriend.

18   Q.  What's his name?

19   A.  Tamar Raheem.

20   Q.  How do you spell his last name?

21   A.  R-A-H-E-E-M.

22   Q.  R-A-H?

23   A.  E-E-M.

24   Q.  Are you still with Mr. Aheem[sic]?

25   A.  Raheem.  Yes, I am.

1   Q.  Is it R-A-H?

2   A.  R-A-H.

3   Q.  I thought you said A-A-H?

4   A.  Yes, it is R-A-H.

5   Q.  Are you still with Mr. Raheem?

6   A.  Yes, I am.

7   Q.  Does he live in Texas with you?

8   A.  Yes, he does.

9   Q.  Does Mr. Raheem -- does he have a job?

10              MR. LUCAS:  That's enough.  I'm going to

11      instruct her not to answer.  It's completely

12      irrelevant.  If you want to call the arbitrator, we

13      can.

14  Q.  So when he lives with you at the same address --

15              MR. LUCAS:  That's enough.  She already

16      answered that.  Asked and answered.

17  Q.  Okay.  Anybody else live with you in 20- --

18              MR. RUBIN:  So if I were to continue down

19      that line, you would just continue to instruct her?

20      So we have a clean and clear record.

21              MR. LUCAS:  You mean continuing down a

22      line that has nothing to do with the lawsuit?

23              MR. RUBIN:  I think it has lots to do with

24      the lawsuit.

25              MR. LUCAS:  You asked her if she still

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 5

```
 1      lives with him now.

 2                  MR. RUBIN:  Yes.

 3                  MR. LUCAS:  And we're done at that point,

 4      so --

 5                  MR. RUBIN:  You are going to instruct her

 6      not to answer?

 7                  MR. LUCAS:  Go ahead and ask the rest of

 8      your outline, and I'll continue to object.

 9                  MR. RUBIN:  Okay.  Fair enough.

10  Q.  Does Mr. Raheem have a job?

11                  MR. LUCAS:  Instruct her not to answer it.

12  Q.  If I wanted to locate him, where would I find him?

13                  MR. LUCAS:  Same.

14  Q.  Does he have a phone number?

15                  MR. LUCAS:  Same.

16  Q.  What's his date of birth --

17                  MR. LUCAS:  Same.

18  Q.  -- if you know?

19                  MR. RUBIN:  Let me at least finish my

20      questions before you instruct her.

21                  MR. LUCAS:  Date of birth, same objection.

22                  MR. RUBIN:  Okay.

23  Q.  Does he have e-mail?

24  A.  Yes.

25  Q.  What's his e-mail?
```

```
 1                    MR. LUCAS:  Same ob- -- same instruction.

 2   Q.  Does he have a cell phone?

 3   A.  Yes.

 4   Q.  What's his cell phone number?

 5                    MR. LUCAS:  Same objection.  Same

 6        instruction.

 7   Q.  Okay.  In 2013 Mr. Raheem lived with you for the

 8        entire year?

 9   A.  Yes.

10   Q.  Mr. Raheem would be aware of your comings and

11        goings?

12   A.  Yes.

13   Q.  Did you discuss with Mr. Raheem when you were going

14        to work?

15   A.  Yes.

16   Q.  Did he drive you to work?

17   A.  Yes.

18   Q.  So he would be very familiar with your schedule?

19   A.  Yes.

20   Q.  Anybody else who may be familiar with your schedule

21        in 2013 who you may know?

22   A.  No.

23                    MR. LUCAS:  If your client wants to make

24        comments, he's certainly welcome to whisper.  But

25        he's not whispering, and he's doing a lot of huffing
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                        Page 61

```
 1    and puffing and making faces and making comments.

 2              MR. YOUNGELSON:  It's because I have heart

 3    failure.

 4              MR. LUCAS:  No, no.  You are talking.  You

 5    are very loud, and you are reacting to her answers.

 6              MR. YOUNGELSON:  I'm so sorry.

 7              MR. LUCAS:  Thank you.  I appreciate your

 8    apology.

 9    BY MR. RUBIN:

10  Q.  Now, anybody else who may be familiar with your

11    schedule from to 2013?

12  A.  No.

13  Q.  Did you have any other roommates who may have

14    resided with you?

15  A.  No.

16  Q.  Is Mr. Raheem originally from the Atlanta area?

17  A.  No.

18  Q.  Where is he from originally?

19  A.  New York.

20  Q.  New York.  How old is he?

21  A.  Older.

22  Q.  Older?  Is he more than ten years older than you?

23  A.  Yes.

24  Q.  Approximately -- if you could guess, how --

25              MR. LUCAS:  I'd instruct her not to
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 62

```
 1      answer.

 2                  MR. RUBIN:  Okay.

 3                  MR. LUCAS:  Let's go on to the lawsuit.

 4      We're an hour and 15 minutes in.

 5                  MR. RUBIN:  You know, we can play this

 6      game, if you want, Paul.  But as you know, she's

 7      made some claims so far today that I'm entitled to

 8      follow up on.

 9                  MR. LUCAS:  Follow up.

10      BY MR. RUBIN:

11   Q.  Approximately how old is Mr. Raheem?

12   A.  50.

13   Q.  Okay.  Now, you said in 2013 you would regularly

14      perform at The Follies and that was the only place

15      you would perform?

16   A.  Yes.

17   Q.  So you would have been pretty familiar with how the

18      process worked when you went into the club?

19   A.  Yes.

20   Q.  Okay.  When you went into the club, did you have to

21      let somebody know you were there?

22   A.  Yes.

23   Q.  Okay.  And when you got there, who would you let

24      know?

25   A.  The house mom.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 63

```
 1   Q.  And at some point would you have to let the DJ know

 2       that you were leaving?

 3   A.  Yes.

 4   Q.  Did the DJ have some sheets that he was recording

 5       when you came and went on?

 6   A.  Yes.

 7   Q.  Did you have to initial those?

 8   A.  Yes.

 9   Q.  Did you initial those on every day that you

10       performed there?

11   A.  On the night shift, yes.

12   Q.  And on the day shift, did you initial as well?

13   A.  No.

14   Q.  Never?

15   A.  Well, I'm not going to say never, but I don't really

16       remember.  I remember on the night shift we had to

17       initial.

18   Q.  Would it record -- would you write on this document

19       yourself?

20   A.  No.

21   Q.  So you wouldn't record -- like you wouldn't initial

22       it?

23   A.  Well, I would initial it, yes.

24   Q.  Other than initialing it, would you have written on

25       it in any way?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                           Page 6

```
 1   A.  No.

 2   Q.  So the only thing that you would have done is

 3       initial it to attest that it was --

 4   A.  Correct.

 5   Q.  -- you?

 6   A.  Yes.

 7   Q.  And did you initial it believing it to be correct?

 8   A.  Yes.

 9   Q.  Did you ever believe it not to be correct?

10   A.  No.

11   Q.  Okay.  Was that the same process that you followed

12       on every day that you went there --

13   A.  Yes.

14   Q.  -- in 2013 at least?

15   A.  Yes.

16   Q.  Is that the same process that you saw other

17       entertainers following?

18   A.  Yes.

19              THE WITNESS:  Did you tell him about the

20       paperwork?

21              MR. LUCAS:  Uh-huh.  We'll tell him about

22       it when we get to it.

23              MR. RUBIN:  Is there something that you

24       want to tell me about?

25              MR. LUCAS:  Yeah, there's a couple of
```

```
 1        inaccuracies in her interrogatory answers that she

 2        wants to correct, a correction she gave us that we

 3        didn't make.

 4                   MR. RUBIN:  Well, we can --

 5                   MR. LUCAS:  When we get to that, we'll

 6        deal with it.  It's pretty minor stuff.

 7        BY MR. RUBIN:

 8   Q.   Now, was there a particular DJ who you worked with

 9        more frequently than others?

10   A.   Yes.

11   Q.   Who was that?

12   A.   Julian.

13   Q.   Julian?

14   A.   Yes.

15   Q.   Did you ever work with a DJ John?

16   A.   Yes.

17   Q.   Did you ever work with a DJ Brian?

18   A.   Yes.

19   Q.   Any other DJs that you recall working with?

20   A.   Josiah.

21   Q.   What?

22   A.   Josiah.

23   Q.   Josiah.  Would all these DJs follow the same

24        process?

25   A.   No.
```

1   Q.  Were they slightly different?

2   A.  Yes.

3   Q.  How were they different between the DJs?

4   A.  Julian would let us pay him to not go on stage, and

5       sometimes he didn't charge us.

6   Q.  Okay.

7   A.  Josiah took $20 if we didn't want to get on stage.

8       Brian never let us skip stage.

9   Q.  Okay.

10  A.  And then I don't remember about the -- whatever his

11      name is.

12  Q.  Well, let met ask you some basic questions, if I

13      can.  When you went to work at the club --

14  A.  Yes.

15  Q.  -- and you walked in the door, approximately how big

16      was it?

17  A.  Spacious.

18  Q.  Is it a large club, small club, medium club?

19  A.  Medium club.

20  Q.  How does it compare to where you work today?

21  A.  It's like tiny compared to the club I work at now.

22  Q.  Okay.  And how does it compare to the Goldrush?

23  A.  It's not as big as the Goldrush.

24  Q.  It's a smaller club, right?

25  A.  It's a smaller club.

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 6

```
 1   Q.  And approximately how many other entertainers would

 2       be there performing on any particular day shift?

 3   A.  Maybe 50, 60, 70.  Maybe 40 -- between 40 and 70, I

 4       guess.

 5   Q.  So 40 to 70 a day?

 6   A.  Yes.

 7   Q.  How many at night?

 8   A.  Up to a hundred girls.

 9   Q.  Now, were there some entertainers who liked

10       performing on stage?

11   A.  Yes.

12   Q.  Were you one of those?

13   A.  Not really.

14   Q.  Were there some entertainers who wanted to perform

15       on stage because they believed that it would be

16       something good for them to market themselves to the

17       customers?

18   A.  Yes.

19   Q.  Also get stage tips?

20   A.  Yes.

21   Q.  And others didn't like doing it?

22   A.  Yes.

23   Q.  Was one of the ways that the entertainers would

24       market themselves was by getting on stage?

25   A.  Yes.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 68

```
 1   Q.  And dancing to whatever music they may like?

 2   A.  No.  We didn't pick our music.

 3   Q.  Did you pick the type of music you liked?

 4   A.  Yes.

 5   Q.  Did you tell the DJ what kind of music you liked to

 6       perform to?

 7   A.  Yes.

 8   Q.  And within that -- and generally they would call you

 9       up when they were playing whatever the music that

10       you liked was?

11   A.  They called us up as we were on the schedule.

12   Q.  You said there was a schedule that they kept?

13   A.  Well, a list of all the girls who came in as you

14       sign in, that's the list that you go up on stage by.

15   Q.  Okay.  Did anybody at the club ever tell you that

16       you had to go on stage?

17   A.  Yes.

18   Q.  Who?

19   A.  The club.

20   Q.  Who?

21   A.  The house mom, the DJs, anybody who -- unless Julian

22       was there and he let me pay him not to go on the

23       stage or Josiah.

24   Q.  Let me start out real slowly.  What was the house

25       mom who told you that you were required to go on
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 6

```
 1        stage?

 2   A.   Abby, Victoria, T, Sabina.

 3   Q.   They all told you that?

 4   A.   Yes, you have to go on stage.

 5   Q.   Hear me out.  Just hear me out.

 6   A.   Yes.

 7   Q.   Somebody told you that you were required to go on

 8        stage?

 9   A.   The DJ in particular.  I already said the DJs.

10   Q.   Which DJ?

11   A.   All four of them, unless Josiah was in one of his

12        nice up feelings, or Julian was there.

13   Q.   And did anybody tell -- so after the first -- did

14        they tell you that on the first day?

15   A.   Also the management.

16   Q.   Who?

17   A.   Cain.

18   Q.   Cain told you that you had to go on stage?

19   A.   Yes.

20   Q.   Anybody else?

21   A.   Stevie.

22   Q.   Is that Steve Shine?

23   A.   Yes.

24   Q.   Anybody else?

25   A.   Jim never said anything to me.  Steve -- no, he
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page  0

```
 1       never said anything to me either.  Those are pretty

 2       much the only ones.

 3   Q.  And they told you that you had to go on stage, and

 4       one of the DJs told you that you could pay $20 to

 5       him if you didn't want to?

 6   A.  Yes.

 7   Q.  Did you ever pay $20 to him?

 8   A.  Yes.

 9   Q.  How many times?

10   A.  Like -- I don't even know how many times to count.

11       Probably like 50 times.

12   Q.  Probably like 50 times?

13   A.  Yes.

14   Q.  Probably like 50 times.  So what days did -- which

15       one did you pay that to, Josiah?

16   A.  Josiah and sometimes Julian, just if I was feeling

17       nice, but Julian didn't --

18   Q.  Okay.  No, no.  These are the ones that you paid $20

19       to, not because you were feeling nice, because you

20       didn't want to go on stage; that's what I'm asking

21       you.

22   A.  But sometimes Julian would let -- Julian would let

23       us skip if he was there without paying.

24   Q.  Okay.  So Julian would let you skip without paying

25       sometimes?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page  1

```
 1   A.  Sometimes.

 2   Q.  Okay.  And Josiah --

 3   A.  Always took $20.

 4   Q.  -- took $20 when you didn't want to go on stage?

 5   A.  And we couldn't skip with Brian or the other guy.

 6   Q.  So did you ever work with Brian when you initialed

 7       the amount that you tipped him out?

 8   A.  I don't know.

 9   Q.  Okay.  Did you typically tip out the DJs?

10   A.  Yes.

11   Q.  Was it customary to tip out the DJs at the club?

12   A.  Yes.

13   Q.  That's because in part they were providing services

14       to you, right?

15   A.  Right.

16   Q.  It's kind of industry practice for people who

17       provide you services for you to tip out to?

18   A.  It's the rules.

19   Q.  It's also industry practice, right?

20   A.  Well, it was required of me, so I did it.

21   Q.  Was it required of you at Heartbreakers?

22   A.  Yes.

23   Q.  And you do it there?

24   A.  Yes.

25   Q.  Was it required of you at Shooter's?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page  2

```
 1   A.   Yes.

 2   Q.   And you did it there?

 3   A.   Yes.

 4   Q.   Was it required of you at Goldrush?

 5   A.   Yes.

 6   Q.   And you did it there?

 7   A.   Yes.

 8   Q.   Was it all around the same amount at each of the

 9        clubs?

10   A.   Yes.

11   Q.   What was the amount?

12   A.   Ten percent of what you make.

13   Q.   And that was what was required?

14   A.   Yes.

15   Q.   Who told you that paying ten percent of what you

16        make was required at The Follies?

17   A.   The DJ and management.

18   Q.   First of all, which DJ?

19   A.   All of them.

20   Q.   Which manager?

21   A.   All of them.

22   Q.   All the managers told you that you were required to

23        pay ten percent?

24   A.   Yes.

25   Q.   What day did they tell you that?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page  3

```
 1   A.  When I first started there and whenever I couldn't

 2       afford my tip out.

 3   Q.  Were there days that you couldn't afford your tip

 4       out?

 5   A.  All the time.

 6   Q.  Did you not pay your tip out when you couldn't

 7       afford it?

 8   A.  I will have to come back and pay it the next day.

 9   Q.  Were there times you recorded zero paid as tip out

10       and initialed it?

11   A.  I suppose there is, but I'm not a hundred percent.

12   Q.  And if you did, it would have been accurate?

13   A.  That I didn't pay?

14   Q.  Yes, ma'am.

15   A.  Yes.

16   Q.  Did you ever tip out less than ten percent of what

17       you made?

18   A.  No.

19   Q.  Never?

20   A.  If I didn't have it, of course.

21   Q.  Did you ever tip out in the range of like ten bucks?

22   A.  I always tip more than $10.

23   Q.  Always?

24   A.  Yes.  I believe in doing -- you get out what you put

25       in, so --
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page

```
 1   Q.   So you thought that if you put in more, the DJs
 2        would treat you better and you'd get out more?
 3   A.   No.  I think that the law of attraction would treat
 4        me better when people get what they work for.
 5   Q.   I'm not understanding what you are saying.
 6   A.   The minimum dollars was ten percent of what I made.
 7        I always tipped out way more than ten percent
 8        because it's just the right thing to do.  If you
 9        worked hard and the minimum is ten percent, the DJ
10        told me that -- all the DJs said that they have to
11        pay a club a portion of the tip outs, so I always
12        tip more than ten percent.
13   Q.   Did you choose to do that?
14   A.   I choose to tip more than ten percent, but it was
15        required for me to tip at least ten percent.
16   Q.   Okay.  Let's just say you made a hundred bucks.
17   A.   $10.
18   Q.   Right.  You claim that $10 was --
19   A.   Required.
20   Q.   -- what the minimum was?
21        What would you typically then tip out on a
22        hundred dollars?
23   A.   7 or $8 more.
24   Q.   So you would tip -- so you would choose to tip out
25        17 or 18 as opposed to 10?
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                                Page  5

```
 1   A.  Yes.

 2   Q.  And that was of your own free choice?

 3   A.  Yes.

 4   Q.  Were there other people who you tipped out?

 5   A.  The bartender, the house mom and the security.

 6   Q.  Did the bartender provide services to you?

 7   A.  Made drinks.

 8   Q.  And have you been to a bar other than The Follies or

 9       an adult club?

10   A.  No.

11   Q.  Well, have you ever been to Starbucks?

12   A.  Oh, yes.

13   Q.  Some people make -- they make you drinks?

14   A.  Yes.

15   Q.  I see that you have one.  That's why I asked you.

16   A.  Yes, yes.

17   Q.  When you bought that coffee or whatever drink that

18       you were drinking, did you throw some money in the

19       change drawer?

20   A.  No.

21   Q.  Was that your choice?

22   A.  Yes.

23   Q.  You understand it's typical that when people provide

24       you service like waiters or waitresses, bartenders,

25       that it's typical to tip?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page  6

```
 1   A.   Yes.

 2   Q.   Did you tip the bartender?

 3   A.   Whenever they made me a drink, yes.

 4   Q.   Was that of your own free will?

 5   A.   Yes.  As far as tip out, I had to tip at least $5

 6        every day, though --

 7   Q.   Did you --

 8   A.   -- before I leave and they would sign a sheet saying

 9        that I tipped it.

10   Q.   Did you typically tip more than $5?

11   A.   No.

12   Q.   That includes when they made you drinks?

13   A.   No.  I mean, if they make me a drink, then I'm going

14        to tip them then.  But this is at the end of the

15        night:  Before I leave, I have to pay everybody.

16        And when I pay the bartender, I give him $5 and

17        that's it.

18   Q.   Okay.  And anybody else that you would tip?

19   A.   The house mom.

20   Q.   How much would you tip the house mom?

21   A.   I tipped the house mom about -- to start, day shift,

22        it was 25.

23   Q.   Okay.

24   A.   Mid shift was 25, sometimes 15, depending on the

25        day.  It's like on Saturdays for the drink tickets,
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page

```
 1       the price went up.
 2   Q.  So let's talk about some of this stuff.  So you said
 3       you would tip the house mom?
 4   A.  Yes.
 5   Q.  What would the house mom do for you?
 6   A.  Provide feminine products, watch over our
 7       belongings.
 8   Q.  Did she bring -- was there food and drink back
 9       there?
10   A.  Yes.
11   Q.  Were there other types of -- other than feminine
12       products, other types of products that she would
13       supply to you?
14   A.  Just like little trinkets that we might need; burn
15       cream, stuff like that.
16   Q.  Did you have to pay for that?
17   A.  No.  That was just like you should tip her.
18   Q.  So it was just like you should tip her?
19   A.  Right.
20   Q.  And in exchange for whatever you tipped her, you got
21       all these free products?
22   A.  Pretty much, yes.
23   Q.  And services, right?  She'd help you with your hair?
24   A.  Yes, yes, yes.
25   Q.  And so in exchange for her providing those services
```

```
 1        to her -- to you, you would tip her?

 2   A.   Yes.  I mean, there was a house mom fee, but we were

 3        still supposed to tip, I guess, if you want to.

 4   Q.   Let me ask you:  Was there a schedule of tips in

 5        writing anywhere?

 6   A.   A schedule of tips in writing?

 7   Q.   Where all these tips that you said that you were

 8        required to pay out were labeled anywhere?

 9   A.   No.  We had see ya passes.  When you go to the DJ,

10        you pay him.  He marks it.  When you go to the

11        bartender, you pay them, they mark it.  That's all

12        we had.

13   Q.   That's not my question.

14   A.   Did Follies keep up with their records as far as --

15   Q.   Ma'am, ma'am --

16   A.   -- if our -- their independent contractors tipped

17        out every day?  Do they have that type of

18        information?

19   Q.   Ma'am, that's not my question to you.  My question

20        to you is this:  And listen carefully.

21             MR. LUCAS:  The first part was responsive,

22        but --

23   Q.   Listen carefully.  Did you see anywhere a schedule

24        of these required tips that you say that you made?

25   A.   Oh, yeah, I was made to sign some paperwork that had
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page

```
 1        a list of all the fees and what time this fee was

 2        going to be that, and I did sign something like

 3        that, but I'm not sure what it was because I was

 4        required to sign it or my job would be ended.

 5   Q.   Okay.  Well, when you showed up there the first day,

 6        you filled out some paperwork after you showed back

 7        up with your permit, didn't you?

 8   A.   No, I didn't sign any paperwork.  When I signed this

 9        paperwork, this was right before I got terminated

10        when I signed this paperwork.

11   Q.   Right before you got terminated is when you signed

12        this paperwork, huh?

13   A.   I signed some contract right before -- not too long

14        before I got terminated.

15   Q.   Okay.  Any other paperwork that you signed right

16        before you got terminated?

17   A.   If I signed anything, then it was because I was

18        forced to sign it or my job was terminated.

19   Q.   Forced to sign it because your job --

20   A.   Forced to sign it because I need to work.  And if I

21        didn't sign it, yes, my job would have been

22        terminated.

23   Q.   Did someone hold a gun to your head?

24                   MR. LUCAS:  I'm going to object to the

25        form of the question.
```

```
 1   A.  This is crazy.

 2   Q.  No, no, it's not crazy.  Did somebody hold a gun to

 3       your --

 4   A.  Nobody put a gun to my head.  But if I needed to

 5       work -- I needed to work.

 6   Q.  Okay.

 7   A.  And it was, You sign this paperwork or you can't

 8       work here anymore.

 9   Q.  Was there a McDonald's down the street?

10   A.  Yes.

11   Q.  Was there a Macy's down the street?

12   A.  Yeah.  And I could have gone to any one of them, but

13       I chose to stay at Follies.

14   Q.  Ma'am, listen to my question.  I know you want to be

15       argumentative.

16   A.  I don't.

17   Q.  Listen to my question.  Remember, I told you very

18       early on:  This process, I get to ask the questions.

19       You get to answer them.

20   A.  Okay.

21   Q.  If there is anything that you don't think I've asked

22       you, you can speak to your lawyer.  He can ask you

23       any question he wants when I'm done.  This is my

24       opportunity to ask you questions.

25   A.  I'm answering them.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 81

```
 1   Q.  So listen to me.  Okay?

 2   A.  Okay.

 3   Q.  Did anybody force you to work at The Follies?

 4   A.  No.

 5   Q.  Did you choose to work at The Follies of your own

 6       free will?

 7   A.  Yes.

 8   Q.  Prior to signing any paperwork at The Follies --

 9   A.  Yes.

10   Q.  -- did you make a conscious decision that you wanted

11       to continue your employment, or whatever it was,

12       your relationship with the club?

13   A.  Say that one more time.

14   Q.  Prior to signing any of the paperwork that was

15       presented to you, okay, did you make a conscious

16       decision that you wanted to sign the paperwork and

17       continue with your relationship at The Follies?

18   A.  No.  It was like I came to work, and it was, You

19       have to sign this now or you can't work here

20       anymore.  So I don't even know what I signed.

21   Q.  So it was either you have to sign it or you are not

22       allowed to continue to perform here?

23   A.  Yes, and that's with my right hand up.

24   Q.  Did you decide that it was worth it to continue your

25       employment at Follies?
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                    Page 82

```
 1   A.  Yes.

 2   Q.  And sign the documents?

 3   A.  Yes.

 4   Q.  Okay.  So if you decided that you didn't want to

 5       sign the documents, you had the choice to go and

 6       cease your working at The Follies?

 7   A.  Yes.

 8   Q.  And those were the choices that you had, correct?

 9   A.  Correct.

10   Q.  Okay.  Prior to walking in that day, had you -- had

11       they called you and said, Tiara come in?

12   A.  No.

13   Q.  Okay.  Did they know you were coming in?

14   A.  No.

15   Q.  Did they know if you were going to come in the day

16       before or the day after?

17   A.  No.

18   Q.  Did they know that -- if you were going to come in

19       the week after or the month after?

20   A.  No.

21   Q.  You could have gone and left Follies any time you

22       wanted, right?

23   A.  Yes.

24   Q.  And you could have returned any time you wanted?

25   A.  Yes.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 83

```
 1   Q.  When you worked, by the way, at this telemarketing

 2       company, did you have that same freedom?

 3   A.  No.

 4   Q.  You had a schedule?

 5   A.  Yes.

 6   Q.  You had to be there at certain times?

 7   A.  Yes.

 8   Q.  And they told you when you could come?

 9   A.  Yes.

10   Q.  It wasn't the same at The Follies?

11   A.  Yeah, but that's the only thing that was different

12       than anything else, that they didn't have a

13       schedule.  But other than that, I had to pay tip

14       outs.  I had to do everything else just like -- you

15       are trying to say whatever you are trying to say.  I

16       don't know.

17   Q.  Okay.

18   A.  But --

19   Q.  Well, was there a list of rules up anywhere?

20   A.  Yeah, there was.

21   Q.  What were the rules up?

22   A.  You can't be in dressing room for more than 15

23       minutes.  That was one of the rules.

24   Q.  Any other rules?

25   A.  No drug activity.
```

TIARA PAYNE v. WBY, INC.

| Tiara Payne on 06/23/2015 | Page 8 |
|---|---|

```
 1   Q.  Okay.  Let me show you what was marked yesterday as

 2       Exhibit 10.

 3   A.  Yeah, this was picked up after Onyx got their

 4       settlement.

 5   Q.  Was that one of the -- one of the signs that you

 6       were talking about and one of the rules?

 7   A.  This is a new rule.  This is something that was done

 8       not -- well way into my job there.

 9   Q.  Exhibit 4 from yesterday, is that one of the things?

10   A.  Yes.

11   Q.  Exhibit 5, was that the other sign that you are

12       referring to?

13   A.  This is the same sign right here.

14   Q.  So these are the rules that you are talking about?

15   A.  Some of them.

16   Q.  What other rules did you see in writing?

17   A.  I don't know.  It was a big -- it was a big list of

18       rules in there.  I don't remember what they were.

19   Q.  Let me show you something.  I'll just ask you --

20       show you exhibit -- was there a big list of rules?

21   A.  Yeah, it was a big list of rules that they put up

22       right after -- around the time that they put all

23       this stuff up.

24   Q.  What was on that list of rules?

25   A.  No prostitution.  That's the only one I remember.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                          Page 85

```
 1   Q.  Any other rules that you can remember that they put

 2       up?

 3   A.  No drug usage.

 4   Q.  Okay.  Anything else?

 5   A.  No, not really.

 6   Q.  Okay.  So as I understand it, the rules that you

 7       understood there to be was no drug usage?

 8   A.  Yes.

 9   Q.  No prostitution?

10   A.  Yes.

11              MR. LUCAS:  Your question was what rules

12       did they have posted?

13              MR. RUBIN:  That's what I'm asking.

14   Q.  No drug usage, no prostitution, can't stay in the

15       locker room for more than 15 minutes.  Anything

16       else?

17   A.  I can't recall.

18   Q.  Those are the only four rules that you are aware of?

19   A.  That I can think of.

20   Q.  Okay.  So don't break the law was the first two; no

21       drugs or prostitution, right?

22   A.  Correct.

23   Q.  Don't stay in the locker room for more than 15

24       minutes?

25   A.  Correct.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                               Page 86

```
 1   Q.  And anything else?

 2   A.  I don't know.

 3   Q.  Was this the sign -- just -- I'm sorry.  I'm going

 4       to show you what was marked as Exhibit 6.  The zero

 5       tolerance dealing with illegal drugs?

 6   A.  No.  That's been in there.

 7   Q.  So those are the only rules that you ever saw?

 8              MR. LUCAS:  Posted.

 9              MR. RUBIN:  Posted.

10   A.  Yes.

11   Q.  So were there any other written rules that you are

12       aware of?

13   A.  See, like I don't understand.  Like this whole thing

14       is null and void.  It says right here, "Pay all fees

15       at the beginning of shift."  So like everything that

16       -- that's your whole case right there.

17   Q.  Ma'am, when you came to the club, did you have an

18       agreement with the club as to what you were going to

19       do and what they were going to do?

20   A.  I was going to get my permit and then I was going to

21       work in that club.  That was the agreement.

22   Q.  When you showed up the very first day --

23   A.  Yes.

24   Q.  -- okay, did they tell you they were going to pay

25       you a wage?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 8

```
 1   A.  No.

 2   Q.  Did they tell you that you were going to have to pay

 3       them money?

 4   A.  Yes.

 5   Q.  Okay.  That you would pay them money, and for paying

 6       them that money, you would have the right to

 7       perform?

 8   A.  Yes.

 9   Q.  Okay.  Did you have any other agreement with the

10       club?

11   A.  None.

12   Q.  Okay.  So you knew when you showed up every day, you

13       made a choice to pay a wage, right?

14   A.  Yes.

15   Q.  To pay the club?

16   A.  Yes.

17   Q.  And that for that payment, you would have the

18       opportunity to sell your services to customers?

19   A.  Yes.

20   Q.  And retain the fees that those customers pay you?

21   A.  Yes.

22   Q.  Okay.  So in exchange for whatever the hundred bucks

23       or so you paid a day, you would get the right to

24       sell your services.  And if you worked six days a

25       week, just say roughly 600 bucks, you'd make -- you
```

1    ████████████████████████████

2    A.   Correct.

3    Q.   So you were making a profit of about ████ a week?

4    A.   Uh-huh.

5    Q.   Okay.

6    A.   Yes.

7    Q.   That was the only deal that you had?

8    A.   Yes.

9    Q.   And the day that you -- every day that you chose to

10        come back there, you knew what the deal was, right?

11   A.   Yes.

12   Q.   It wasn't that it was changing, right?

13   A.   Right.

14   Q.   You made a conscious decision to show up every day?

15   A.   Yes.

16   Q.   They had made the same deal with you, right -- well,

17        strike that.

18             Did anybody tell you they were going to pay you

19        tip minimum wage?

20   A.   They were going to pay me?

21   Q.   Yes, ma'am.

22   A.   No, nobody told me they were going to pay me

23        anything.

24   Q.   Did anybody tell you they were going to pay full

25        minimum wage?

```
 1   A.  No.

 2   Q.  Anyone tell you they were going to pay you a salary?

 3   A.  No.

 4   Q.  So you knew the deal, didn't you?

 5   A.  Of course.

 6   Q.  It wasn't a surprise to you?

 7   A.  No.

 8   Q.  And you already told me that if they said the deal

 9       was seven and a quarter, it would have been a far

10       worse deal?

11               MR. LUCAS:  Objection.  Calls for

12       speculation.  Go ahead.

13   A.  No.  They didn't give me that option.  Follies

14       didn't give me that option.

15   Q.  They didn't give you that option, but knowing how

16       much money you made --

17   A.  If I wanted 7.25 an hour, I could have walked down

18       the street, like you said, and got that.

19   Q.  At McDonald's?

20   A.  Yeah.  But it's pretty much a -- not that situation

21       there.

22   Q.  Okay.  And so at McDonald's you don't have the

23       opportunity to make ███ bucks a week either, do

24       you?

25   A.  Nope.
```

1    Q.    There aren't many jobs where you can make ████████ a

2          year at your age?

3                    MR. LUCAS:    Objection.    Calls for

4          speculation.    Go ahead and answer, if you know about

5          every job in the country and how much they pay.

6    A.    Yes, I do.

7    Q.    Not many jobs that you can make that kind of money,

8          are there?

9    A.    There probably are, actually, if you get creative.

10   Q.    Not many for sure?

11   A.    I'm not going to say that because there probably

12         are, if you were creative.

13   Q.    So you show up, you make this deal, and they explain

14         to you whatever the fees that you understood there

15         to be for all these tip outs, right?

16   A.    Uh-huh.

17   Q.    Is that a yes?

18   A.    Yes, that's a yes.

19   Q.    And every day you showed back up, you knew that deal

20         too?

21   A.    Yes.

22   Q.    And every day you showed up, you chose to come to

23         this place as opposed to anywhere else?

24   A.    Yes.

25   Q.    And live up to those portions of the agreement?

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                                      Page  1

```
 1   A.  Yes.

 2   Q.  Did Follies ever not do something that they promised

 3       you they wouldn't do?

 4   A.  They didn't promise me anything.

 5   Q.  Was there anything that Follies told you that they

 6       were going to do that they didn't do?

 7              MR. LUCAS:  I'm going to object to the

 8       form of the question, but go ahead.

 9   A.  I don't know.

10   Q.  Anything that you can recall?

11   A.  No.

12   Q.  So for example, they told you that if you wanted to

13       show up and lease space, you could do so if you paid

14       a fee?

15   A.  They didn't tell me that.  It was just understood.

16   Q.  Okay.  In any event, was there ever a day that you

17       showed up that they told you that you couldn't pay a

18       fee and work --

19   A.  No.

20   Q.  -- or perform?  Okay.

21          Was there ever -- they never -- did they ever

22       tell you that one of the benefits of working there

23       is that they didn't schedule people?

24   A.  No.

25   Q.  Did they ever call you up and say, Get in to work?
```

```
 1   A.   No.

 2   Q.   Did they ever tell you that there were any

 3        requirements other than the payment of the fees that

 4        you had to perform there?

 5   A.   No.

 6   Q.   Did they ever tell you what it is that you had to

 7        wear?

 8   A.   Yes.

 9   Q.   What did they tell you you had to wear?

10   A.   G-string, then it got to the point we had to wear

11        bottoms on the floor.  One time I had put on some

12        like blue jeans shorts, and I was made to remove

13        them and put on my thong and bottom.

14   Q.   Do you know why that may have been?

15   A.   Because we had to be in dance attire on the floor.

16   Q.   So other than wearing dance attire on the floor, was

17        there any requirements about the clothing that you

18        wore?

19   A.   I put on tennis shoes once and got scolded at.

20   Q.   Was tennis shoes dance attire?

21   A.   No.

22   Q.   Other than wearing dance attire of some sort, were

23        there any requirements about the clothing that you

24        wore?

25   A.   No.
```

```
 1   Q.  Did they tell you what kind of dance attire to wear?

 2   A.  No.

 3   Q.  Did they tell you what color it should be?

 4   A.  No.

 5   Q.  Did they tell you how much to spend on it?

 6   A.  No.

 7   Q.  Where to buy it?

 8   A.  No.

 9   Q.  Did it have logos on it?

10   A.  No, none of that.

11   Q.  You can buy anything you wanted and wear anything

12       you wanted as long as it fit within the general

13       requirement of dance attire?

14   A.  Yes.

15   Q.  Other than not wearing tennis shoes, any other rules

16       about shoes?

17   A.  No.

18   Q.  So other than you can't wear tennis shoes, they told

19       you you could wear anything you wanted?

20   A.  Yes.

21   Q.  And that was only once.  On other occasions did you

22       wear tennis shoes?

23   A.  No.  I didn't usually do that.  I just hurt my foot

24       that day.

25   Q.  Okay.  Any other clothing requirements other than
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page

```
 1      wear some sort of dance attire, and on one occasion,

 2      don't wear tennis shoes?

 3  A.  No.

 4  Q.  Okay.  Any other requirements about when you had to

 5      be at work?

 6  A.  No requirements.

 7  Q.  You chose when you wanted to show up for work?

 8  A.  The only thing is, the later that you are, the more

 9      tip out is.

10  Q.  So the later you are -- it was really how long you

11      worked, right, is how much you would pay?

12  A.  No.  It's a set fee, and then the later that I got

13      there is $20 every ten minutes that I was late.

14  Q.  So it's not $20 -- well, you didn't -- so for

15      example, if you were there at 11 o'clock, how much

16      would it cost you?

17  A.  It depends on what time that shift starts.  What

18      time is night shift, 8 o'clock?

19  Q.  It would cost you $20 every --

20  A.  That's how much they charged me.  They would charge

21      me $20 every ten minutes I was late.

22  Q.  So if you were an hour late, they would charge you

23      $1800?

24  A.  No.  They stop it at a certain -- like after $85 or

25      something like that.  That's the max, but --
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                      Page  5

```
 1   Q.  Did they have a schedule that you ever saw of rent

 2       charges?

 3   A.  Write charges?

 4   Q.  Rent, entertainment charges?

 5   A.  That paperwork I signed.  Whatever I signed, it had

 6       on there how much everything cost.

 7   Q.  Let me show you what's marked as Exhibit 2.  Why

 8       don't you take a look at that and tell me if that

 9       fits within your recollection of what the various

10       charges were.

11   A.  No, this isn't right.

12   Q.  What's not right about that?

13   A.  Like this is saying at 11 o'clock it's $30.  It was

14       $25 to come in there.

15   Q.  Okay.

16   A.  It was always $25 at the beginning of the shift, and

17       then like every ten minutes it would go up $20.

18       I've never made it past $80.

19   Q.  Every ten minutes it would go up $20?

20   A.  Yeah.

21   Q.  So the schedule there you are saying is inaccurate?

22   A.  Yeah, this -- this is not right.

23   Q.  So it wasn't that if you showed up at 11:00 or

24       before 12:00 it was 30, and then if you showed up

25       after that it was more?  So for example, if your
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                              Page  6

```
 1      shift ended instead of at seven, but it ended after
 2      eight, you would pay 40?
 3   A. No.  You pay based off of what time you get there.
 4   Q. Okay.  It wasn't what time you get there and what
 5      time you leave?
 6   A. No.  If you stay longer, then you pay another shift.
 7   Q. Okay.
 8   A. But it was -- but your fee is going to be based on
 9      what time I get there.  It's 11 o'clock.  I'm
10      supposed to be there at 11 o'clock.  I get there at
11      11:20.  They then charge me 40 more dollars on top
12      of 25.
13   Q. What did they charge you?
14   A. Whatever 40 bucks --
15   Q. They charged you $65?
16   A. $65 to work, yeah.
17   Q. And if you wanted to pay less than that, you would
18      show up before 11:00?
19   A. Yeah, I show up on time.
20   Q. Okay.  And you knew that if you showed up later, it
21      would cost you more?
22   A. Yeah.
23   Q. Okay.  And you made those decisions?
24   A. Yes.
25   Q. And nobody -- all you knew is that you would pay --
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page

```
 1        you would have to pay more money if you came later?

 2   A.   Exactly.

 3   Q.   Okay.  And if you came earlier, you would pay less

 4        money?

 5   A.   No.  It was $25 off the jump.

 6   Q.   Less money if you came earlier, more money if you

 7        came later?

 8   A.   Correct.

 9   Q.   That's what you knew?

10   A.   Correct.

11   Q.   And you knew that every day you showed up?

12   A.   Yes.

13   Q.   And you picked the time that you would show up?

14   A.   Yes.

15   Q.   So you picked the time -- you picked the amount of

16        money that you would be paying based upon the time

17        that you decided to show up?

18   A.   Yes.

19   Q.   If you wanted to make more money that day, you could

20        show up earlier, right?

21   A.   Yes.

22   Q.   If you wanted to -- if you were having a great week,

23        you could show up at midnight, maybe work a couple

24        of hours and leave?

25   A.   Yes.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page  8

```
 1   Q.  Okay.

 2   A.  Well, no, no.

 3   Q.  Or not at all?

 4   A.  No, no.  I mean, the only way you could leave, if

 5       you wanted to work a couple of hours and do that, is

 6       if you got permission, then that was $20.

 7   Q.  Did somebody physically hold you back from leaving?

 8   A.  Yes.

 9   Q.  Who held you back from leaving?

10   A.  If I wanted to leave -- well, no.  Okay.  If I

11       wanted to leave early, then I had to get permission.

12       If I wasn't -- if I wasn't granted this permission,

13       then I couldn't leave.  And I mean, if I wanted to

14       keep my job, then I didn't leave.

15   Q.  Okay.  Who told you -- who ever told you that you

16       weren't allowed to leave?

17   A.  Every manager except Jim.  Jimmy and Jim have never

18       once told me that I couldn't leave, but I never

19       asked them either.

20   Q.  Anybody that you asked who told you that you

21       couldn't leave?

22   A.  Yeah, Cain told me I couldn't leave.  Stevie B. told

23       me I couldn't leave one time.

24   Q.  Anybody else?

25   A.  Steve Shine wouldn't let me leave one time.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page

```
 1   Q.  How many times in total did they tell you that you

 2       weren't allowed to leave of the -- all these times

 3       that you worked there?

 4   A.  The only times I really wanted to leave early was

 5       when I got twisted.

 6   Q.  Once?

 7   A.  No.

 8   Q.  Twice, three times?

 9   A.  Probably like ten or so times.

10   Q.  And that was when you were drunk?

11   A.  Yes, and I needed to go.

12   Q.  And did you drive there?

13   A.  No.  There were times that I did drive, but I didn't

14       really drive.

15   Q.  Okay.  Did you not being able to go, have anything

16       to do with your alcoholic -- your level of

17       intoxication?

18   A.  No, because everybody knew that I had a boyfriend

19       who came and picked me up every day.  It was because

20       my shift wasn't over and I had to stay to finish my

21       shift.

22   Q.  Who told you that?

23   A.  Cain.

24   Q.  Cain told you you had to stay to finish your shift

25       how many times?
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                        Page 100

```
 1   A.   Probably -- the most probably about eight or so

 2        times because he's the main one that I used to ask.

 3   Q.   Anybody else tell you?

 4   A.   Steve told me I couldn't leave once and then --

 5   Q.   Steve Shine?

 6   A.   Yes.  And Stevie B. told me I couldn't leave once.

 7   Q.   Stevie who?

 8   A.   Stevie B.  He's in one of these pictures.  Cain's

 9        brother, he told me I couldn't leave one time.

10   Q.   Now, how old were you when you worked there?

11   A.   I started there at 18.

12   Q.   And how old were you when you stopped working there?

13   A.   19 or 20.

14   Q.   Can you read, write and understand the English

15        language?

16   A.   Yes.

17             MR. RUBIN:  Can you mark this?

18             (Exhibit 11 marked for identification.)

19   Q.   I've showed you what I've had marked as Exhibit 11.

20        Is that the document you referred to?

21             MR. RUBIN:  I'm going to hand you a copy

22        of it.  I'm sorry.  I thought I had it right in

23        front of me.

24             MR. LUCAS:  This was already marked

25        yesterday.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 101

```
 1                    MR. RUBIN:  It may be.

 2                    MR. LUCAS:  Yeah, this was -- oh, maybe it

 3        wasn't.

 4                    MS. NORDSTROM:  I don't think it was.

 5        BY MR. RUBIN:

 6    Q.  Okay.  I'm showing you what I've had marked as

 7        Exhibit 11.  Have you seen that document before?

 8    A.  I don't recall.  I signed the entertainer contract

 9        and arbitration policy document, yeah, but I don't

10        remember what I stated or what it resembled.

11    Q.  Have you ever read it since?

12    A.  I've read it recently.

13    Q.  Did you ever read it at any time after you signed

14        it?

15    A.  No, I never had a copy of it.

16    Q.  Did you ever ask for one?

17    A.  I did.

18    Q.  Did somebody tell you you couldn't have one?

19    A.  Yep.

20    Q.  Who?

21    A.  Abby.

22    Q.  Who is Abby?

23    A.  The house mom.

24    Q.  She told you you couldn't have it?

25    A.  Well, they didn't have it to give to me.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                          Page 102

1    Q.   Okay.  Did you ever send in something that I revoke

2         my agreement?

3    A.   I don't know what I signed.  That's what I'm trying

4         to say.  I don't know what I signed.

5    Q.   But you know -- you do recall it had prices on it?

6    A.   Yes.

7    Q.   So this is -- I'm going to show you just a document

8         that's been attached to your demand in this case for

9         arbitration and ask you if this is the entertainer

10        agreement that you signed?

11   A.   Where is my contract?

12   Q.   I'm asking you -- this is the one that is attached

13        to --

14   A.   I don't know.  I don't know what -- no, I don't

15        remember signing anything that had all this

16        information on it.

17   Q.   This is for arbitration.

18   A.   Okay.

19   Q.   This is a document your lawyer attached to the

20        arbitration demand.  Okay?

21             MR. LUCAS:  This is not signed by you.

22   A.   I don't remember signing anything that looked like

23        this.

24   Q.   Is this the document that you signed?

25   A.   I've never seen that.

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                              Page 103

1   Q.  You've never seen what is referred to as -- or

2       what's called WBY, Inc. --

3   A.  I'm not going to agree to that because I don't know.

4   Q.  Let me finish my question, please.

5   A.  I don't know is my answer to your question.  I know

6       what you are going to ask me.

7   Q.  I don't care if you know what I'm going to ask you.

8       Please let me ask my questions.

9   A.  Okay.

10  Q.  And then you can answer them.

11  A.  Okay.

12  Q.  Did you sign a document called "WBY, Inc.'s d/b/a

13      The Follies Entertainment Contract"?

14  A.  I don't know.  I don't know what it was called or

15      what was on the document.

16  Q.  Okay.  So this is a document that was attached to

17      your claim in arbitration.  Can you tell me whether

18      or not a similar document is one to which you

19      signed?

20  A.  No.  I signed something where it said name, Social

21      Security number, and that was all on the back piece

22      of the paper.

23  Q.  Did you sign an arbitration policy that's

24      attached --

25  A.  Yes.

TIARA PAYNE v. WBY, INC.
**Tiara Payne on 06/23/2015**                                      **Page 10**

```
 1   Q.  -- to your complaint?

 2   A.  I did.

 3   Q.  Okay.  And is this -- this is a document that you --

 4   A.  I didn't sign.

 5   Q.  -- did sign?

 6   A.  I signed this sheet right here.  That sheet right

 7       there is what I signed.

 8   Q.  This sheet is an attachment to the entertainment

 9       arbitration agreement.  Okay?

10   A.  Uh-huh.

11   Q.  So you signed the arbitration agreement; you don't

12       dispute that, right?

13   A.  No.

14   Q.  You filled out this form here?

15   A.  Yes.

16   Q.  Okay.  Are there any other documents that you recall

17       signing?

18   A.  No.

19   Q.  Okay.  So you didn't sign the entertainer contract,

20       but you did sign the arbitration agreement?

21   A.  I don't know.  I don't know what I signed.

22   Q.  I'm trying --

23              MR. LUCAS:  You are mischaracterizing what

24       she said.

25              MR. RUBIN:  I'm trying to understand what
```

```
 1      she's saying.

 2  A.  What I'm saying is that I was given paperwork.  I

 3      don't recall what was on that paperwork, and I

 4      signed it.

 5  Q.  Okay.

 6  A.  So all your specifics to that, I don't know, and

 7      it's going to be that every time.

 8  Q.  Okay.  Well, I'm going to keep on asking you the

 9      questions.

10  A.  Well, you are going to keep getting the answer.

11  Q.  Just give me an answer to my question --

12  A.  Okay.

13  Q.  -- without giving me these lengthy --

14  A.  Okay.

15  Q.  -- explanations --

16  A.  Okay.

17  Q.  -- so I can just have a record of what it is --

18  A.  All right.

19  Q.  -- that I understand you to say.

20  A.  All right.

21  Q.  See this document?

22  A.  Yes.

23  Q.  It's your arbitration demand.  It's your claim in

24      arbitration.

25  A.  Yes.
```

1   Q.   It's what you claim occurred in this case.

2   A.   Okay.

3   Q.   Okay.  To that you attached a document that says

4        "WBY, Inc. The Follies."

5   A.   Okay.

6   Q.   Your copy is unsigned.  This is what you attached.

7              MR. LUCAS:  That's what your lawyers

8        attached.

9   Q.   My question to you is, do you recall ever seeing

10       this document before?

11             MR. LUCAS:  Objection.  Asked and

12       answered.  Go ahead.

13  A.   I don't recall.

14  Q.   Okay.  You are not saying that you didn't sign it;

15       you are saying you don't recall whether you signed

16       it?

17  A.   Because I -- the only place that I remember signing

18       is this right here, and that's -- that is my

19       testimony.

20  Q.   Okay.  Let me go through these documents, please.

21       Okay?  So I can understand for the record what it

22       is.

23             MR. LUCAS:  I don't know what you don't

24       understand.

25  A.   It's like you keep asking the same question.  It's

 1        the same document.  I don't know what I signed.  I

 2        signed this paperwork right here.  This right here,

 3        I signed.

 4                    MR. LUCAS:  So the record reflects, it's

 5        the --

 6                    MR. RUBIN:  It's got no signature on it.

 7                    MR. LUCAS:  It has no signature on it.

 8        It's got no Bates stamp number on it.  It is the

 9        last page of the employment arbitration rules demand

10        that counsel has shown the witness.

11        BY MR. RUBIN:

12   Q.   So where did you sign this form?  Do you recall

13        where on the document you may have signed it, since

14        it doesn't have a signature block?

15   A.   This right here?  This was just -- this was the last

16        page.  It was just like this.

17   Q.   It was the last page to the arbitration agreement --

18   A.   Yes.

19   Q.   -- which is what I was asking you before you

20        interrupted me.  Is this --

21   A.   I already told you that I signed that.

22   Q.   We're going to go through this all day if you keep

23        this up, ma'am.  So let's --

24   A.   We can go at it all day.

25                    MR. LUCAS:  Don't threatened the witness.

```
 1   A.   I got all day.  I got all day.

 2   Q.   I got all day, too.

 3   A.   Okay.  Well, let's do it.

 4   Q.   Okay.  So we already talked about the entertainment

 5        contract.  The next document attached to your

 6        pleading is the arbitration policy.

 7   A.   Yes.

 8   Q.   Okay.  This document which has a signature block on

 9        what is page 3 of 3, you did sign?

10   A.   I don't remember signing that.

11   Q.   So this is the document you've just been yelling at

12        me about telling me that you signed.

13   A.   I don't remember it.  The only thing I remember is

14        this.  I remember clear as day filling this

15        information out and signing it.  That is all I

16        remember.

17   Q.   Did you sign it on a page that was similar to page 3

18        of 3?

19   A.   It was on the back of all of the paperwork just like

20        this by itself, and I flipped it over, I signed it,

21        and I turned it in.

22   Q.   Okay.  Any other documents you recall at any time

23        signing at the club?

24   A.   That's the only document I ever signed working at

25        Follies.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 10

 1   Q.   Okay.  Is there another document you recall seeing

 2        that had prices on it other than what is the

 3        entertainer contract because that's what you said --

 4        I thought you said --

 5   A.   It was all attached to the same thing.  It had the

 6        prices on it with the rules and the arbitration

 7        agreement, and I signed it.

 8   Q.   There were rules attached to whatever contract you

 9        purportedly had signed?

10   A.   Yeah.

11   Q.   And those rules were the four that we talked about?

12   A.   I don't remember what rules were on there.

13   Q.   You don't remember at all what the rules were?

14   A.   The rules that I told you about were the rules that

15        I put up in the club.  They were these that were

16        posted.  They were not the rules that were on this

17        agreement that I signed.

18   Q.   What other rules do you recall being on the

19        agreement?

20   A.   I don't remember because I don't know what I signed.

21   Q.   Okay.  So whatever it was that you signed, you don't

22        know what it is because you didn't read it?

23   A.   No, I wasn't given the opportunity to.  It was, sign

24        it now or you can't work here.  Literally like that:

25        The way that I'm giving it to you was the way it was

```
 1      given to me.

 2   Q.  Who told you?

 3   A.  Cain.  Cain was the one who came out with them, and

 4       Abby was the one who enforced us to sign them.  And

 5       before we checked in and signed in that day, we had

 6       to sign these contracts.

 7   Q.  Okay.  So Cain would have been the manager on duty

 8       the day that you signed whatever the

 9       agreement -- well, you just pointed to this

10       entertainment contract.  Did you sign the

11       entertainment contract on the same day?

12   A.  I don't know what --

13              MR. LUCAS:  Objection.  Asked and

14       answered.

15              MR. RUBIN:  Hold on.

16   Q.  Did you sign the entertainment contract on the same

17       day you signed the arbitration agreement?

18   A.  It was all put together, yes.  It was all in the

19       same paperwork.  Whatever it was that I signed was

20       all together.  The entertainment contract, the wages

21       and hours for tip out, the rules and the arbitration

22       agreement, it was all stapled together and on the

23       back of it, this page, was right here and I signed

24       this, and I handed it to the house mom.  And I asked

25       for a copy of it, and I was not granted that wish.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 111

1   Q.  What shift does Cain work?

2   A.  Night shift.

3   Q.  What shift does Abby work?

4   A.  Day shift.  Abby was I think leaving at that time or

5       she had stayed over.  I don't remember what

6       happened, but I remember Cain giving me the

7       paperwork and I turned it in to Abby.  I remember

8       that much.

9   Q.  Okay.  Cain gave you the paperwork and Abby

10      collected it?

11  A.  Yes.

12  Q.  Okay.

13            MR. LUCAS:  Can we take a break when you

14      have a chance?

15            MR. RUBIN:  Absolutely, whenever you want

16      to take a break.  Right now is fine.

17            (Recess.)

18            (Exhibit 12 marked for identification.)

19  Q.  I'll show you what I've had marked as Exhibit 12.

20      This is another -- it's a photograph of some

21      documents that were posted at the club.  And my only

22      question to you is, did you ever see this document

23      at the club?

24  A.  I don't recall.

25  Q.  It's possible you did, possible you didn't?

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 112

```
 1   A.   Yes.

 2   Q.   Okay.

 3   A.   I never seen this.  "Entertainer is free to perform

 4        at other businesses."  Okay.

 5   Q.   This is a document that you've never seen?

 6   A.   Yeah, I didn't -- I didn't -- this is not true at

 7        all because this is not true.

 8                MR. LUCAS:  He didn't ask if it's true.

 9        He asked if you've ever seen it, and I think you've

10        answered.

11                THE WITNESS:  Yeah, okay.  Well, maybe it

12        is now.

13                MR. LUCAS:  He's not asking about whether

14        it's true or not.

15                THE WITNESS:  Yeah, that's true because

16        maybe it is now.  But when I was working there, it

17        wasn't.

18        BY MR. RUBIN:

19   Q.   Did you ever see any documents like Exhibit 12

20        posted at the club?

21   A.   Possibly.

22   Q.   Okay.

23   A.   Not posted, no.  There was no documents at all

24        posted there when I worked there.

25   Q.   So nothing was posted anywhere in the locker room?
```

```
 1  A.  No documentation was posted.  There was signs just

 2      like this that were posted there, but there was no

 3      documents posted.

 4  Q.  "This" and "that" doesn't translate very well, so if

 5      you could just do me a favor --

 6  A.  And be specific?  Well, any type of entertainment

 7      contract, arbitration form, anything of that nature

 8      was not posted anywhere at Follies when I was there.

 9  Q.  Okay.  It's possible it was posted afterwards?

10  A.  It's possible it was posted, but not when I was

11      there.

12  Q.  And you said things like what you saw is Exhibit 6,

13      I believe it is?

14  A.  Exhibit 6, Exhibit 4, these are the type of things

15      that were posted.  These are the type of paperwork

16      that were posted when I worked there, yes.

17  Q.  Now, I'm going to show you what I'm going to have

18      marked as Exhibit 13.

19              (Exhibit 13 marked for identification.)

20  Q.  This is what I've marked as Exhibit 13.  It is a

21      packet of documents.

22              MR. LUCAS:  Just for the record, Allan, I

23      did pull this out.  I think what you marked as

24      Exhibit 11 today is Exhibit 8 from yesterday.

25              MR. RUBIN:  No worries.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 11

```
 1                  MR. LUCAS:  I want make to sure that the
 2        record is clear.  That's all.  I thought I saw it
 3        before, but I wasn't sure.
 4                  MR. RUBIN:  I looked through the exhibits.
 5        I didn't see it, so --
 6                  MR. LUCAS:  That's what I have.  I could
 7        be wrong, too.  We'll know when we see this stuff.
 8                  MR. RUBIN:  No worries.
 9   Q.   I'm not going to ask you a lot of questions about
10        these documents.  But just take a look at this
11        packet of documents and tell me if this is the type
12        of form you remember initialing when you worked
13        there -- when you performed there?
14   A.   Yes.
15   Q.   Okay.  Do you see that there is the name Climax
16        written there --
17   A.   Yeah.
18   Q.   -- on these documents?
19   A.   Yes.
20   Q.   And there's some other stuff that's blocked out?
21   A.   Yeah.
22   Q.   Does this seem to be the types of documents you
23        filled out when you worked there?
24   A.   Yes, on -- at times, yes.
25   Q.   Okay.
```

 1   A.   Well, I initialed.  I didn't fill anything out.

 2   Q.   Well, you said that you initialed it indicating it

 3        was accurate?

 4   A.   Correct.

 5   Q.   Okay.  Do you ever recall initialing a form that you

 6        did not believe to be accurate?

 7   A.   Yeah.  Probably the whole thing I signed, whatever

 8        it was that I signed.

 9   Q.   I'm talking about Exhibit 13.

10   A.   Okay.  No.  I think that this is right.  I believe

11        it's right.

12   Q.   The tip out column there, that's the amount that you

13        tipped out to the DJ?

14   A.   Yes.

15   Q.   Do you see where like on the page it's got a time

16        note 4:51; do you recall what that was referring to?

17   A.   Possibly when I clocked in.

18   Q.   Well, you didn't clock in because there weren't any

19        clocks to clock into, right?

20   A.   Okay.  I didn't literally clock in, but the time

21        that I signed in, because I did literally sign in.

22   Q.   Okay.  So this would have been -- so where it says

23        4:51, you think that that would have been the time

24        you signed it in?

25   A.   That would be the only reason I could see a time in

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 116

```
 1       there.

 2   Q.  On this first page is there anything that's yours

 3       other than the initial?

 4   A.  I don't even remember initialing that.

 5   Q.  Does it look like your handwriting, though?

 6   A.  I usually did like a squiggly, but it's possible

 7       that I gave him some money and he put that in there

 8       real quick and -- just to say that I gave him the

 9       money, and that was it.  It is possible that I

10       didn't initial it.

11   Q.  Do you see where -- if you go to a form, and it's 19

12       on the bottom in the lower right-hand corner -- do

13       see these little numbers right here?  On the bottom

14       here, one of them is going to have a 19 after it.

15   A.  I see it.

16   Q.  Okay.  Does that look like the little squiggly that

17       you would do?

18   A.  Yes.

19   Q.  Okay.  If you turn to 21, there is another squiggly

20       there.  Does that look like the type of squiggly

21       that you would do?

22   A.  That looks more like my squiggly.

23   Q.  Okay.  Now, when you worked more than one shift in a

24       day, would you squiggle and initial more than one of

25       these?
```

```
 1   A.  No.

 2   Q.  Okay.

 3   A.  I would just pay the DJ and then go back on the

 4       floor.

 5   Q.  So when you -- so you only completed one of these,

 6       right and you initialed it -- did you initial it

 7       when you came in or when you left?

 8   A.  When we left.

 9   Q.  Okay.  And it would have been accurate for whatever

10       the amount was for that day?

11   A.  Approximately.

12   Q.  Now, was there any place that you kept records of

13       where and when you performed?

14   A.  No.

15   Q.  Did you maintain a calendar like a door or wall

16       calendar of any type?

17   A.  No.

18   Q.  No computer calendar?

19   A.  No.

20   Q.  No calendar on your iPhone or iPad?

21   A.  No.

22   Q.  And you didn't track any income you received on a

23       day-to-day basis?

24   A.  No.

25   Q.  You didn't record any tip outs that you paid to
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                            Page 118

```
 1        people on a day-to-day basis?
 2   A.   No.
 3   Q.   Okay.  I don't want to know about any conversations
 4        you had with any lawyers, but did you ever seek tax
 5        advice as to what you are supposed to do to maintain
 6        your business records?
 7   A.   No.
 8   Q.   Okay.  Did you ever go to like H&R Block or anybody
 9        else like that and say, I want to file taxes, Tell
10        me what I need to keep?
11   A.   No.
12   Q.   Did you ever go to anybody and ask that question?
13   A.   No.
14   Q.   Did you ever ask your parents?
15   A.   No.
16   Q.   When you went to college, what were you studying at
17        Stillman?
18   A.   Forensic science.
19   Q.   What about at -- I'm sorry.  I know Stillman.  At
20        Savannah, same thing?
21   A.   Yes.
22   Q.   Did you ever take any business or accounting
23        classes?
24   A.   I don't think I did, no.
25   Q.   Did you ever take any in high school?
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                    Page 11

```
 1   A.  No.

 2   Q.  Other than the lawyers involved with suing the

 3       various clubs that you performed at, because I don't

 4       want to know about any of those conversations.

 5       Okay?

 6   A.  Okay.

 7   Q.  At all.  Okay.  I just want to know if you ever

 8       consulted with a lawyer relative to your tax filing

 9       advice or tax filing requirements?

10   A.  No.

11   Q.  Did you ever seek any advice as to what types of

12       records you were supposed to maintain if you were an

13       independent contractor?

14   A.  No.

15   Q.  Or your own self-employed person?

16   A.  No.

17   Q.  Okay.  Now, when did you first become -- strike

18       that.

19           Were you involved in any other litigation?

20   A.  No, not other than what I told you.

21   Q.  So you weren't involved in any Onyx litigation?

22   A.  No.

23   Q.  Or any other litigation involving adult

24       entertainment in Atlanta?

25   A.  No.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 120

1   Q.  Who would have records of -- strike that.

2       Were there any records of the date and times

3       that you performed at Shooter's that you saw in

4       connection with your litigation?

5   A.  If they kept records.

6   Q.  Did you see -- were there any records that you saw?

7   A.  As far as --

8   Q.  Dates and times that you performed at Shooter's?

9   A.  Yes.

10  Q.  What records did you see?

11  A.  They had a time book for when you signed in.

12  Q.  So if I wanted to know when you worked at Shooter's,

13      I could look at that time book and would know?

14  A.  Yes.

15  Q.  The sign-in sheets that are Exhibit 13 that we

16      looked at, the DJ sheets, were there any --

17  A.  I mean it's just like this pretty much.

18  Q.  Okay.

19  A.  It's the same.  So if this is what you are talking

20      about --

21  Q.  No.

22  A.  -- it's pretty much the same thing.

23  Q.  So take a look at Exhibit 13.  Were there any other

24      types of documents that you signed in or out on?

25  A.  No.

1   Q.   Okay.  But did you recall signing in or out on that

2        kind of document every day that you worked?

3   A.   Not every day.  I didn't sign this every day.

4   Q.   How many times a week would you sign it?

5   A.   Maybe five.

6   Q.   So five days a week you wouldn't sign it?

7   A.   No.  I would.  Maybe four or five.  I don't really

8        recall.  It was just sometimes like -- if I wasn't

9        rushing -- because usually I would be rushing to get

10       out the door.  So I would be trying to pay everybody

11       real quick and get up out of there, so I mean --

12  Q.   Was one of the requirements they had that you

13       initial that?

14  A.   No.  It was just like, Come here and initial this.

15  Q.   So it wasn't a requirement; it was just, Come here

16       and initial this?

17  A.   Uh-huh.

18  Q.   You look at it for accuracy and initial it?

19  A.   I didn't look at it.  I just initialed it.

20  Q.   So you don't know if it was accurate or not?

21  A.   It should have been.

22  Q.   Okay.  Now, when you worked at Shooter's, was it

23       similar to that?

24  A.   It was just like, when you sign in at the door, you

25       show the permit.  And then they put on there your

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 122

```
 1        name and the time that you come in, and you leave --
 2        and you go on the floor.
 3   Q.   What would be the circumstances that you wouldn't
 4        initial that document?
 5   A.   If I'm just running too fast or a day shift.  I
 6        didn't sign this day shift.  Like this is a night
 7        shift type of thing.  When you are leaving -- when
 8        you are trying to leave and get out of there -- this
 9        is day shift.  We didn't really do this.
10   Q.   You are sure you didn't do that on day shift?
11   A.   I'm not sure that I didn't do it.  I mean, I'm sure
12        that Julian a couple of times had me probably
13        initial this once or twice, but this is not really a
14        day shift type of thing.  This is more of at the end
15        of the night.
16   Q.   Do you know if there are day shift and night shift
17        sheets in there that you've initialed?
18   A.   Yeah, some of this is -- according to these times,
19        some of them -- you know, I can't -- I can't really
20        tell you because I don't really -- I'm not a hundred
21        percent on this.  I know when I could, I signed it.
22        If they were like, Hey, Climax, come here and sign
23        this, I signed it.  That's pretty much one of those
24        things.
25   Q.   Okay.  So the circumstances that you didn't sign it,
```

```
 1        were you were running around too busy to sign it?

 2   A.   Yes, or I wasn't asked to sign it.

 3   Q.   Well, every time you went to see the DJ as you were

 4        leaving, was that one of the things that you would

 5        typically do?

 6   A.   Yes, at nighttime.

 7   Q.   Okay.  And during the daytime you don't recall being

 8        asked do that?

 9   A.   I think, yeah, I was a couple of times, but it

10        wasn't like -- at nighttime I think it was like

11        required-required.

12   Q.   Now --

13   A.   At mid shift you don't sign anything like this.

14   Q.   Well, mid shift -- what's mid shift?  What is day

15        shift?

16   A.   Day shift is 11:00 to 8:00.  Mid shift is 4:00 to

17        12:00.  Night shift 8:00 to 4:00.

18   Q.   So when you would walk out at, whatever, eight to --

19        four to midnight, if you worked mid shift, you

20        wouldn't sign that?

21   A.   No.  I would -- like if I -- I didn't usually walk

22        out on mid shift.  I usually stayed all night.  So

23        it's just like you tip the DJ and pay your -- pay

24        your fee and then keep it moving.

25   Q.   So when you left mid-shift, would there ever be an
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 12

```
 1        occasion where you would sign that before midnights?

 2   A.   Yeah, I think there were times when I signed this if

 3        I left mid shift.

 4   Q.   It was your understanding the practice was that you

 5        would sign this for at least some period of time

 6        when you left after every shift?

 7   A.   Yeah.

 8   Q.   Okay.  I know it's been a while since you worked

 9        there and so some of it may come back slowly.

10   A.   I know -- like I said, I know that last shift you

11        had to sign it, but there were times in day shift

12        where I never looked at this.

13   Q.   Okay.  Who decided if you were going to stay over

14        from mid shift to day shift or day shift to mid

15        shift?

16   A.   I did.  That's a choice.

17   Q.   Okay.  A choice you made?

18   A.   Yes.

19   Q.   Let's talk about how you would make your money as an

20        entertainer.

21   A.   Okay.

22   Q.   What were the various ways for which you as an

23        entertainer could make money?

24   A.   Dance and do table dances.  You could take a

25        customer to private rooms.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 125

```
 1   Q.  So you could dance?

 2   A.  On the floor, you could dance on the stage, and you

 3       could go to private rooms.

 4   Q.  Okay.  So there's three types:  Dancing on the

 5       floor?

 6   A.  Yes.

 7   Q.  Dancing on the stage?

 8   A.  Yes.

 9   Q.  Actually, I think there's four.  VIP?

10   A.  Well, that's what I meant by private room.

11   Q.  Okay.  Now, when you would dance on the floor, was

12       there a charge?

13   A.  $10.

14   Q.  Who set that charge?

15   A.  The management.

16   Q.  Did you have any discretion as to setting that fee?

17   A.  Yeah, because one time I tried to charge $20 for a

18       dance and I almost got fired for it.

19   Q.  So the answer is you had no discretion for setting

20       that fee?

21   A.  I didn't understand that.

22   Q.  So if you don't understand, remember I told you

23       you've got to tell me you don't understand --

24   A.  Yeah, I didn't --

25   Q.  -- because otherwise, I'm going to assume then --
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                    Page 126

```
 1   A.  I don't understand the way you are asking me.

 2   Q.  Did you set the price for on-the-floor --

 3   A.  No.

 4   Q.  -- dances?

 5   A.  I didn't set the price.

 6   Q.  So they were $10 on the floor?

 7   A.  Yes.

 8   Q.  Could a customer choose to tip you more?

 9   A.  Yes.

10   Q.  Okay.  You could dance on the stage?

11   A.  Yes.

12   Q.  Could -- was there a price that the customers paid

13       to have you dance on the stage?

14   A.  No.

15   Q.  Customers could tip you?

16   A.  Yes.

17   Q.  Okay.  So they would -- if you danced on the floor,

18       customers would pay $10 set by the club for you to

19       dance and may tip you more?

20   A.  Yes.

21   Q.  Okay.  Typically, how much in tips -- by that I mean

22       the amount above the $10 fee, would customers

23       typically pay you per dance?

24   A.  $10.

25   Q.  So typically you would make $10 from dancing and
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                      Page 12

1        then $10 on tip?

2    A.  Typically.

3    Q.  So typically you were putting in your pocket $20 a

4        dance?

5    A.  Yes.

6    Q.  Okay.  Sometimes more, sometimes less?

7    A.  Yeah.  Ten usually, $10.

8    Q.  It was no less than ten --

9    A.  No.

10   Q.  -- because the club set that, right?

11   A.  Right.

12   Q.  So it was at least ten that you were putting in your

13       pocket for every song you were dancing?

14   A.  Right.

15   Q.  And it could be up to 20 or more?

16   A.  Or more, yeah.

17   Q.  And typically it was 20?

18   A.  Typically.

19   Q.  So if I was a customer and I wanted you to dance for

20       me, I would say, Climax, will you dance for me, or

21       something like that, right?

22   A.  Yes.

23   Q.  And you would say, That's great.  It's $10 a --

24   A.  Ten.

25   Q.  -- song?

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                          Page 128

```
 1   A.   Yes.

 2   Q.   And how long will the songs last for?

 3   A.   Three to four minutes.

 4   Q.   And the songs would last for three to four minutes?

 5   A.   (Nonverbal response.)

 6   Q.   Would you typically dance for a certain minimum

 7        number of songs?

 8   A.   No.

 9   Q.   Okay.  And did customers usually stop at one or did

10        they usually buy more than one?

11   A.   They usually buy more than one.

12   Q.   How many would they usually buy?  I understand there

13        are going to be variations.

14   A.   I mean like four to eight to ten.

15   Q.   So four to ten?

16   A.   (Nonverbal response.)

17   Q.   So once you had a customer with one, you had him for

18        typically four to ten?

19   A.   Yes.

20   Q.   Okay.  So in that four to ten minute or that four to

21        ten song, you're typically making, if I understand

22        it, somewhere between 40 and a hundred bucks?

23   A.   Yes.

24   Q.   How many of those types of dances for different

25        customers would you do on a typical hour?
```

███████████████████████████████

█████████████████

3   Q.  So you were typically doing ten dances per hour?

4   A.  Typically a little more.

5   Q.  So you are typically doing ten dances, sometimes

6       more, sometimes a little less?

7   A.  Sometimes you are not doing nothing.

8   Q.  But you were averaging about ten you said, right; is

9       that fair?

10  A.  That's probably fair.

11  Q.  Okay.  Now, on top of that, customers may tip you,

12      if it was -- if you danced for me four songs, I may

13      give you 40, I might give you 60?

14  A.  Yes.

15  Q.  Couldn't give you less than 40, but I could give you

16      whatever I wanted on the top end?

17  A.  Right.

18  Q.  Now, on the stage, if you were dancing, did you do

19      pole tricks?

20  A.  Yes.

21  Q.  Is that one of the things you were known for?

22  A.  No.

23  Q.  Are there some really good pole trick girls out

24      there?

25  A.  Yes.

```
 1   Q.  And you would dance on stage?

 2   A.  Yes, I would.

 3   Q.  And how many times a shift, as you've described it,

 4       day, mid, afternoon, would you get up on stage?

 5   A.  Probably like two or three.

 6   Q.  Okay.  And that would be for a three-song set?

 7   A.  Three-song set.

 8   Q.  So somewhere between 9 and 12 minutes?

 9   A.  Yes.

10   Q.  So of the 16 hours that you said you worked in an

11       average day, you would be on the stage somewhere

12       less than an hour?

13   A.  More or less than an hour.

14   Q.  And would you typically get tips from customers

15       while you were dancing on stage?

16   A.  Sometimes.

17   Q.  Did they have -- was there an average amount you

18       would make every time you were up there?

19   A.  No.  It varies.

20   Q.  What was the most you recall making?

21   A.  I made ▌▌▌▌▌ on stage.

22   Q.  What's the least you recall making?

23   A.  ▌▌▌

24   Q.  How often did that happen?

25   A.  About -- at least once every time I got up there I
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 131

```
 1        wouldn't make anything.

 2   Q.   Not even $1?

 3   A.   No.

 4   Q.   Okay.  And then you would do VIP?

 5   A.   Yeah, I did VIP.

 6   Q.   What's the -- so you would go in private rooms and

 7        have more private dances with customers?

 8   A.   Yes.

 9   Q.   Dances similar to what was happening on the floor

10        but in a private room?

11   A.   Yes.

12   Q.   And would those dances cost more?

13   A.   It was $152.

14   Q.   Okay.  How much would you get per half-hour?

15   A.   A hundred dollars.

16   Q.   A minimum of a hundred?

17   A.   Yeah, it's like -- it's a minimum of 52 really, and

18        that's for the VIP room, but you can technically

19        charge what you want to charge.

20   Q.   Okay.  So the customer would pay $52 to the club,

21        right?

22   A.   Yes.

23   Q.   So if I'm the customer, again, I'm taking you back

24        to the VIP room?

25   A.   Yes.
```

```
 1   Q.  I'm paying $52 to the club?

 2   A.  Yes.

 3   Q.  And that's for the privilege -- for the right to

 4       rent that space?

 5   A.  Yes.

 6   Q.  And then I can bring you with me?

 7   A.  Yes.

 8   Q.  I can go there alone if I wanted to, right?

 9   A.  Yes.

10   Q.  But I can bring you with me, and I can charge -- and

11       you charge me whatever you want to charge me?

12   A.  Yes.

13   Q.  Did you have a typical price that you would charge?

14   ████████████████████

     ████████████████

16   A.  (Nonverbal response.)

17   Q.  For a half-hour?

18   A.  Yes.

19   Q.  So you would -- so you would typically make

20       somewhere between ████ on the floor for -- or a ████

21       ████████ on the floor in an hour, and in the VIP room

22       you would make almost twice that?

23   A.  Yes.

24   Q.  So you tried to sell as many VIPs as you could?

25   A.  Yes.
```

```
 1   Q.   As the customer, okay, of -- your customer, when I'm

 2        on the floor, am I paying anything to -- from any of

 3        those dances to the club?

 4   A.   As far as like our dances?

 5   Q.   Yeah, am I paying any money to the club directly?

 6   A.   No.

 7   Q.   So when you are on the floor, I'm giving you the

 8        money?

 9   A.   Yes.

10   Q.   Okay.  Now, you talked about having to pay all these

11        fees.  So, for example, you had to pay a fee when

12        you walked in the door?

13   A.   Correct.

14   Q.   That was what you called the house fee?

15   A.   Yes.

16   Q.   Now, that was the 40 or 60 or 80, whatever dollar it

17        was, for whether you were late or not late that you

18        were talking about?

19   A.   Yes.

20   Q.   As the club -- did the club ever tell you where you

21        had to get that money?

22   A.   No.

23   Q.   Did they tell you that it could only come from your

24        tips?

25   A.   No.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 13

```
 1   Q.  That it could only come from dancing?

 2   A.  No.

 3   Q.  If your mom gave you 80 bucks, could you pay for it

 4       with that?

 5   A.  Yes.

 6   Q.  If your boyfriend said, Here is 40 bucks that I won

 7       on the lotto ticket, you can pay for it with that?

 8   A.  Yes.

 9   Q.  No restriction on where you got the money from?

10   A.  No.

11   Q.  No requirement that the money come out of your tips,

12       correct?

13   A.  Correct.

14   Q.  You can pay it for anything you want?

15   A.  Correct.

16   Q.  Same thing with all the other tip outs that you had,

17       right?

18   A.  Yes, that's right.

19   Q.  You could pay with whatever money you wanted from

20       whatever source you wanted?

21   A.  Correct.

22   Q.  So theoretically -- just follow my example for a

23       moment.

24   A.  Okay.

25   Q.  If you worked as a lawyer here in one of the law
```

```
 1        firms involved in this case during the day, you

 2        could save your money from being a lawyer and make

 3        all those payments, correct?

 4   A.   Yes.

 5   Q.   Okay.  Did you ever do anything to track where your

 6        money came from that you were using to pay those tip

 7        outs?

 8   A.   No.

 9   Q.   Okay.  Did you ever -- did you ever keep a tip

10        journal?

11   A.   Uh-uh.

12   Q.   Do you know what --

13   A.   No, I did not.

14   Q.   -- a tip journal is?

15   A.   Yes, I know what it is.

16   Q.   A tip journal is somewhere where you are recording

17        the tips that you make and the payments that you are

18        making?

19   A.   Right.

20   Q.   Did you ever record in one of those?

21   A.   No.

22   Q.   When did you first learn of what's a tip journal?

23   A.   After I got into this altercation with Shooter's,

24        after I signed on with the whole other case.

25   Q.   What was that?  When did you sign on?
```

```
 1   A.  I don't even remember exactly when I did it, but

 2       that's when I realized that you should probably be

 3       keeping track of all this stuff.

 4   Q.  Are you keeping track of it today?

 5   A.  Yes.

 6   Q.  What kind of format are you keeping track of it

 7       today?

 8   A.  Now I get receipts from when I tip out.

 9   Q.  Okay.  Are those forms that you create?

10   A.  No.  They are computer generated.

11   Q.  From that -- from Heartbreakers?

12   A.  Yes.

13   Q.  Now, did you ever advertise your services?

14   A.  Yeah, it was times where I went on my Instagram and

15       I will put a nice picture of me in a bikini and tell

16       people to come out and see us.

17   Q.  So tell me what -- any other ways other than

18       Instagram?

19   A.  No.

20   Q.  No other social media?

21   A.  No.

22   Q.  First of all, have you ever in your life seen an ad

23       from Follies?

24   A.  No.

25   Q.  Did you ever see any social media that they put out?
```

1    A.   I think they got an Instagram.

2    Q.   Do you know whether they have an Instagram or

3         whether or not there is just a hashtag name that's

4         got their name on it?

5    A.   No.  It's an Instagram.

6    Q.   What's their Instagram name?

7    A.   I don't know what it is, but I've seen it.  They

8         used to have a website, but I don't know if they

9         still have it or not.

10   Q.   Do you know whether or not they created any of that

11        stuff?

12   A.   No.  No telling.

13   Q.   So you don't know whether or not that was something

14        they did or something that a bunch of entertainers

15        did?

16   A.   Yeah.  I don't know.

17   Q.   Okay.  But nonetheless, you had an Instagram site,

18        right?

19   A.   Yes, I had an Instagram.

20   Q.   And you would put up on your Instagram a picture of

21        you in revealing clothing?  I think you said a

22        bikini?

23   A.   Right, and tell people to come out tonight or --

24   Q.   Is that what you used the ███████ account for?

25   A.   No, that's not what I used it for, but on occasions

```
 1        I would put that on there.
 2   Q.   Okay.  Any other social media site that you would
 3        put it on other than your ██████ site?
 4   A.   No.
 5   Q.   Okay.  I take it that's not a site that you shared
 6        with your family?
 7   A.   No.
 8   Q.   Did you ever advertise your services that you were
 9        going to be somewhere other than Follies like at
10        Shooter's or the Goldrush or --
11   A.   No.
12   Q.   Okay.  So you would put a picture of yourself in
13        your bikini out there and say, Come see me?
14   A.   Yeah, Come to Follies.
15   Q.   I'll be there Monday through Friday from open to
16        close?
17   A.   I'll be here now.  It was just a now thing, you
18        know, or --
19   Q.   Did you have a group of regular customers?
20   A.   I have regulars.
21   Q.   How would you communicate with your regulars?
22   A.   Via text message, phone calls.
23   Q.   When you were going to the club, would you call your
24        regulars?
25   A.   Yes.
```

**TIARA PAYNE v. WBY, INC.**

Tiara Payne on 06/23/2015                                    Page 13

```
 1   Q.  Tell them, I'm going to be at the club today?

 2   A.  Yes.

 3   Q.  And when you were going to be at the club, would you

 4       text your regulars?

 5   A.  Yes.

 6   Q.  I'm going to be at the club today, come and see me?

 7   A.  Yes.

 8   Q.  That kind of stuff?

 9   A.  Yes.

10   Q.  And was the purpose of that to generate your

11       customers coming to see you?

12   A.  Yeah, to bring them in and make something happen.

13   Q.  So you are trying to generate business for yourself,

14       right?

15   A.  Yeah.  And, I mean, it was a teamwork thing.  We

16       bring people into there and people see, you know,

17       Follies and pretty girls in pictures, and they are

18       going to want to come.  They are going to spend

19       money.  It's pretty much a win-win, we thought.

20   Q.  So it's something that you made the investment both

21       in time and whatever it cost you to do this, right,

22       to do?

23   A.  Yeah, when I did it.

24   Q.  Okay.  Any other ways other than texting your

25       customers, your regulars -- how many regulars did
```

```
 1        you have at the time?
 2   A.   Probably like 30.
 3   Q.   When we've referred to regulars, you mean people who
 4        come on a regular basis --
 5   A.   Yes.
 6   Q.   -- and spend a good portion of money --
 7   A.   Right.
 8   Q.   -- with you dancing?
 9   A.   Yes.
10   Q.   That's why you refer to them as "regulars," right?
11   A.   Regulars, yes.
12   Q.   So it's not just a guy who you happen to see on one
13        occasion flying in from Geor- -- flying in from
14        Washington or Minnesota?
15   A.   Correct.
16   Q.   It's the guys --
17   A.   Consistent buyer who is coming in consistently.
18   Q.   And spending significant amounts of money on you?
19   A.   Yes, like three or four times a week.
20   Q.   And you had 30 to 40 of those types of people who
21        would come to see you three or four times a week?
22   A.   Yes.
23   Q.   So other than texting, putting up Instagram and
24        calling, any other ways that you promoted yourself?
25   A.   No.
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                        Page 1  1

```
 1   Q.  Did you ever go to events where you would wear

 2       something or hand out business cards or anything

 3       like that?

 4   A.  No.

 5   Q.  Did you ever take dance lessons?

 6   A.  No.

 7   Q.  Ever in your entire life?

 8   A.  No.

 9   Q.  You've never had any dance training as a child or

10       like ballet or --

11   A.  No.

12   Q.  Okay.  Gymnastics?

13   A.  I did gymnastics once.

14   Q.  Okay.  How about in the last probably five years --

15   A.  Oh, no.

16   Q.  -- any training in any --

17   A.  No.

18   Q.  Let me finish my question.

19   A.  Okay.

20   Q.  Any training in gymnastics, dance or any of those

21       related fields?

22   A.  No.

23   Q.  How did you learn how to pole dance?

24   A.  Watching the other entertainers.

25   Q.  And you just practiced?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                   Page 1  2

```
 1   A.   Yes.

 2   Q.   How often would you practice pole dancing?

 3   A.   Maybe once every two weeks.

 4   Q.   Well, I'm assuming earlier on you probably practiced

 5        a lot more to learn it?

 6   A.   Well, I mean, I wasn't like, you know, the top dog

 7        of pole dancing either, so --

 8   Q.   But I'm assuming that when you were trying to learn

 9        it -- because it's fairly hard, right?

10   A.   Fairly, yes.

11   Q.   You had to practice a lot more at keeping up your

12        skills as opposed to learning them?

13   A.   I didn't really keep up with it.

14   Q.   Because you do it?

15   A.   I don't really now.

16   Q.   But at the time you did?

17   A.   Yeah.  Well, I was attempting to.

18   Q.   Now, did the club tell you whether or not you should

19        learn pole dancing or not?

20   A.   No, they did not.

21   Q.   Did they tell you how you should dance?

22   A.   We weren't allowed to like sit on top of the

23        customers.  Like if I just take myself and come over

24        there and straddle you just like that, we couldn't

25        do that.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 1  3

```
 1   Q.  Do you know why?

 2   A.  I'm guessing something to do with just --

 3   Q.  Could it be because it's against the law?

 4   A.  Yeah.

 5   Q.  So other than legal requirements for how you could

 6       comply with the law, right, you can't do certain

 7       things because it might break the liquor code or it

 8       might break the law?

 9   A.  Right.

10   Q.  Any other requirements about how you dance?

11   A.  No.

12   Q.  Any other requirements about who you dance -- any

13       requirements about who you danced for?

14   A.  No.

15   Q.  Could you choose all the customers you wanted to

16       dance for?

17   A.  Yes.

18   Q.  So if I came up to you and you said, Man, I don't

19       like you, could you say no?

20   A.  Yes.

21   Q.  So, Sorry, sir, not interested?

22   A.  Yes.

23   Q.  Could you on the other hand, say, If you want to go

24       back to the VIP room, it's going to be $10,000 an

25       hour?
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**                                    Page 1

```
 1   A.  Yes.

 2   Q.  So you could detour customers in any way you wanted?

 3   A.  Yes.

 4   Q.  Did you ever see entertainers use any props during

 5       your performances?

 6   A.  No.

 7   Q.  Like an accessory?

 8   A.  I never saw it.

 9   Q.  You never saw any entertainers use accessories?

10   A.  No.

11   Q.  Anybody tell you you could or you couldn't?

12   A.  No.

13   Q.  Did you ever pretend to be somebody else when you

14       were dancing with a customer, dressing in a certain

15       type of outfit or carry yourself in a different type

16       of way different than you are?

17   A.  I guess my stage person.

18   Q.  Did you choose that?

19   A.  Yes.

20   Q.  And you chose how you wanted to act in that

21       capacity?

22   A.  Yes.

23   Q.  And what you wanted to call yourself?

24   A.  Yes.

25   Q.  What kind of person you wanted to pretend you were
```

```
 1        while you were there?

 2   A.   Yes.

 3   Q.   I'm sure you made all sorts of crazy interests that

 4        you thought the customers might like?

 5   A.   Yes.

 6   Q.   And you would create your own persona, your own

 7        person, as to what you thought would be an

 8        attractive marketing position with customers?

 9   A.   Yes.

10   Q.   And those are things you all chose for yourself?

11   A.   Yes.

12   Q.   Did you wear makeup when you performed?

13   A.   Yes.

14   Q.   You chose that?

15   A.   Yes.

16   Q.   Did you buy your own makeup?

17   A.   Yes.

18   Q.   You chose what type of makeup to buy?

19   A.   Yes.

20   Q.   Where to buy it?

21   A.   Yes.

22   Q.   How much to spend on it?

23   A.   Yes.

24   Q.   How to put it on?

25   A.   Yes.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 1 6

```
 1   Q.  Same thing with your hair?

 2   A.  Same thing.

 3   Q.  You chose the style that you wanted?

 4   A.  Yes.

 5   Q.  Whether or not you are going to wear a wig?

 6   A.  Yes.

 7   Q.  Did you ever wear a wig?

 8   A.  One time.

 9   Q.  Did you buy it?

10   A.  Yes.

11   Q.  You chose whether or not you wanted to wear it,

12       right?

13   A.  Yes.

14   Q.  You could choose whatever clothing you wanted to buy

15       as long as it complied with the law?

16   A.  Yes.

17   Q.  There were certain requirements of certain body

18       parts that you as a licensed performer couldn't

19       show, correct, depending on where you were on stage?

20   A.  Yes.

21   Q.  And where you were in the club?

22   A.  Yes.

23   Q.  There were certain places you could wear certain

24       things and certain places you could not; you

25       understood that as a matter of law, not as a matter
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1

```
 1       of what the club wanted?

 2  A.   Yes.

 3  Q.   But short of complying with what the law was, you

 4       chose what you wore, right?

 5  A.   I mean no.  Because if it was up to me, I would have

 6       wore tennis shoes every day.

 7  Q.   We talked about the tennis shoes, right?  We talked

 8       about no tennis shoes?

 9  A.   At Kamal's 21 before, wherever it is, they could

10       wear tennis shoes on certain days.

11  Q.   I'm sorry.  I didn't hear you.

12  A.   There was another club where you could wear tennis

13       shoes on certain days.  So I mean everybody is -- it

14       just depends on the club.  At Follies I could not

15       wear anything other than my dance attire and dance

16       heels.

17  Q.   We talked about that earlier --

18  A.   But that's not my choice.

19  Q.   We talked about that earlier, right?  Other than

20       some basic dance attire, right, and some -- you

21       couldn't wear tennis shoes?

22  A.   Exactly.

23  Q.   You could wear whatever within that realm you

24       wanted?

25  A.   I could pick the sequins and the blues and reds and
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1 8

```
 1        all that, yes.

 2   Q.   You could wear 20-inch heels or one-inch heels,

 3        right?

 4   A.   Yes.

 5   Q.   Now, what club was it that you said you could wear

 6        -- that they wore tennis shoes at?

 7   A.   At Kamal's, before it was whatever it is now.  It's

 8        not Kamal's anymore, but there was nights in there

 9        where they could wear tennis shoes.  But, I mean,

10        each club is different.

11   Q.   Did you ever wear outfits when you performed like

12        anything special or particular?

13   A.   No.

14   Q.   Now, you said that you had -- that there were --

15        when you were going to dance on stage there was --

16        the DJ -- I think we talked about this earlier --

17        would play certain types of music?

18   A.   Yes.

19   Q.   And you could choose to dance -- I'm going to be a

20        country girl, I'm going to be a rock and roll girl,

21        a rap girl, whatever it was?

22   A.   Yes.

23   Q.   What was your style?

24   A.   Hip-hop.

25   Q.   Hip-hop.  Could you have chosen to be -- could you
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1

```
 1      have chosen a dance to country music if you wanted

 2      to?

 3   A.  Yes, I could have.

 4   Q.  Now, you talked about these dance -- or these drink

 5      tickets earlier, just briefly you mentioned them in

 6      something?

 7   A.  Yes.

 8   Q.  Did you get a drink ticket every time that you

 9      showed up?

10   A.  Yes.

11   Q.  Was that something that was included in the price

12      that you paid or was that different than the price

13      you paid?

14   A.  It was included.

15   Q.  Okay.  So you would pay $40, let's say

16      hypothetically, to get one dance ticket or drink

17      ticket?

18   A.  Yes.

19   Q.  Now, could you use that drink ticket to buy yourself

20      a drink?

21   A.  Yes.

22   Q.  Could you use it to buy a customer a drink?

23   A.  Yes.

24   Q.  Could you use it to buy another entertainer a drink?

25   A.  Yes.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                        Page 150

 1   Q.   And did you sell these tickets?

 2   A.   Yes.

 3   Q.   How much would you sell these drink tickets for?

 4   A.   $20.

 5   Q.   And did you give that $20 to the club or did you

 6        keep that?

 7   A.   We would keep it.

 8   Q.   And who would provide -- did you provide the liquor

 9        then or did the club?

10   A.   The club.

11   Q.   So you would -- they would give you a ticket as part

12        of your lease fee that you would sell for $20 to

13        customers, and customers could go get liquor?

14   A.   Yes.

15   Q.   Okay.  They would give you this -- they would

16        provide you with this dance ticket or this drink

17        ticket and you would -- if you chose not to sell it

18        to a customer, you could keep it and buy yourself a

19        drink?

20   A.   Yes.

21   Q.   Could you use it to entice customers to buy dances

22        from them?  So for example, give them -- if you buy

23        two dances from me, I'll give you a drink ticket?

24   A.   Yes.

25   Q.   You could use it any way you wanted as a marketing

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                        Page 151

```
 1      tool?

 2   A.  Yes.

 3   Q.  Other than what we've talked about for the stage

 4       dances, the table dances, the drink ticket sales,

 5       the VIP rooms, any other ways as an entertainer you

 6       could make money?

 7   A.  I guess if you really come up with something to add,

 8       you know, that nobody else thought of.  Other than

 9       that, that's pretty much the way to make money, what

10       we discussed.

11   Q.  And then I guess some of the other ways that you

12       would make money in using this was depending how

13       much you marketed yourself, how much customers you

14       may have called to say, Come on in and see me?

15   A.  Yeah, how hard you work every day.

16   Q.  Well, not just how hard you work, but how well you

17       market yourself, too, right?

18   A.  Right, but I mean you could be in there all day and

19       sit around and drink all day.  You could be there

20       all day and kick it.  You can be in there all day

21       and --

22   Q.  Some of that is all your choice, right?

23   A.  Exactly.

24   Q.  So you could show up there and decide, I just don't

25       want to work today and go sit in the corner
```

```
 1      somewhere?

 2  A.  That's how you make your money, depending on how

 3      hard you work.

 4  Q.  As well as how much -- you know, if you want to make

 5      a lot of money, you could call all those customers,

 6      send all those Instagram posts; that helps you make

 7      money, right?

 8  A.  Yes.

 9  Q.  Do you tell the customers how much the dances are

10      going to cost and the VIP rooms are going to cost

11      before you perform them?

12  A.  Yes.

13  Q.  Did the club ever advertise or say what the prices

14      of the dances are?

15  A.  It was just $10.  I mean like --

16  Q.  Were there signs up?

17  A.  No, there were no signs.

18  Q.  Were there announcements?

19  A.  I'm not sure how the -- I think it was just when I

20      started working there, they just told me it's $10 a

21      song.  It was just like one of those things.

22  Q.  Did the customers seem to know that?

23  A.  Yeah.

24  Q.  So it wasn't -- everybody seemed to know it; you

25      just don't know how everybody knew it?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 153

```
 1   A.  Yes.

 2   Q.  But it wasn't a shock to anybody, right?

 3   A.  No.

 4   Q.  Customers seemed to have figured it out, right?

 5   A.  Yes.

 6   Q.  Now, you said that when you -- you had a permit --

 7   A.  Yes.

 8   Q.  -- to dance to work there from DeKalb County?

 9   A.  Yes.

10   Q.  And you said the club required you to give it to

11       them?

12   A.  Yes.

13   Q.  Okay.  Who required you to actually give it to them?

14       Did somebody tell you that specifically, I need it?

15   A.  Yes.

16   Q.  And I need to keep it until you are done performing

17       here or --

18   A.  Yes.

19   Q.  Or did they say just -- did they just say, I need

20       your permit when you are here?

21   A.  No.  They told me I had to have it or my job is

22       going to be terminated.

23   Q.  Did you understand that it was a requirement of you

24       as an entertainer that you have your dance permit on

25       you every day that you were performing as an adult
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                    Page 15

```
 1        entertainer no matter where you worked?
 2   A.   When I started working at Follies --
 3   Q.   I'm not asking about when you started working at
 4        Follies.  I'm asking you as an adult entertainer
 5        licensed by the County of DeKalb, you went out and
 6        paid 3 or $400 for your own dance license, right?
 7   A.   Right.
 8   Q.   And you understood, did you not, that it was a
 9        requirement that you have it with you when you
10        performed?
11   A.   It was a requirement that I kept it there.  I could
12        not take my permit anywhere else.
13   Q.   Was that from DeKalb County?
14   A.   Yes, this is the DeKalb County permit.
15   Q.   Did DeKalb County require you to leave it with the
16        club?
17   A.   No.  Follies required me to leave it with them.
18   Q.   DeKalb County required you to have it on you when
19        you performed there, right?
20   A.   Yeah, it's a DeKalb County requirement to have a
21        permit.
22   Q.   And you needed to have it on your person every time
23        you were performing; is that true?
24   A.   I mean I would assume so.
25   Q.   It was also required the club be responsible, was it
```

```
 1        not, if you did not have your permit and allowed you

 2        to perform?

 3   A.   Yes.

 4   Q.   Okay.  So you were required to have it?

 5   A.   Yes.

 6   Q.   They were required to verify that you had it, right?

 7   A.   Yes.

 8   Q.   Okay.  And you said at one point they took it from

 9        you?

10   A.   Yes.  When I first started working there, they asked

11        me for my permit.  Okay.  I gave it to them.  I

12        wanted to work at Shooter's Alley.  I needed a

13        permit.  So I told Abby that I needed two forms of

14        ID, and I was going to court, and I needed my

15        permit.  She allowed me to have the permit.  For the

16        first six months that I worked at Shooter's Alley,

17        that's how I was able to get the permit.  It wasn't

18        until about January of 2013 when Abby kept harassing

19        me about the permit and she told me, "I need your

20        permit.  You have to give me your permit.  I need

21        your permit or you can't work here."  So I gave her

22        the permit, and it was kept in a big book of

23        permits.

24   Q.   Did you ever ask her for it so you could work at

25        Shooter's Alley?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 156

```
 1   A.  No.  I wasn't working there anymore.

 2   Q.  So --

 3   A.  I was allowed to work day shift and any shift at

 4       Follies.  The whole point of me working at Shooter's

 5       Alley was because I couldn't work day shift at

 6       Follies, so I worked day shift at Shooter's Alley

 7       and night shift at Follies.

 8   Q.  So it wasn't that they required you to -- it wasn't

 9       so much that they required you to keep it; you

10       didn't even want it back, did you, because you

11       were --

12   A.  I did want it back because I wanted to be able to go

13       to other clubs, and I didn't want to have to pay

14       another $400 for another DeKalb County permit, but I

15       wasn't allow to have my permit back.

16   Q.  How do you know you weren't allowed?

17   A.  Because Abby told me.

18   Q.  Abby told you --

19   A.  I told her that I had my permit.  She kept asking me

20       where was my permit, and I told her that I had it,

21       and she told me that she had to have it and she

22       needed it back from me.

23   Q.  Did she ever tell you that if you wanted to go work

24       somewhere else you couldn't have it back?

25   A.  She just told me that if I wanted to work there,
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 15

```
 1        they needed to keep it.
 2   Q.   And so did you ever say to Abby -- I just want to
 3        make sure that we're on the same page.  Did you ever
 4        ask Abby, Hey, tomorrow I want to go work at -- I
 5        don't know a name of a club in DeKalb County -- X
 6        Club, Can I have my permit so I can work there
 7        tomorrow?
 8   A.   Uh-uh.  After I was allowed to work day shift and
 9        mid shift, I didn't need to do that.  I just was
10        cool with working at Follies.  I only worked there
11        the whole year.
12   Q.   So you don't know whether you could have had it back
13        to go work somewhere else or not because it didn't
14        matter to you?
15   A.   I knew I couldn't have it back because she told me
16        that actually I had to give it to her and she had to
17        keep it in a book.
18   Q.   I understand that.  When you --
19   A.   So I knew -- I assumed at that point that I could
20        not have my permit back, and I was fine with working
21        there.
22   Q.   You assumed?
23   A.   She told me that she had to have it.
24   Q.   I understand she said that she had to have it.
25   A.   Yes.
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                          Page 158

```
 1   Q.  Did she ever tell you that if you want to go work at

 2       Shooter's Alley again that you can't because I'm not

 3       going to give you your permit back?

 4   A.  Yeah, she did tell me that.

 5   Q.  What did she tell you exactly?

 6   A.  She told me that I couldn't have my permit to go and

 7       work at another club.  If I wanted to go work at

 8       another club, I had to go work at another club.

 9   Q.  Okay.

10   A.  Because I argued with her about it; obviously, I've

11       been working for six months and I've had my permit,

12       why do you need it so bad now?  She told me that she

13       had to have it on file; they have to have my permit

14       there.

15   Q.  So they had to have your permit there or you

16       couldn't perform there?

17   A.  Exactly.

18   Q.  Did she ever tell you that they wouldn't give you

19       your permit back to perform somewhere else?

20   A.  No.

21               MR. RUBIN:  Okay.  Now I need to use the

22       restroom.  Why don't we go off the record.

23               (Recess.)

24       BY MR. RUBIN:

25   Q.  How did your relationship with The Follies end?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 15

```
 1   A.  I was terminated for no explanation.

 2   Q.  Who terminated you?

 3   A.  I don't know.

 4   Q.  How do you know you were terminated?

 5   A.  Because they told me that I couldn't work.  "They"

 6       being Victoria, the house mom, told me that I

 7       couldn't work there.  I didn't know why, so I came

 8       and asked Stevie B. if I could work.  He told me

 9       that I could come in and work the next day.  When I

10       came back the next day, Victoria told me that I was

11       on a no-rehire list.

12   Q.  Do you know why?

13   A.  Because I sued Shooter's Alley was all I could get

14       to.

15   Q.  Who told you that?

16   A.  It was just --

17   Q.  You were guessing?

18   A.  That's the only thing that I could come up with.

19   Q.  You were guessing?

20   A.  Yes.

21   Q.  You don't know why the club decided to end the

22       relationship?

23   A.  They never gave me a reason.

24   Q.  Okay.  Now, when you were working or performing at

25       the club, was there anybody directing you on what
```

TIARA PAYNE v. WBY, INC.

Tiara Payne on 06/23/2015                                    Page 160

```
 1        you needed to do on any particular shift?
 2   A.   No.
 3   Q.   So you told me like right before we went on the
 4        break --
 5   A.   Yes.
 6   Q.   -- right, that you could just go sit in the corner
 7        and drink pops all day if you wanted to?
 8   A.   Correct.
 9   Q.   Did anybody tell you to get up and dance?
10   A.   No.
11   Q.   Anybody tell you -- you know, for example, did you
12        see --
13   A.   Actually, yeah, this did happen.  Victoria came to
14        me numerous times when I didn't have my tip out and
15        told me that I need to get up and make some money so
16        I can pay my tip out.
17   Q.   Was that because you were sitting around not
18        working?
19   A.   That was because there was nothing happening, and I
20        did the best that I could.
21   Q.   That's not my -- so Victoria told you you need to go
22        make your tip out?
23   A.   Yes.
24   Q.   Did she actually tell you you had to make your tip
25        out, or did she actually tell you she didn't care,
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                      Page 161

```
 1      she wanted to get tipped?

 2  A.  No.  She told me, "You need to get up and make some

 3      money so you can pay your tip out."

 4  Q.  How many times did that happen?

 5  A.  About five.

 6  Q.  Okay.  Any other time where you were just sitting in

 7      the corner hanging out with your friends talking --

 8  A.  No, because usually I don't do that.  I get my

 9      money.

10  Q.  I understand you may get your money.  My question,

11      is there any other time where you were just sitting

12      around not doing anything that your manager came up

13      to you and said, You must go to work, You must go

14      serve these drinks, You must go do X, Y, Z?

15  A.  Yeah, like I had to do -- when I sell the drink

16      tickets, we had to go on stage and do that or there

17      was a $50 fine, and that was incorporated by Cain.

18  Q.  There was a fine?

19  A.  It was a fine for not getting on stage.  And when we

20      had to -- I'm sure.  Oh, I worked there.  When we

21      had to get on stage and all the girls had to get on

22      stage to show off all the hot chicks at Follies, it

23      was a fine if you didn't go and get on that stage.

24      I paid it once.

25  Q.  You paid a fine once?
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                                   Page 162

```
 1   A.  $50.

 2   Q.  To who?

 3   A.  To Cain.

 4   Q.  To Cain.

 5   A.  He was the one who made the decision.

 6   Q.  Okay.  Any other fines that you paid?

 7   A.  A fine to leave early.

 8   Q.  It wasn't a fine to leave early; you understood --

 9   A.  $20.

10   Q.  You understood if you wanted to leave before the end

11       of the shift, you could, as long as you paid $20,

12       right?

13   A.  No, I didn't.  There was so many times that I was

14       not granted the ability to leave.

15   Q.  There were so many times?  Earlier when we talked

16       about it you said it was eight times by Cain and two

17       times by somebody else?

18   A.  Approximately.  That's just guessing.  But it was

19       numerous times where I asked to leave early, and I

20       was not granted to leave.  But when I was, I had to

21       pay $20 to do it.  There was a fine for staying in

22       the dressing room for too long.

23   Q.  There was a fine for staying in the dressing room

24       too long?

25   A.  Yeah.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                         Page 163

```
 1   Q.   What was the fine?  What was the fine?

 2   A.   Like -- I don't know how much the fine was, but Abby

 3        threatened it with us all the time.  She told us if

 4        we stayed in there too long, then we were going to

 5        get fined.

 6   Q.   Did she ever fine you?

 7   A.   No, I never got fined.  I didn't hang out in the

 8        dressing room or kick it with people.  I went and

 9        got -- did my business and left.

10   Q.   Okay.  So you paid a $50 fine once that you said,

11        right?

12   A.   Yes.

13   Q.   And do you know whether or not -- remember I showed

14        you that schedule earlier that had all those

15        different rates and had various times on there for

16        coming and going?

17   A.   Yes.

18   Q.   And there was various rents depending on what time

19        you came and went?

20   A.   Yes.

21   Q.   Do you know if that was the $20 that you paid?

22   A.   No.  I paid $20 to leave early on top of my regular

23        fee.

24   Q.   I understand that, but do you know whether or not

25        that was because if you chose to end your shift at
```

```
 1        certain times, the rent may be more or less?

 2                MR. LUCAS:  Objection.  Asked and

 3        answered.

 4   Q.   I'm asking do you know?

 5   A.   I don't understand your question.

 6   Q.   Okay.  I showed you -- I can show it to you again.

 7        Okay.  What was Exhibit 2, why don't you take a look

 8        at that.

 9                MR. LUCAS:  She did and she said that's

10        not right.

11   Q.   I understand you --

12   A.   The $20 that I'm discussing is a leave early fee.

13        That doesn't include the regular house fee, no.

14   Q.   So you are pointing at Exhibit 2 which you say is --

15        doesn't fit with what you recall?

16   A.   Yes.  I don't think that this is accurate because it

17        was not -- I don't ever remember it being $30 or $35

18        to start.  It was always 25 to start.

19   Q.   Okay.  Now, do you know whether or not rent was more

20        or less depending on when you showed up and when you

21        left?  Do you know if the rent adjusted?

22   A.   It adjust by the time you get there.

23   Q.   Do you know if it increased if you wanted to -- if

24        you were going to perform for a smaller period of

25        time, do you know if it cost more in rent to do so?
```

 1   A.   You couldn't do that.  You had to work your whole

 2        entire period.  If you wanted to leave early, you

 3        had to request permission from the manager.  If they

 4        granted such permission, it was $20.

 5   Q.   Okay.  And that's your testimony?

 6   A.   Yes.

 7   Q.   Okay.  Now, did you ever see anything that had a

 8        leave early fee on it?

 9   A.   No.

10   Q.   Okay.

11   A.   There was nothing with any fees on it.  No paperwork

12        with any fees on it besides what I signed when I

13        signed it.

14   Q.   Now, despite all these restrictions and requirements

15        that you've talked about and these fines and these

16        fees and these tip outs --

17   A.   Yeah.  That's right here on the document.  Since you

18        want to bring up so many documents, let's pull up

19        Example 4 that says "Pay of all of your fees before

20        beginning of shift."  That's just like --

21   Q.   Let's take a look at Exhibit 4.  "Pay all of your

22        fees before the beginning of the shift."  That's

23        what you had to pay before you got there, right?

24   A.   That means that you have to pay before the beginning

25        of your shift.  Before you get out there and start

```
 1        charging guys $10 a song for the dances, you pay

 2        your tip out.

 3   Q.   So you paid your --

 4   A.   The house fee --

 5   Q.   Hold on.

 6   A.   -- which is 25.

 7   Q.   You paid your house fee.  Any other fees that you

 8        were required to pay at the --

 9   A.   Any back tip outs.

10   Q.   Hold on.  Hold on.  At the beginning of your shift,

11        any other fees that you were required to pay?

12   A.   Yes.

13   Q.   What other fees were you required to pay --

14   A.   Just your house fee.

15   Q.   -- at the beginning of --

16   A.   This is referring to your house fee which is that

17        $25, unless you are late, and then it's more.  But

18        those are their rules and their dressing room.  So

19        at the end of the day, even if I am an independent

20        contractor, even if I was one, what independent

21        contractor has to pay to work?  What plumber do you

22        hire on Craigslist and then when he gets there, you

23        tell him he has to pay you to work there, and then

24        if he wants to leave, he has to request your

25        permission to leave and then pay a fee to leave?
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 16

```
 1                    MR. RUBIN:  Move to strike as

 2          nonresponsive.

 3    A.    Even if I am an independent contractor, the way they

 4          are doing it is all crazy.

 5    Q.    Let me ask you this:  How many -- do you pay -- do

 6          you live in an apartment?

 7    A.    No.  I live in a house.  I have a house.

 8    Q.    You lived in an apartment when you lived in Atlanta,

 9          right?

10    A.    Yes, I did.

11    Q.    You paid rent?

12    A.    Yes.

13    Q.    You paid that rent in order to use the property?

14    A.    Yes.

15    Q.    Did you drive a car?

16    A.    Yes.

17    Q.    You borrowed money to do that?

18    A.    Yes.

19    Q.    And you knew if you didn't pay it, they would

20          repossess your car?

21    A.    Yes.

22    Q.    So you paid money to use your car?

23    A.    Yes.

24    Q.    You flew into Atlanta for your --

25    A.    Well, but --
```

TIARA PAYNE v. WBY, INC.
Tiara Payne on 06/23/2015                               Page 168

 1   Q.  Just hear me, ma'am.  You flew --

 2   A.  There is no way to justify this.

 3               MR. LUCAS:  You know what?  It's not even

 4       a question.  Let him give a speech.

 5   A.  Well, give me the speech.

 6   Q.  Did you fly in today?

 7   A.  Yes.

 8   Q.  Did you rent a car?

 9   A.  No.

10   Q.  Did you pay for -- did you rent a cab -- take a cab?

11   A.  Yes.

12   Q.  Did you pay for those services?

13   A.  Yes, yes, yes.  I pay for everything that I have

14       acquired.  What is it that we're getting to?

15   Q.  Okay.  So you are at least familiar generally with

16       the concept of paying for the right to use certain

17       people's property?

18   A.  I have to pay to work?  I'm not -- I don't

19       understand that.

20               MR. LUCAS:  Just answer his questions

21       regardless of -- if he asks one, answer it.

22               THE WITNESS:  Okay.

23               MR. RUBIN:  Move to strike as

24       nonresponsive.

25               MR. LUCAS:  It's nonresponsive to a

```
 1        completely irrelevant line of questioning.

 2                    THE WITNESS:  Am I paying to --

 3                    MR. LUCAS:  Listen.  Hold on.  There is no

 4        question pending.  Wait.  Wait.  We'll get through

 5        this eventually.

 6                    THE WITNESS:  I hope so.  God, I'm keeping

 7        the faith.

 8                    MR. LUCAS:  That's enough.  That's enough.

 9        Just answer his questions.

10        BY MR. RUBIN:

11   Q.   When you worked at the company that you worked at,

12        the telemarketing company, were you selling

13        something?

14   A.   No.

15   Q.   What were you doing?

16   A.   I was responding to people who had questions about

17        cars.

18   Q.   Can I ask you a question?  You've been in the adult

19        industry for a number of years?

20   A.   Yes.

21   Q.   And you've, in every one of the jobs that -- or the

22        positions that you've held, you've chosen to work as

23        an independent contractor, including your most

24        recent position?

25   A.   That was the only one that I chose.  Follies didn't
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                                    Page 1 0

```
 1        give me an opportunity to pick what I wanted to do.

 2        I just got hired there, and I operated the way that

 3        they told me to.

 4   Q.   My question to you is, why did you choose to

 5        continue to work as an independent contractor?

 6   A.   Because it was productive.  I was making money.  My

 7        permit was already there.  I'm not going to pay for

 8        another permit to work anywhere else.

 9   Q.   I'm not talking about at Follies.  I mean at

10        Heartbreakers.

11   A.   Because apparently I've been blacklisted in Atlanta,

12        and I can't work in the clubs in Atlanta.

13   Q.   That's not my question.  Why did you choose to work

14        as an independent contractor as opposed to an

15        employee?

16   A.   Because either way you look at it, it's messed up.

17        You can't -- you can't charge me 7.25 -- you can't

18        pay me 7.25 an hour and then take my tips.  How are

19        you going to take my tips?  They don't do that at

20        Starbucks, like you were talking about.  They work

21        at Starbucks, and they're employees.  They get 7.25,

22        but they get to keep their tips.  Why would the club

23        have to take mine?

24   Q.   Do you know whether or not your -- whether or not in

25        -- whether or not they can -- they can even let you
```

```
 1        get tips if they don't want to?  Do you know if a

 2        business could pay 7.25 and prohibit you from

 3        getting tips?

 4   A.   All I know is what I'm telling you here.  I'm

 5        telling you that they charge me these fees.  I want

 6        them back, and that's how it's going.  That's all I

 7        tell you.

 8   Q.   And did you ever --

 9   A.   Every single day when it was required for me to go

10        in Follies and pay this fee, he wanted his money,

11        and I paid all of it.  I paid him exactly what he

12        wanted, and I gave him -- I paid that fee every

13        single day.  Now, I want mine.

14   Q.   So let me ask you this:  Did you ever have an

15        agreement of any -- of any type or sort with the

16        club other than what the club charged you?

17   A.   No.

18   Q.   Okay.  I have one other question.  You wanted to

19        correct some answers to interrogatories?

20             MR. LUCAS:  Yeah.

21             MR. RUBIN:  Let me ask the question.

22   Q.   What particular interrogatory answers did you want

23        to change, correct or amend?

24             MR. LUCAS:  I will help her on that.

25   A.   I know exactly what it is.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1 2

```
 1              MR. LUCAS:  Was it the interrogatories?

 2      Let's go off the record for a second.

 3              (Discussion off the record.)

 4              MR. RUBIN:  What were the interrogatory

 5      answers that you wanted to correct?

 6              MR. LUCAS:  Back on the record?  It's

 7      Interrogatory No. 10 that talks about work hours.

 8              MR. RUBIN:  Let me pull it up here.  What

 9      number are we up to?

10              MR. LUCAS:  14.

11              MR. RUBIN:  I'll mark this as Exhibit 14

12      just so that we can have it marked for the record.

13              MR. LUCAS:  That's fine, uh-huh.

14              (Exhibit 14 marked for identification.)

15      BY MR. RUBIN:

16  Q.  Exhibit 14 are your interrogatory responses?

17              MR. LUCAS:  If you turn to No. 10, in No.

18      10 we describe a day shift and a mid shift, but we

19      failed to add the evening shift.

20              THE WITNESS:  Yes, we did.

21              MR. YOUNGELSON:  8:00 p.m. to 4:00 a.m.

22              MS. NORDSTROM:  It's on there.

23              MR. RUBIN:  Claimant works six days a week

24      for the first six months on the night shift working

25      8:00 p.m. to 4:00 a.m.
```

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1 3

```
 1                    MR. LUCAS:  Yeah, but it says that the

 2        remainder of the time -- it makes it sound like the

 3        remainder of the time she only worked --

 4                    MR. RUBIN:  So would --

 5                    MR. LUCAS:  Days and mid, but she also

 6        worked evenings.  See what I'm saying?

 7                    THE WITNESS:  This is saying for the first

 8        six months I worked eight to four which is right,

 9        but then they need to add that I worked -- that the

10        last year or whatever -- the little under a year

11        that I worked there --

12                    MR. LUCAS:  You worked days, mid and

13        evenings.

14                    THE WITNESS:  Exactly.

15        BY MR. RUBIN:

16   Q.   So you want this to read that you worked essentially

17        from -- just maybe we can just -- make this clear --

18        from 12:00 p.m. to 4:00 a.m.?

19   A.   Yes.

20   Q.   Six days a week?

21   A.   Yes.

22   Q.   Okay.

23                    MR. LUCAS:  And then the other one was --

24                    MR. RUBIN:  Why don't you just -- we've

25        noted it on the record.  At some point just amend
```

**TIARA PAYNE v. WBY, INC.**
**Tiara Payne on 06/23/2015**           Page 1

1   the answer.

2          MR. LUCAS:  We'll amend.  In No. 15 it's

3   very simple.  15 is simply the bar fee for day shift

4   and mid shift.  It says $10 for day shift and 3 for

5   mid.  It's $5 for both.  And we'll amend and make

6   that change as well.

7          MR. RUBIN:  Okay.  Any other changes?

8          MR. LUCAS:  No.  That's it.

9          MR. RUBIN:  All right.  I've got no

10  further questions at this point.

11         MR. LUCAS:  Okay.

12         MR. RUBIN:  Although I will indicate that

13  to the extent that there have been some documents

14  that we requested that you've told us that you will

15  produce at some point that have not been produced,

16  to the extent there are any, we would reserve on

17  those bases as in those points.  But other than

18  that, I have no further questions.

19         (Time noted:  12:03 p.m.)

20

21

22

23

24

25

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1 5

```
1    ATTACH TO THE DEPOSITION OF TIARA PAYNE
     In Re:  PAYNE v. WBY, INC., d/b/a THE FOLLIES
2

3
                        ERRATA SHEET
4
     INSTRUCTIONS:  After reading the transcript of your
5    deposition, note any change or correction to your
     testimony and the reason therefor on this sheet.  DO
6    NOT make any marks or notations on the transcript
     volume itself.  Sign and date this errata sheet
7    (before a Notary Public, if required).

8    PAGE   LINE
     _____  _____     CHANGE:_____
9    _____  _____     REASON:_____
                      CHANGE:_____
10   _____  _____     REASON:_____
                      CHANGE:_____
11   _____  _____     REASON:_____
                      CHANGE:_____
12   _____  _____     REASON:_____
                      CHANGE:_____
13   _____  _____     REASON:_____
                      CHANGE:_____
14   _____  _____     REASON:_____
                      CHANGE:_____
15   _____  _____     REASON:_____
                      CHANGE:_____
16   _____  _____     REASON:_____
                      CHANGE:_____
17   _____  _____     REASON:_____
                      CHANGE:_____
18                    REASON:_____

19          I have read the foregoing transcript of my
     deposition and except for any corrections or changes
20   noted above, I hereby subscribe to the transcript as
     an accurate record of the statements made by me.

21

22          _____
23          Tiara Payne  Date

24

25
```

1

2

3

4

5    C E R T I F I C A T E

6

7

8    GEORGIA:

9

10        I hereby certify that the foregoing deposition

11   was reported, as stated in the caption, and the

12   questions and answers thereto were reduced to the

13   written page under my direction; that the foregoing

14   pages 1 through 177 represent a true and correct

15   transcript of the evidence given.  I further certify

16   that I am not in any way financially interested in

17   the result of said case.

18        Pursuant to the Rules and Regulations of the

19   Board of Court Reporting of the Judicial Council of

20   Georgia, I make the following disclosure:

21        I am a Georgia Certified Court Reporter.  I am

22   here as an independent contractor for Huseby,

23   Incorporated.

24        I was contacted by the offices of Huseby,

25   Incorporated to provide court reporting services for

**TIARA PAYNE v. WBY, INC.**
Tiara Payne on 06/23/2015                                    Page 1

1   this deposition.  I will not be taking this

2   deposition under any contract that is prohibited by

3   O.C.G.A. 15-14-37 (a) or (b).

4        I have no written contract to provide reporting

5   services with any party to the case, any counsel in

6   the case, or any reporter or reporting agency from

7   whom a referral might have been made to cover this

8   deposition.  I will charge my usual and customary

9   rates to all parties in the case.

10                       This 6th day of July, 2015.

11

12

13

14

15   _____

16        Sandra Kwiecien

17        Certified Court Reporter

18        CRR-6012-7323-6088-4224

19        License Valid Until

20        April 1, 2016

21

22

23

24

25